# EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT FOR THE

## EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

MAY – 8 2012

UNITED STATES OF AMERICA,                    )

            v.                                      )

MELCY YALEXSY GUEVARA-BARRERA,               )
also known as "Pedro" and "Primo,"           )
                                             )
SAMUEL BENITEZ-PINEDA,                        )
also known as "Wilfredo Benitez," "Roque,"   )
and "Chiripa,"                               )
                                             )
JOSE FREDY DELCID,                           )
also known as "Oscar Salgado," "Oscar,"      )
Franklin," "Chami," and "Matador,"           )
                                             )
CONCEPCION BENITEZ-PINEDA,                    )
also known as "Conchi" and "Concha,"         )
                                             )
LINDOR DELIS MARTINEZ-GUEVARA,               )
also known as "Lindo" and "Genero,"          )
                                             )
HECTOR MAURICIO AMAYA,                        )
also known as "Conejo" and "Kaubil,"         )
                                             )
NELSON AMAYA ESCALON,                         )
also known as "Choco" and "Choquito,"        )
                                             )
GENIS JHESSON AMAYA-PENA                      )
also known as "Jenis Yexon Amaya-Pena,"      )
"Flaco," and "Juanchope,"                    )
                                             )
MARVIN EDUARDO ESCOBAR BARRIOS,              )
also known as "Catracho" and "Garrobo,"      )
                                             )
WILSON RENIERY GUEVARA,                       )
also known as "Wilsson R. Guevara,"          )
                                             )
JOEL LOPEZ,                                   )

UNDER SEAL

Criminal Case No. 1:12-mj-00310



ANNELO ARGUETA REYES,
also known as "Nelo,"

GLORIA ELENA OLIVIA CASTRO,

JOAQUIN AVILA-RODRIGUEZ,
also known as "Pollo,"

MARIO BENITEZ-PINEDA,
also known as "Chaparro" and "Cuzuco,"

SANTOS EFRAIN CARBAJAL BENITES,

JOSE NELSON JURADO MEJIA,
also known as "Chino,"

DOMINGO GOMEZ-RIVERA,
also known as "Flaco,"

ANGEL ZELAYA LIZAMA,
also known as "El Diablo,"

MARIO NOEL MEDINA-AGUILAR,

JOSE DELORES VANEGAS,
also known as "Chivito,"

ISAIAS ABREGO-MANCIA,

RUDY HUMBERTO TABARO,
also known as "Rudy Humberto Tabara" and
"Colocho,"

EDWIN ESPANA MORALES,

JOSE LORENZO SARAVIA,
also known as "Jose Saravia-Lozano,"

FNU LNU,
also known as "Alex" and "Gordito,"

JULIO GIOVANNI NOLASCO,
also known as "Puma,"

MARIA FLORINDA BENITEZ-PINEDA,
also known as "Flor" and "Loli,"

2

JOSE MARIA BENITES-PINEDA,                    )
                                              )
JOSE ENRIQUE FUNEZ,                           )          MAY - 8 2012
also known as "Jose Enrique Funz-Garay,"      )
"Jose Enrique Funes-Garay," and "Rick,"       )
                                              )
MARTIN JUAREZ-LOPEZ, and                      )
                                              )          UNDER SEAL
ELMER ADILIO ANZORA-MIRANDA,                  )
                                              )
          Defendants.                         )

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR
## CRIMINAL COMPLAINT AND ARREST WARRANTS

I, Glenn Mai, Special Agent of the Federal Bureau of Investigation ("FBI"), Washington

(D.C.) Field Office, Northern Virginia Resident Agency, being duly sworn, depose and state the

following:

### INTRODUCTION

1.      This affidavit is submitted in support of an application for a criminal complaint

and arrest warrants for the following people: Melcy Yalexsy Guevara-BARRERA (also known

as "Pedro" and "Primo"); SAMUEL Benitez-Pineda (also known as "Wilfredo Benitez,"

"Roque," and "Chiripa"); Jose Fredy DELCID (also known as "Oscar Salgado," "Oscar,"

Franklin," "Chami," and "Matador"); CONCEPCION Benitez-Pineda (also known as "Conchi"

and "Concha"); LINDOR Delis Martinez-Guevara (also known as "Lindo" and "Genero");

Hector MAURICIO Amaya (also known as "Conejo" and "Kaubil"); NELSON Amaya Escalon

(also known as "Choco" and "Choquito"); Genis Jhesson Amaya-PENA (also known as "Jenis

Yexon Amaya-Pena," "Flaco," and "Juanchope"); Marvin Eduardo Escobar BARRIOS (also

known as "Catracho" and "Garrobo"); WILSON Reniery Guevara (also known as "Wilsson R.

Guevara"); Joel LOPEZ; Annelo Argueta REYES (also known as "Nelo"); GLORIA Elena

Olivia Castro; Joaquin AVILA-Rodriguez (also known as "Pollo"); MARIO Benitez-Pineda

(also known as "Chaparro" and "Cuzuco"); SANTOS Efrain Carbajal Benites; Jose Nelson JURADO Mejia (also known as "Chino"); Domingo GOMEZ-RIVERA (also known as "Flaco"); Angel Zelaya LIZAMA (also known as "El Diablo"); Mario NOEL Medina-Aguilar; Jose Delores VANEGAS (also known as "Chivito"); Isaias ABREGO-MANCIA; RUDY Humberto Tabaro (also known as "Rudy Humberto Tabara" and "Colocho"); EDWIN Espana Morales; Jose Lorenzo SARAVIA (also known as "Jose Saravia-Lozano"); FNU LNU (also known as "Alex" and "GORDITO"); JULIO Giovanni Nolasco (also known as "Puma"); Maria FLORINDA Benitez-Pineda (also known as "Flor" and "Loli"); Jose MARIA Benites-Pineda; Jose ENRIQUE Funez (also known as "Jose Enrique Funz-Garay," "Jose Enrique Funes-Garay," and "Rick"); Martin JUAREZ-LOPEZ; and ELMER Adilio Anzora-Miranda.

2.      Each person will be referred to individually by the portion of their name that is in all capitalized letters in the paragraph above, except for FNU LNU, who will be referred to by his nickname, GORDITO. They will collectively be referred to as the defendants.

3.      Your affiant submits that the evidence described in this affidavit establishes probable cause to believe that between in and around 2006 and the present date, within the Eastern District of Virginia and elsewhere, the defendants did unlawfully, knowingly, and intentionally combine, conspire, confederate, and agree with other persons, both known and unknown, to unlawfully, knowingly, and intentionally distribute 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

4.      Additionally, your affiant submits that the evidence described in this affidavit establishes that, in the course of the conspiracy, certain of the defendants have committed additional criminal offenses, to include: importation of cocaine, and conspiracy and attempt to do

the same, in violation of Title 21, United States Code, Sections 952(a), 960(a)(1), and 963; conspiracy to distribute a mixture and substance containing a detectable amount of cocaine base (commonly known as "crack cocaine"), a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 846; money laundering, and conspiracy and attempt to do the same, in violation of Title 18, United States Code Section 1956; use of or carrying a firearm during and in relation to any crime of violence or drug trafficking crime, or possession of a firearm in furtherance of any such crime, in violation of Title 18, United States Code, Section 924(c); possession of a firearm by an illegal alien, in violation of Title 18, United States Code, Section 922(g)(5)(A); unlawful transfer of a firearm from Virginia to a person residing outside of Virginia, in violation of Title 18 United States Code, Section 922(a)(5); and illegal use of a communication facility, and conspiracy and attempt to do the same, in violation of Title 21, United States Code, Sections 843(b) and 846.

5.      All information in this affidavit is either personally known to me, has been related to me by other law enforcement officers and/or confidential sources, or has been related to me by records and documents gathered during this investigation, as noted. This affidavit contains information necessary to support probable cause for this application. It is not intended to include each and every fact and matter observed by me or known to the government. The inferences and conclusions I draw from the evidence that are included in this affidavit are what I believe based on my training, experience, and knowledge of the investigation.

## AGENT BACKGROUND

6.      I am an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to

conduct investigations of, and to make arrests for, offenses enumerated in Section 2516 of Title 18, United States Code.

7.     I am a Special Agent of the FBI and have been so employed since September 18, 1995. I have received extensive training in criminal law enforcement from the FBI Academy in Quantico, Virginia, including training in drug identification, drug distribution methods and law enforcement techniques related to drug trafficking. As a Special Agent with the FBI, I have applied for and obtained arrest and search warrants and have participated in the investigation of narcotics-related offenses resulting in arrests and convictions. As a narcotics investigator, I have interviewed over a hundred individuals involved in drug trafficking and have obtained information from them regarding the acquisition, sale importation, manufacture, and distribution of controlled substances. In these interviews, I have also obtained information regarding the means through which individuals involved in drug trafficking launder money and hide the assets acquired through drug distribution. Though my training and experience, I am familiar with the actions, habits, traits, methods and terminology utilized by the traffickers and abusers of controlled dangerous substances.

8.     Through my training, experience, and conversations with other experienced investigators and law enforcement personnel, I have become familiar with the methods used by drug traffickers to manufacture, smuggle, safeguard, and distribute narcotics, and to collect and launder trafficking-derived proceeds. I am further aware of the methods employed by major narcotics organizations and their use of telephones and other devices to conduct their criminal enterprises; including the use of fictitious subscriber names to conceal their identities and thwart investigation of their illegal activities.

## OVERVIEW

9.      This years-long conspiracy involves the importation of wholesale quantities of cocaine from Honduras that is sold for profit in the United States through a network of Honduran immigrants, many of whom live within the Eastern District of Virginia. Several people in Honduras supply the conspiracy. They do so primarily by hiding the cocaine within seemingly innocuous items, including shoes and decorative wooden frames of various shapes and sizes, which paid couriers then take in their luggage on flights into the United States. A courier can smuggle up to several kilograms of the drug in one trip. Proceeds generated from the sale of the cocaine are often sent back to Honduras via wire transfer. Some members of the conspiracy possess guns and have spoken about committing violence. Many of the conspirators living in the United States are illegal aliens.

10.      Below are pictures of some wooden frames containing hidden cocaine that law enforcement agents seized during the course of the investigation:[1]

 

---

[1] In previous affidavits and documents connected with this investigation, agents have used the term "plaques" to describe these items. This affidavit refers to them as "frames" because many of the co-conspirators have been heard to use the Spanish equivalent of that term when discussing these items.

11.    The FBI and other local, state, and federal law enforcement agencies have used many methods to investigate the conspiracy. These include interviews of confidential sources[2] and defendants, consensually monitored phone calls, physical surveillance, search warrants, border searches, and the examination of wire transfers and other financial instruments. Controlled purchases of cocaine have been made from several defendants. Dozens of wooden frames have been seized, as have several pairs of shoes, that had cocaine secreted inside. To date, agents have collected in excess of five kilograms of suspected cocaine.[3]

12.    Additionally, United States District Judges Liam O'Grady and Leonie M. Brinkema, of the United States District Court for the Eastern District of Virginia, issued Orders authorizing law enforcement to intercept certain communications over six cellular telephones used by certain defendants. Thousands of intercepted communications have been pertinent to this investigation. Interception of wire and electronic communications over the following telephones occurred over the following time periods: Target Telephone #1, used by BARRERA, from February 2, 2012, to April 26, 2012; Target Telephone #2, used by SAMUEL, began on February 17, 2012, and is ongoing; Target Telephone #3, used by DELCID, from March 1, 2012,

---

[2] This affidavit discusses several confidential sources, whose information law enforcement has found to be reliable, credible, and often corroborated by other sources or events. Each confidential source is referred to in the masculine gender, regardless of their true gender, and they are labeled by "CS" and a corresponding number. The numbers do not carry any significance and do not appear sequentially in this affidavit; they were assigned in previous affidavits submitted in the course of the investigation.

[3] The controlled purchases and seizures referenced within this affidavit were of substances that, based on the investigation and training and experience of law enforcement, are suspected to be cocaine. Though some field tests were performed, because agents are awaiting the results of analyses conducted of all the substances by forensic chemists with the Drug Enforcement Administration and other agencies, all references within this affidavit to cocaine in law enforcement's possession should be read as "suspected cocaine." Additionally, the stated quantities of the suspected cocaine are based on estimates made by law enforcement in and around the time of the respective seizures of those substances and therefore are not final and are subject to revision by the forensic chemists.

to April 26, 2012; Target Telephone #4, used by CONCEPCION, began on April 13, 2012, and is ongoing; Target Telephone #5, used by BARRERA, began on April 30, 2012, and is ongoing. Interception of wire communications over Target Telephone #6, used by DELCID, began on April 30, 2012, and is ongoing.

13.    During the course of intercepting communications over these telephones, all of the defendants who used their respective telephone(s) identified themselves by their first and/or last name, and/or were identified as such by a person with whom they were communicating. Furthermore, Target Telephone #4, which CONCEPCION uses, is registered in her name, as is Target Telephone #2, which is used by SAMUEL. The investigation has revealed that CONCEPCION and SAMUEL are in a relationship and live together. Finally, physical surveillance and other investigative techniques, in conjunction with the intercepted communications, confirmed the identities of the defendants using their respective telephone(s).

14.    Wherever in this affidavit I discuss information resulting from physical surveillance conducted in this investigation, that information, except where otherwise indicated, does not set forth my own personal observations, but rather that which has been provided directly or indirectly to me through other law enforcement officers who made such observations. Additionally, unless otherwise noted, wherever in this affidavit I assert that a statement was made by an individual, such statement is described in substance herein, and is not intended to be a verbatim recitation of such statement. Furthermore, any statements excerpted from recorded conversations, included those that are quoted, are subject to further revision for clarification and/or accuracy. The summaries for intercepted communications in this affidavit are based on preliminary summary translations prepared by wiretap monitors/translators. To the extent the quotations are used in the descriptions below, the quoted segments are based on line sheets and

reviews of recordings, and not final or certified transcripts. In addition, all dates and times are approximate and based on the monitoring equipment at the time the communication was intercepted. Not all relevant intercepted communications are described and not all relevant portions of mentioned communications have been described. Unless otherwise noted, the intercepted communications occurred in Spanish and were translated into English by the wiretap monitor.

15.     Discussions of particular intercepted communications include a reference to the Target Telephone on which the communications was intercepted, indicated by "TT" followed by the number of the telephone, as well as the unique session number assigned to the communication by the monitoring equipment. For instance, the first intercepted communication over Target Telephone #1 would be referenced as "TT1 #1." With quotations of communications, brackets are used for the following purposes: The use of "[UI]" indicates that the word or words used were unintelligible and thus could not be translated, and the use of "[OV]" indicates that the parties to a call were talking over one another and thus some words could not be heard. A phonetic spelling of a word that could not be translated is indicated with "[PH]." Brackets are also used to protect the identifying information of persons not named as defendants, as well as to provide certain contextual information, *e.g.*, explain which defendant is being referenced when a nickname is used by another co-conspirator to refer to that defendant.

## THE CONSPIRACY

16.     This portion of the affidavit discusses some of the evidence collected in the course of the investigation that explains the conspiracy and how the defendants and other co-conspirators fit within it. It is divided into seven sections. The first deals with how the conspiracy was uncovered, followed by an overview of the known background of the conspiracy. The third

section discusses sources of supply in Honduras, while the fourth covers the topic of couriers and details some of the recent instances in which they are known to have smuggled, or attempted to smuggle, cocaine into the United States. In the fifth section, I discuss the distribution of cocaine within the United States, and in the sixth explain how the proceeds from that distribution make it back to the sources in Honduras. Finally, the seventh section details evidence of co-conspirators possessing firearms and conspiring to commit violence.

## I.   CONSPIRACY UNCOVERED

17.     The existence of this conspiracy was first uncovered through a series of controlled purchases of cocaine and search warrants conducted by the Fairfax County Police Department ("FCPD") that are described below.

### A.   Controlled purchases from Lindor and search warrant at his residence on August 30, 2011

18.     In July 2011, CS #1 approached FCPD officers due to his concern about LINDOR selling cocaine in CS#1's neighborhood. Between July and August of 2011, at the direction and under the supervision of FCPD, CS #1 conducted two controlled purchases of cocaine from LINDOR in Fairfax County, Virginia, which is within the Eastern District of Virginia. CS #1 did not have pending charges and received no compensation for providing information about LINDOR or cooperating with law enforcement. Based on these controlled purchases, FCPD detectives obtained a warrant to search a residence in Fairfax County where LINDOR was known to reside. The detectives executed the warrant on August 30, 2011, and seized approximately 6.5 ounces of cocaine and $14,829 of U.S. currency. LINDOR was present while the residence was searched. The detectives arrested him for possessing the cocaine.

19.     During a post-*Miranda* interview, LINDOR admitted to selling cocaine. He said all the cocaine in his residence belonged to his supplier, who LINDOR would meet every four

days to provide with proceeds from the sale of cocaine and obtain more of the drug to sell. LINDOR said his supplier was a man who goes by the nickname "Moio" or "Mayo." Law enforcement agents have not been able to identify any person who goes by this nickname. I believe that this person does not exist and LINDOR was trying to minimize his role in the conspiracy and protect his co-conspirators.

20.     LINDOR was released on bond pending resolution of his case in Fairfax County. As described in more detail below, a search of a safe seized during a consent search of BARRERA's residence on October 21, 2011, revealed, among other items, a $10,000 collateral bond receipt dated September 2, 2011, on which BARRERA was listed as the recipient and LINDOR was listed as the defendant, indicating BARRERA paid for LINDOR's bond.

**B.     Controlled purchase from Barrera on October 21, 2011**

21.     In September 2011, CS #2 was arrested by FCPD for distributing cocaine. CS #2 is not a convicted felon, has no arrests or convictions for crimes of deception, and has provided information that has been independently corroborated by law enforcement in the past. CS #2 cooperated with law enforcement for consideration in his felony drug charges in Fairfax County. As part of his cooperation, CS #2 told law enforcement that BARRERA was the source of supply for the cocaine he was arrested for distributing. CS #2 met BARRERA a couple months prior to his arrest at a Jiffy Lube in Fairfax County, Virginia. CS #2 purchased half an ounce of cocaine from BARRERA at that time, which CS #2 later distributed, and CS #2 continued to buy cocaine from BARRERA until he was arrested. CS #2 said BARRERA also distributed cocaine to employees of the Jiffy Lube.

22.     On October 21, 2011, FCPD used CS #2 to arrange for an undercover officer ("UC #1")[4] to purchase cocaine from BARRERA in Fairfax County. At the direction and under the supervision of FCPD officers, CS #2 conducted several monitored telephone calls with BARRERA to arrange for UC #1's purchase of seven grams of cocaine for $300. UC #1 and CS #2 waited at the predetermined location for BARRERA and observed BARRERA's vehicle arrive in the parking lot. BARRERA was driving and there was another man ("UCC #1")[5] in the front passenger seat. UCC #1 got out of the vehicle and met with UC #1 and CS #2. UCC #1 handed UC #1 two bags of cocaine, and UC #1 and CS #2 gave UCC #1 the agreed upon $300. After the sale, UCC #1 got back into BARRERA's vehicle. FCPD officers then stopped the vehicle and placed both BARRERA and UCC #1 under arrest.

23.     FCPD officers conducted searches of BARRERA and UCC #1 incident to their arrests, as well as a search of BARRERA's vehicle. BARRERA had on him, among other items, a cellular telephone, four bags of cocaine inside an Altoids container, and $1,054 of U.S. currency. In UCC #1's possession were, among other items, two bags of cocaine. When UCC #1 was asked if he had any drugs on his person, he said that he had cocaine in his pocket and that he got it from BARRERA. Found in BARRERA's vehicle were $400 of U.S. currency, which included the $300 used by UC #1 and CS #2 to purchase the cocaine, along with twenty small bindle baggies containing cocaine and dozens of empty bindle baggies and other materials that are used to package and distribute controlled substances.

---

[4] Undercover officers are referred to throughout this affidavit by "UC" and a corresponding number. The numbers assigned each undercover officer do not carry any significance and do not necessarily appear sequentially in this affidavit.

[5] Uncharged co-conspirators are referred to throughout this affidavit by "UCC" and a corresponding number. The numbers assigned each uncharged co-conspirator do not carry any significance, do not represent their respective position within the conspiracy, and do not necessarily appear sequentially in this affidavit.

24.    During a post-*Miranda* interview of BARRERA, he said that he drove UCC #1 to a drug deal and explained that the two of them picked up a half ounce of cocaine in Baltimore the day prior for $450 that they split. BARRERA said he had cocaine in his pocket and that he sold it as he got it.

25.    The charges FCPD brought against BARRERA and UCC #1 are pending. They both are out on bond.

### C.    Search warrant at Barrera's residence on October 21, 2011

26.    Later on October 21, 2011, FCPD detectives conducted a "knock and talk" at a home in Fairfax County where BARRERA was believed to reside with his girlfriend. BARRERA's girlfriend answered the door, and she invited the detectives in and consented to a search of the home. During the search, PENA was found in one of the bedrooms. Further investigation revealed PENA rented the room from BARRERA's girlfriend.

27.    PENA gave the FCPD detectives consent to search his bedroom. An FCPD canine and handler certified by the United States Police Canine Association and trained to alert to the odor of marijuana, hashish, cocaine, heroin, ecstasy, and methamphetamine conducted a search of the room and alerted in the bedroom. Hanging on the wall was a baseball hat, inside of which was a small digital scale that is of the kind used to weigh controlled substances for distribution purposes. Inside a liquid detergent bottle were several bindle baggies containing cocaine, along with an Altoids container full of dozens of empty bindle baggies. In a dresser drawer, $1,160 of U.S. currency was found, along with a small tin container with numerous empty bindle baggies. An identification card with PENA's name and photograph was found in the same drawer as the currency and packaging material. PENA consented to a search of his person as well, which revealed two cellular telephones, additional empty bindle baggies, and $1,843 of U.S. currency.

28. The FCPD detectives also found a locked safe in a hallway closet. The narcotics canine alerted and aggressively responded to the safe, so the FCPD detectives seized it as evidence. A Fairfax County Magistrate Judge issued a search warrant for it on October 27, 2011.

29. When the search warrant was executed, found inside were, among other items, numerous records and documents in the name of BARRERA, to include credit cards and Virginia driver's licenses; the $10,000 collateral bond receipt for LINDOR discussed above; two cellular telephones; approximately $2,900 of U.S. currency; and eight wooden frames with decorative Honduras-related labeling on them.

30. Cocaine was secreted inside each of the wooden frames, between which there was a total of approximately 18.4 ounces of the drug. Based on my training and experience, I know that the secreting of drugs within seemingly innocuous items, like the wooden frames, is a common tactic of drug trafficking organizations that smuggle drugs into the United States from foreign countries. This tactic is used to avoid detection of the drugs by law enforcement officers as couriers bring the drugs across the United States border. That BARRERA possessed these unopened frames suggested that he was obtaining them directly from sources of supply outside of the United States.

**D.      Controlled purchase from Lindor on November 16, 2011**

31. In November 2011, CS #3 was arrested by FCPD detectives for possession of cocaine. CS #3 is not a convicted felon, has no arrests or convictions for crimes of deception, and has provided information that has been independently corroborated by law enforcement in the past. CS #3 cooperated with law enforcement for consideration in his felony drug charges in Fairfax County. As part of his cooperation, and under the direction and supervision of FCPD, CS

#3 called LINDOR on or about November 16, 2011, and arranged to purchase four ounces of cocaine. When LINDOR arrived with the cocaine, he was arrested.

32.     At that time, FCPD detectives asked LINDOR if he would consent to a search of the bedroom of his residence. He gave consent, and law enforcement seized from his bedroom a .45-caliber Sig Sauer handgun, $9,500 of U.S. currency, a known cutting agent and other drug paraphernalia associated with the distribution of cocaine, as well as eleven wooden frames with decorative Honduras-related labeling on them similar to those found inside the safe taken from BARRERA's residence. Secreted inside the wooden frames was a total of approximately 29 ounces of cocaine. Like with BARRERA, LINDOR's possession of these unopened frames suggested that he too was obtaining them directly from sources of supply outside of the United States.

33.     During a post-*Miranda* interview of LINDOR, he admitted that the four ounces of cocaine he brought to the controlled purchase were his, and said he intended to sell them for $4,000. LINDOR said he stood to make $400 off the sale and would owe the remaining $3,600 to his supplier, who he again named as "Moio" or "Mayo." LINDOR said he had been selling cocaine for his supplier for approximately four months, and that on November 15, 2011, his supplier brought to LINDOR's residence a firearm, a large quantity of U.S. currency, and eleven wooden frames containing cocaine. LINDOR estimated that the frames, which he said were in his bedroom, contained between 15 to 16 ounces of cocaine. He said he was only holding the frames for his supplier, that is, he was not intending to sell the cocaine within them.

34.     The charges FCPD brought against LINDOR are pending and he has been incarcerated since his arrest. He has used the jail telephones to stay in touch with co-

16

conspirators. For instance, he has often been intercepted speaking with SAMUEL, who often conducts a three-way call to allow LINDOR to speak with individuals in Honduras.

35.    One such call occurred on April 18, 2012, when SAMUEL brought into the conversation an unknown female in Honduras. LINDOR spoke with this woman about money that SAMUEL had sent to Honduras and about sending cocaine to the United States. During the call LINDOR said, "Did you take out the money that Samuel sent?" She said, "Yes, just now. What he sent me about eight days ago, and he sent the other one today. . . . I will pay [name of Honduran source of supply] with what I took out today, I mean [name of another Honduran source of supply]." At one point LINDOR asked, "Did you all do the work for the other six?" She said, "Oh, yes." LINDOR replied, "That is good. [UI] that I said to wait until [he] pays off to continue working. . . . Because [UI] told me that [he] owes him a lot." LINDOR said, "[UI] to send at least three." She said, "What I say is that if Samuelito likes it, then there is no problem. The problem would be if he does not like it." Later in the conversation, LINDOR referenced a suspected courier in Honduras who may be traveling to the United States. LINDOR said, "I will talk to that man for the next trip and I will tell him [UI] work for him." She replied, "You know what I don't like, that he does not send the money, a lot of money or, because he owes a lot right now." LINDOR asked who to whom the subject owed money, and she gave the name of a known source of supply in Honduras. (TT2 #12,533).

### E.    Controlled purchases from Barrios and Barrera in January 2012

36.    In November 2011, CS #4 met BARRIOS at a restaurant in Fairfax County. BARRIOS, who went by the nickname "Catracho," told CS #4 his cousin could sell CS #4 kilogram quantities of cocaine, and gave CS #4 his (BARRIOS's) cellular telephone number so

that they could coordinate cocaine transactions. CS #4 provided this information to law enforcement and subsequently identified a photograph of BARRIOS as being "Catracho."

37.     CS #4 is a paid confidential human source with the FBI who has been providing reliable information to the FBI since February 2009. CS #4 has a basis of knowledge with drug trafficking, and at the direction and supervision of law enforcement has conducted the purchase of ounce quantities to kilogram quantities of cocaine from subjects involved in drug trafficking. CS #4 is not a convicted felon, has no arrests or convictions for crimes of deception, and has provided information that has been independently corroborated by law enforcement in the past. CS #4 is cooperating with law enforcement for financial compensation. CS #4 has been paid approximately $10,000 for information CS #4 has provided to law enforcement since CS #4 became a confidential human source with the FBI. CS #4 has been compensated with a payment of $300.00 for a controlled purchase conducted by CS #4 in relation to this investigation.

38.     From January 3, 2012, to January 12, 2012, CS #4 conducted numerous consensually recorded telephone calls with BARRIOS. During the calls, the two discussed CS #4 purchasing cocaine from BARRIOS, and BARRIOS commonly referred to his cousin as the source for the cocaine. BARRIOS said that his cousin had pending drug charges with FCPD and so was nervous to meet CS #4.

39.     As discussed above, the charges brought by FCPD against BARRERA on October 21, 2011, are pending, and a review of toll records revealed BARRIOS's cellular telephone had frequent contact with a cellular telephone number known to be used by BARRERA. These facts suggested that BARRERA could be BARRIOS's cocaine supplier, and investigators proceeded with a plan to make controlled purchases of cocaine from BARRIOS in an effort to determine if that was true. Two controlled purchases were conducted on January 10 and 13, 2012.

40.     On January 10, 2012, at approximately 5:30 p.m., at the direction and under the supervision and surveillance of law enforcement, CS #4 purchased one ounce of cocaine from BARRIOS for $1,000 in Fairfax County. The transaction was audio recorded. BARRIOS arrived at the deal location in a green Subaru Legacy. Two other occupants were observed sitting in the vehicle, but they never got out during the deal. According to CS #4, during the transaction BARRIOS told CS #4 that his cousin was in the car, but since it was their first meeting BARRIOS's cousin was nervous to deal with CS #4 directly due to his pending drug charges. Surveillance units did not have a vantage point from which they could see and identify the two other people in the vehicle with BARRIOS.

41.     At the direction and under the supervision and surveillance of law enforcement, on January 13, 2012, at approximately 4:20 p.m., CS #4 met with BARRIOS at a parking lot in Fairfax County for the purpose of purchasing one ounce of cocaine. CS #4 had on his person audio and video recording equipment that recorded the ensuing events, which law enforcement officers also surveilled.

42.     After arriving at the deal location, CS #4 got into BARRIOS's Ford truck, which was registered in BARRIOS's name. Over the course of the next approximately thirty minutes, BARRIOS had several telephone conversations with a person using Target Telephone #1 that CS #4 later told law enforcement he overheard. BARRIOS identified the user of Target Telephone #1 as his cousin and supplier of cocaine, and he was speaking with his cousin in order to arrange meeting him so that they could sell cocaine to CS #4. BARRIOS told CS #4 that his cousin could supply CS #4 with whatever quantity of cocaine he needed, and his cousin got the cocaine from Manassas, Virginia.

43.     Because BARRIOS and his cousin became concerned that law enforcement might be surveiling them, they decided to meet at a different location in Fairfax County to conduct the deal. BARRIOS told his cousin to bring all the cocaine because CS #4 had the money in hand for the purchase. Before BARRIOS and CS #4 left, a blue Mazda minivan registered to BARRERA was observed by law enforcement driving near them.

44.     At approximately 5:00 p.m., BARRIOS and CS #4 drove in BARRIOS's truck to the new deal location. It took about five minutes for them to arrive. At approximately 5:06 p.m., BARRERA's minivan pulled up next to BARRIOS's truck. The driver of the minivan was the only person inside the vehicle, and he got out of his own vehicle and into BARRIOS's. The man then sold one ounce of cocaine to CS #4 for $1,000. CS #4 immediately exited BARRIOS's truck and met with law enforcement.

45.     CS #4 subsequently identified a photograph of BARRERA as BARRIOS's cousin, the man who sold him the ounce of cocaine in BARRIOS's truck. Law enforcement officers involved in surveillance of the controlled purchase were also able to identify BARRERA as the driver of minivan.

F.      **Search of cellular telephones reveals link to Honduran sources of supply**

46.     On January 4, 2012, United States Magistrate Judge Theresa C. Buchanan of the Eastern District of Virginia issued search warrants authorizing the search and seizure of the contents of the cellular telephones seized from BARRERA and PENA at the time of their arrests on October 21, 2011, as well as the cellular telephones inside the safe in BARRERA's residence.

47.     The search of the cellular telephone seized from BARRERA's person revealed its telephone number matched a phone number written on the back of one of the frames with cocaine found in the safe. Furthermore, text messages dated October 21, 2011, found within the

telephone revealed communication between BARRERA and two subjects with Honduras telephone numbers who are living in Honduras and will be referred to, respectively, as UCC #2 and UCC #3. These text messages, as well as additional evidence, indicated that UCC #2 and UCC #3 were Honduras-based sources of supply for cocaine, and that BARRERA was receiving cocaine directly from them.

### i.   Text messages with UCC #2

48.   UCC #2 sent BARRERA a text message that read, "Everything is ok brother the alcitqones [actual Spanish word used] arrived ok." BARRERA replied, "Yes everything good." UCC #2 then sent BARRERA two text messages that read, respectively, "I'm not making it up," and "For November I'm thinking of sending you another parcel with the same traveler if that is what you want."

49.   These text messages appeared to discuss the importation of cocaine into the United States from Honduras. The first two messages appeared to refer to cocaine that UCC #2 had already imported into the United States for BARRERA and other co-conspirators to distribute, while the last message appeared to concern a plan to import more cocaine. I have learned during the course of this investigation that co-conspirators use the Spanish equivalent of the word "traveler" to refer to a courier who flies cocaine from Honduras into the United States.

50.   The conclusion that UCC #2 was involved in supplying BARRERA and others with cocaine was further supported by subpoenaed Western Union records that showed between December of 2011 and January 5, 2012, UCC #2 received three wire transfers in Honduras totaling $2,000 that originated in Falls Church, Virginia. Three different people were listed as the senders of the respective wire transfers, and it is unknown at this time whether those people are involved in the organization and/or drug trafficking. However, I know from their training and

experience that drug traffickers in the United States often use Western Union to send drug proceeds to sources of supply living in other countries, both to pay the sources back for drugs already provided and to purchase more drugs for future distribution, and that in order to avoid detection by law enforcement they will sometimes use unwitting associates to make the wire transfers.

### ii.    Text messages with UCC #3

51.    There were two text messages from BARRERA to UCC #3, which were, "[He, she, I] was running behind because of the dental floss, that was a dog that helped you, jiu jiu jiu jiu," and "Call me 911." These messages appeared to be coded conversation related to drug trafficking, which conclusion was supported by UCC #3's criminal history and records from Western Union.

52.    UCC #3 is a convicted cocaine smuggler. On October 27, 2006, agents with Immigration and Customs Enforcement ("ICE") arrested a woman at Washington Dulles International Airport ("Dulles Airport"), within the Eastern District of Virginia, after she arrived on a flight from Honduras with packages containing between them twenty-five pairs of cowboy boots, secreted inside of which was a total of over two kilograms of cocaine. The agents did a controlled delivery of some of the cowboy boots to one of the intended recipients, who turned out to be UCC #3. He was living in Fairfax County.

53.    After his arrest, UCC #3 admitted that he knew the boots contained cocaine, and said he had been asked by two other persons to pick up the boots for them from the courier, in exchange for which he was to be paid money. UCC #3 said that one of those people lived in North Carolina, and that a month prior that person had paid him $3,000 for picking up a similar package from the same courier. UCC #3 said the other person for whom he was picking up pairs

of boots worked at a Vietnamese restaurant in the Eden Center in Falls Church, Virginia, within the Eastern District of Virginia. UCC #3 said he was supposed to deliver the boots to that restaurant, and so agents conducted a controlled delivery. The person who accepted the boots, UCC #4, was arrested and charged together with UCC #3 in the United States District Court for the Eastern District of Virginia.

54.     UCC #3 and UCC #4 pleaded guilty in the United States District Court for the Eastern District of Virginia to conspiracy to distribute 500 grams or more of cocaine. They were both sentenced to imprisonment terms of 37 months. They were released from the Bureau of Prisons in 2009 and then deported to Honduras.[6]

55.     The subpoenaed records provided by Western Union revealed that UCC #3 was the recipient in Honduras of approximately $83,500 in wire transfers in 2010.[7] The wire transfers generally originated from the Eastern District of Virginia, specifically Northern Virginia, and several of the senders of the wire transfers were identified as BARRERA and PENA. The records showed that BARRERA himself sent approximately 130 wire transfers, worth approximately $37,900, to different subjects in Honduras, to include UCC #3, beginning in 2005 and continuing through December 2011.

G.     **Title III investigation**

56.     In light of BARRERA's drug trafficking activities and his connection with Honduran sources of supply, the FBI sought and obtained on February 2, 2012, Court authorization to intercept wire and electronic communications over Target Telephone #1 in order

---

[6] The first names of UCC #2 and UCC #4 are the same. The last name provided by UCC #4 during the course of his prosecution is different than the known last name for UCC #2. Evidence uncovered during this investigation, however, suggests that they may be the same person.

[7] Western Union did not produce any records from 2011 and 2012 that showed UCC #3 receiving wire transfers.

to uncover fully the scope and members of this international drug trafficking conspiracy. Since that time, agents have learned that, like BARRERA, SAMUEL, DELCID, and CONCEPCION are just some of the members of the conspiracy who have direct ties with sources of supply in Honduras from whom they receive shipments of wholesale quantities of cocaine. The FBI also obtained authorization from the Court to intercept wire and electronic communications over their telephones. What follows is a discussion of evidence obtained through thousands of drug-related interceptions over the Target Telephones, as well as other investigative techniques, that establishes the existence of the conspiracy and the involvement of the defendants.

## II.  CONSPIRACY BACKGROUND

57.    After uncovering the conspiracy, in February of 2012 law enforcement met with CS #3 to debrief him about what knowledge, if any, he had of the broader drug trafficking organization. CS #3 was in a detention facility where he was being held pending resolution of deportation proceedings instituted after his arrest in November 2011, and he provided information with the hope of receiving consideration in those proceedings. That information explained the basics of the conspiracy and its scope, identified some of the co-conspirators, and gave a sense of the past and current hierarchy within the Eastern District of Virginia.

### A.    Basic framework of conspiracy

58.    CS #3 explained that he has known NELSON and MAURICIO, who are brothers, for approximately nine years, and that he met LINDOR through NELSON approximately two-and-a-half years ago. He identified all three in photographs. From his involvement with them over the years, as well as other people he met through them, CS #3 was able to provide insight into the history of the conspiracy.

59.     CS #3 learned from them that they are part of a contingent of Honduran immigrants living in the area of Fairfax County that for approximately seven years have been trafficking in cocaine sent from Honduras. There are multiple sources of supply living in Honduras, all of whom hide their cocaine in shoes and wooden frames. Couriers bring these items with them on flights from Honduras into the United States. On a few occasions, CS #3 has seen cocaine taken out of these items. From what CS #3 observed, as well as what he learned from LINDOR, NELSON, and MAURICIO, each shoe typically contained approximately one-and-a-half ounces of cocaine, while each frame had approximately three ounces. The cocaine is sent to dealers in Virginia, North Carolina, and Massachusetts, who in turn send sale proceeds back to Honduras through wire transfers.

60.     LINDOR, NELSON, and MAURICIO received several frames and/or pairs of shoes containing cocaine at a time. On many occasions CS #3 was offered money to pick up these items from couriers. CS #3 declined, but he did agree to wire drug proceeds back to Honduras on LINDOR's behalf. Records from Western Union corroborated this account, showing that in 2010 CS #3 sent two wire transfers to UCC #3. CS #3 also agreed to deliver cocaine to customers and to bring in new customers, and he was paid for these efforts. For instance, the cocaine CS #3 was caught in possession of in November of 2011 came from NELSON, which he was supposed to deliver to one of NELSON's customers in exchange for $400.

61.     Evidence gathered in the investigation confirmed that LINDOR, MAURICIO, and NELSON are part of the conspiracy and that, despite LINDOR's current incarceration, MAURICIO and NELSON have continued to receive and distribute cocaine from Honduras. For instance, on February 26, 2012, MAURICIO and NELSON were intercepted talking with

SAMUEL during the same phone call. The call began with SAMUEL asking MAURICIO, "I want my brother in law's number." MAURICIO responded, "What brother in law?" SAMUEL replied, "Your brother." MAURICIO said, "Which one?" and SAMUEL asked, "How do they call that most humble one? Nelson." MAURICIO said, "Nelson. . . . He's right here. I'll put him on." NELSON and SAMUEL continued the conversation and SAMUEL said, "They sent a souvenir for you from over there. Won't you come get it?" SAMUEL told NELSON he believed it was sent from UCC #5, to which NELSON responded, "That asshole can suck my dick. I've not made any business with him. . . . I thought it was some other dude." SAMUEL said, "I recommend this one. You'll only get butter. You should see this tight-ass product. I have it in my hands. I could keep it but he told me it was yours." After further discussion about some poor quality cocaine that was being sent, SAMUEL told NELSON, "[He's] not sending anything good. This son of a bitch is. I provided it because I have been taking some to a woman in Washington and this bitch turns into oil." NELSON agreed to come see SAMUEL in about one hour to pick up the cocaine (TT2 #1,926).

62.     On April 9, 2012, SAMUEL was intercepted talking with DELCID about cocaine that had arrived and who it was destined for, to include NELSON. SAMUEL said he was told to "give Choco another two." DELCID asked, "Who's Choco?" and SAMUEL replied, "Mauricio's brother, Nelson." SAMUEL said, "That is what [he] told me, to give it to him, two and two for you, [he] said." (TT3 #3,360). And on April 23, 2012, SAMUEL called DELCID and said, "Do you have Choquito's number? Nelson's?" DELCID replied, "He does not have a phone now." SAMUEL said, "How is that asshole not going to have one, if they are in this thing, how are they not going to have a phone number." (TT3 #4,656).

**B.    Lindor's progression from Honduras and Samuel's succession**

63.    LINDOR told CS #3 that several years ago he moved from Honduras to Virginia to deal cocaine after a close family member or associate was arrested in Virginia and deported to Honduras after being caught with shoes that had cocaine. CS #3 does not know this person or their name. It is your affiant's belief that the person LINDOR was describing is UCC #3 given that the two men share the same last name, indicating they likely are family, and the circumstances of UCC #'s arrest, conviction, and deportation match those described by LINDOR.

64.    Prior to arriving in Virginia, I believe that LINDOR was sending cocaine from Honduras to the United States to be distributed by UCC #3 and others in the conspiracy. This belief is supported by Western Union records from May 2005 through September 2006 that show UCC #3 sent approximately fifteen wire transfers totaling $14,600 to LINDOR in Honduras, as well as BARRERA's comment on March 25, 2012, that LINDOR was the person who came up with the idea to hide cocaine in frames: "Lindo is the one that invented that six or seven years ago. He could have been a millionaire. He could have a lot of money if he hadn't been telling everyone where he put it. Now they all want a piece of the cake." (TT1 #12,350).

65.    On March 18, 2012, SAMUEL and UCC #5, a source of supply in Honduras, discussed how LINDOR had been the "big guy" in Virginia, but that now it was SAMUEL, presumably because LINDOR had been incarcerated for four months. The two went on to discuss a cocaine shipment that UCC #5 sent, with UCC #5 explaining that there were two large frames that each had eight ounces, two medium frames with six ounces each, and two little frames that each had three ounces. (TT2 #173).

66.    The investigation to date has corroborated the claim that SAMUEL is a "big guy" in the Eastern District of Virginia. In a conversation with MAURICIO on March 28, 2012, SAMUEL laughed about a large quantity of cocaine they had recently obtained and said, "We have enough coke to bathe in it." (TT2 #8,180). And in the course of a conversation on March 25, 2012, SAMUEL explained, "I have been playing with coke for thirteen or fourteen years, and I've never seen coke that color." (TT2 #7,567).

67.    As referenced throughout this affidavit, SAMUEL discusses with many of the people in his network the fact that he regularly supplies an African American woman in Washington, D.C., with cocaine that she cooks into crack cocaine. Through doing so he has learned how to do it himself, as he explained to BARRERA in a call on April 29, 2012.

68.    During the call, BARRERA said, "That white guy who was with you in your house showed me how to make the rock. How do you make that?" SAMUEL asked, "Which white guy?" BARRERA replied, "That one, don't you remember? We broke some frames there that the lady added some water and then she put them in." BARRERA asked again, "Do you know how to make it?" SAMUEL said, "Boil some water in a pot and in a small glass bottle, of those, [UI] calculate, if you want to try it, calculate about three grams and add to those three grams, add one of the cut. Let it boil, and when it is boiling, when you see the oil at the bottom, put some water and add some pieces of ice, from the bottle, less than half of water and then add the ice. Let it stand for a little bit. Leave it for a little bit, and when you think it solidified, then take out the water and get the leftover and let it dry for ten minutes. Then it will be good." BARRERA said, "Okay." SAMUEL said, "Try it. I am telling you because I see the black woman in Washington do that every day." (TT2 #14,848).

## C.    Geographic scope of the conspiracy within the United States

69.    The investigation has also corroborated CS #3's information about the conspiracy extending in the United States beyond the Eastern District of Virginia to include people in North Carolina, Massachusetts, and other states. For instance, intercepted calls between BARRERA and SAMUEL revealed that SAMUEL would be driving on February 13, 2012, to North Carolina to pick up cocaine to bring back to Virginia for distribution to BARRERA and others. This was confirmed by a pen register/trap-and-trace device with cell tower locations on SAMUEL's telephone, Target Telephone #2, which showed that SAMUEL left the vicinity of his residence in Virginia at approximately 5:16 a.m. on the 13th, traveled to Charlotte, North Carolina, and then returned that night, arriving in the vicinity of his residence at approximately 9:35 p.m. That is a roundtrip of approximately 800 miles.

70.    Intercepted communications between BARRERA and SAMUEL on February 13th also confirmed the trip and that a portion of the cocaine SAMUEL was picking up was sent by UCC #3 for BARRERA. BARRERA sent SAMUEL a text message that said, "What's up Rocke [SAMUEL's nickname]? Have you come with the milk, the kids are hungry." (TT1 #3,203). SAMUEL called and told BARRERA he was on his way to North Carolina. (TT1 #3,204). Later BARRERA sent SAMUEL a text message in which he said, "I also would get something from Lindo when [he] used to go to Massachusetts." (TT1 #3,224). SAMUEL wrote back, "You'll get some of those, how much will you give me." (TT1 #3,248). BARRERA replied, "[UCC #3] will send ten to me, one frame of Copan Ruins,[8] talk to him, that's what he told me." (TT1 #3,249). SAMUEL told BARRERA, "Call me tomorrow because I'll come in the morning . . . ." (TT1 #3,250). BARRERA ended with, "Yes, no problem." (TT1 #3,251).

---

[8] These are ancient Mayan ruins in Honduras.

### D.   Distribution through the Eden Center

71.   The Eden Center is a large shopping center at Seven Corners in Falls Church, Virginia, that consists primarily of stores and restaurants catering to the Vietnamese-American community. CS #3 learned through LINDOR, MAURICIO, and NELSON that, for approximately six years, members of the conspiracy working at the Eden Center have been receiving cocaine to sell. CS #3 knew one of those people, though not by name, describing him as a short Hispanic man with a medium build who walks with a limp. CS #3 later identified a photograph of DELCID as the person he described, and the investigation has revealed that DELCID walks with a noticeable limp, works at the Eden Center, and receives cocaine from Honduras that he distributes to people in various locations, to include at the Eden Center.

72.   As DELCID explained to CONCEPCION on April 18, 2012, "I've been into this for like five years back." CONCEPCION began to reply, "Oh, you have made some pretty money because five years . . ." but was interrupted by DELCID, who said, "Yes, no, I've done very well." (TT4 #284). Western Union records show that on September 12, 2005, DELCID wired $500 to LINDOR in Honduras, and that, in total, between September, 6, 2005, and April 19, 2012, DELCID has wired approximately $77,195 in his name to people in Honduras.

## III.   SOURCES OF SUPPLY

73.   BARRERA's observation that many people in Honduras want "a piece of the cake" appears to be true. The users of the Target Telephones—BARRERA, SAMUEL, CONCEPCION, and DELCID—regularly are in contact with multiple Honduran sources of supply for cocaine, and often talk with and about other co-conspirators in the United States who themselves also have direct contact with sources in that country. Investigators have learned that these sources generally are aware of one another and the higher level co-conspirators in the

United States; use the same or similar methods of concealing their cocaine; often employ the services of the same couriers; send at least multiple ounces of cocaine, if not one kilogram or more, at a time; supply many of the same people in the United States, either directly or indirectly; front those people the cocaine, that is, loan it on consignment and accept payment after it has been sold in the United States; and obtain payment for their cocaine through wire transfers. In sum, they are an interconnected group of wholesale importers sending numerous kilograms of cocaine into the United States every year. Examples follow of communications between certain defendants and sources of supply.

### A.    Barrera

74.    BARRERA primarily obtains cocaine through UCC #3, who BARRERA talked about in detail in a series of text messages with another source of supply, UCC #6, on March 6, 2012. BARRERA said, "You know, I've sent [UCC #3] $135,000 in the time we've been working." (TT1 #7,906). "That's why I've made [UCC #3] a rich man, and I don't complain or have regrets because for whatever I need over he's right there. I don't have to ask twice for him to do what I ask." (TT1 #7,909). UCC #6 expressed some doubt about the amount of cocaine UCC #3 was importing, observing that "Hey, but [UCC #3] doesn't seem to have much. . . . . The one who acts like the boss over there is [UCC #7]." (TT1 #7,912). BARRERA explained, "The thing is that [UCC #3] is a dumb ass[.] [T]hey owe over a million lempiras [Honduran currency equivalent to approximately $50,000] because he sells on credit. I've scolded him because he has no need to be selling or giving credit." (TT1 #7,914). "Lindo alone sent him over 50,000. And he [UCC#3] sends to Samuel, also to Mauricio, and to others that come from other states. The thing is that [UCC #3] is easygoing." (TT1 #7,915). BARRERA ended by saying, "[UCC #3] had some seasons where he would send it through El Salvador, Guatemala and

Honduras. That guy has sent a lot of milk over here for the children." (TT1 #7,919). BARRERA has told SAMUEL that he pays UCC #3 $500 for each ounce of cocaine. (TT2 #13,984)

75.     On April 12, 2012, BARRERA and UCC #3 discussed the increased cost of cocaine coming from Honduras due to a large seizure of the drug by law enforcement. BARRERA asked about the regularity of the cocaine coming in to UCC #3: "On exactly Wednesday, that comes every three weeks right?" UCC #3 said, "Yes, yes. . . . I'm buying the package right [UI] I'm going to buy it all at once tomorrow with the money." BARRERA asked, "For a big one or small?" UCC #3 said, "A big one dude. That shit is expensive. It's costing 10,500 right now, dude. You see ten tons were dropped on those fuckers." BARRERA said, "I heard that a bunch of trucks dropped there in Costa Rica," to which UCC #3 replied, "Ten tons, ten tons. . . . It's really bad right now. Geeze, I'm going all the way to Chalmeca [a small town in Honduras] to look for some." (TT1 # 16,191). Your affiant learned that on April 10, 2012, foreign law enforcement officers in Costa Rica seized over 200 kilograms of cocaine that was concealed inside a tractor trailer with Honduras license plates. I believe UCC #3 was saying that due to the seizure, cocaine was relatively scarcer, driving the price of one kilogram to $10,500.

76.     On April 18, 2012, BARRERA spoke with UCC #3 about an incoming shipment of cocaine that was to arrive for BARRERA and other co-conspirators. BARRERA expressed frustration that UCC #3 kept sending BARRERA's cocaine mixed with cocaine intended for other co-conspirators. BARRERA said, "This is the third time I tell you, I told you the other day: I don't want shit, give separate from that, it won't cost you to send it on another box." I will take it to [him/her] but it's separate." UCC #3 said, "Yes, then I'm going to see what I'm going to do then because I talked with the woman right now and she has the package." BARRERA replied, "Get on with it dude, if one day we fall and you know that if it's more material they will fuck

you more there." UCC #3 then explained the quantity he had shipped inside frames, noting that BARRERA was going to receive forty ounces (over one kilogram), while others, including SAMUEL, would be receiving their own amounts packaged separately: "Two smaller ones are for Samuelito. . . . Look, yours, your forty are eight smaller frames, eight frames of five each frame." UCC #3 also explained that, among other frames, there were two big frames for WILSON, each with ten ounces and marked with red dots. (TT1 #17,626).

**B.      Samuel**

77.      In addition to receiving cocaine from UCC #3, SAMUEL also obtains the drug from other sources of supply, to include UCC #7 and UCC #5. As SAMUEL explained to MARIO on February 25, 2012, the cocaine from UCC #7 is of lesser quality than that sent by UCC #5, which SAMUEL said can be used to make crack cocaine: "The material that [UCC #5] has is better than [UCC #7]; you should not get much from that fucker. . . . Look, the material that [UCC #5] is sending is great to make rocks." (TT2 #1,629). Later that same day, SAMUEL spoke with MARIO again and reemphasized what he told him earlier: "That material [UCC #7] sends is not any good dude. . . [I]t's seldom that he will send you some shit that's good. You're going to lose your clients for some shit that's not worth a crap. . . . I'm telling you, [UCC #5] told me that the material he sends, bitch, is respectable. It's better than that one I sent you right now." (TT2 #1,653).

78.      Despite SAMUEL's expressed displeasure with UCC #7's cocaine, he still continued to do business with him. For instance, on March 28, 2012, SAMUEL called UCC #7 to say he had received four frames. On the front of one frame was a decoration having to do with Spain, on another was an Olympia decoration, while the remaining two had decorations related

to Marathon. UCC #7 confirmed those were the frames he sent and said they contained "really good material." SAMUEL said that he hoped it was. (TT2 #8,221).

79.     On April 4, 2012, SAMUEL said that he had a lot of "powder" because he had just received "fourteen from [UCC #9], eight from [UCC #10], ten from [UCC #11], and twenty-five from [UCC #5]." (TT2 #9,664). I believe the numbers he listed were ounces of cocaine he had in possession from four different sources of supply, which would amount to a total of forty ounces. The next day, SAMUEL claimed that he had sent $125,000 to UCC #5, which I believe to be an estimate of the total amount of proceeds SAMUEL had paid UCC #5 over the course of their relationship. (TT2 #9,846).

80.     With regard to his debts, SAMUEL often talked about wanting to pay off his sources of supply and how having debt caused him much stress. On February 21, 2012, for instance, he said he wanted to pay off some debt he had in Honduras because he did not want to owe money, but he did not want to use his own money he had saved in the bank. Instead, he complained that people "here," that is, in the United States, owed him $20,000 and that it was with that money that he wanted to cover his debts. (TT2 #689). On March 22, 2012, after a courier was intercepted at Dulles Airport, which is discussed in more detail later in the affidavit, SAMUEL and UCC #3 discussed how they might have problems getting other people to bring the frames into the United States, which led SAMUEL to say: "Thank God I don't have any debts right now. There are people who have debts and then they run out of material. Thank God that I only owe [UCC #5] a little bit, but it's a small amount." (TT2 #6,834). In other words, I believe SAMUEL was saying that if the flow of cocaine from Honduras slowed or was cut off, other co-conspirators would not be able to make money to cover their debts, though he himself was in good shape because his only outstanding debt was to UCC #5 and it was not significant.

## C.    Delcid

81.    The topic of debt came up during a conversation between DELCID and SAMUEL on April 13, 2012. The two spoke initially about how they were making progress in paying off certain sources of supply in Honduras. DELCID then boasted that he had three new sources that were sending him high quality cocaine, of which he was able to get "sixteen for 6,400 each" that had "twenty-eight points." I believe DELCID was saying that he was paying $6,400 for sixteen ounces of cocaine, and that each of the ounces had a full twenty-eight grams.[9] DELCID explained that he had a person in Honduras handling everything, and described how that person was going to hide the cocaine in frames that the person had already hollowed out. DELCID said all that was left to do was to fill the frames, glue them together, and then get them to a drop-off point with a courier. (TT2 #11,712).

82.    On March 3, 2012, DELCID called UCC #12, a source of supply in Honduras, and said that he wanted "to get the best possible." UCC #12 asked DELCID how much he wanted, and DELCID answered, "a whole one," by which I believe he meant one kilogram. UCC #12 replied that his "guy can come out on the 23rd or 24th," and then added that "the guy can bring half now, a half with the other, so to not travel too heavy." DELCID said he "wanted them cut clean, not broken up. A client here wants it that way." (TT3 #167).

83.    DELCID confirmed that he receives cocaine from UCC #5, when he said on March 28, 2012, that he had paid UCC #5 "in full today." He also said during the conversation that he sent $3,000 to another source the day prior, and that he still owed yet another source

---

[9] An ounce is equivalent to approximately twenty-eight grams. But throughout the investigation, co-conspirators have spoken about ounces of cocaine arriving from Honduras containing between approximately twenty-three to twenty-eight grams. I know from my training and experience that drug traffickers sometimes define an ounce to be twenty-five grams, which is known as a "Mexican ounce," because that number divides evenly into 1,000 grams, meaning that one kilogram can then be said to contain forty ounces.

$15,000. DELCID then complained that one person owed him $11,000, by which I believe he meant a person to whom he supplies cocaine in the United States. (TT3 #2,348).

### D. Concepcion

84. On March 27, 2012, CONCEPCION used Target Telephone #2, SAMUEL's telephone, to continue a conversation with UCC #13, a Honduras source of supply that she appeared to have just developed. As she explained at the beginning of the call, immediately prior to this conversation, she had been using a different telephone to speak with UCC #13, but that conversation ended because the calling card minutes (which she referred to with a Spanish equivalent of the word "credits") CONCEPCION was using had expired. She therefore switched to using Target Telephone #2 and SAMUEL's calling card to continue the conversation.

85. CONCEPCION inquired as to why UCC #13 did not already buy the cocaine. UCC #13 said, "I didn't buy it Concha because we didn't have anywhere to package it yet." CONCEPCION said, "So you will first prepare the space?" UCC #13 replied, "Of course, they're working on that tonight," likely indicating the frames the cocaine was going to be concealed in would be prepared that evening. CONCEPCION said, "So tomorrow they will cut and pack, and then you'll be carrying . . . ." UCC #13 said, "They bring it to the shop and I package it there." CONCEPCION said, "Don't let them give you, you see, that's pure gold. You know how much money is paid." UCC #13 replied, "And they come back wanting to keep working for me." CONCEPCION said, "Look, [make sure] it's right because if it comes less, then we have a problem here . . . . We hope to get twenty-seven in each one, because that's what I talked about." UCC #13 asked CONCEPCION when they needed to get to San Pedro, Honduras, and CONCEPCION said she already spoke with a courier who would be arriving in Herndon, Virginia. CONCEPCION said, "I already talked to the guy. The guy comes here to

Herndon. . . . He told me he was going to leave the first days of next month, I think the third." CONCEPCION continued, "Samuelito told me to tell you to make sure that comes well packaged, well packaged in aluminum foil." UCC #13 said, "Yeah. He knows all of that. They're professionals. The guy you spoke with today goes to Colombia to get all of that. He works with the captain of a boat all the way down there. He works in all of that." CONCEPCION told UCC #13: "Don't think you're working for the heck of it. As soon as that arrives, we'll send you what we have to send you and you buy more on your own . . . ." (TT2 #8,053). I believe that the reference to the man who goes to Colombia meant that UCC #13 was obtaining the cocaine from a person who himself got the drug directly from Colombia. I further believe from the context of the conversation that CONCEPCION had previously spoken with this man.

86.   This conclusion was confirmed by another call on March 27th between SAMUEL and DELCID, in which the former told the latter about CONCEPCION's new source, who could get high-purity cocaine at good prices. SAMUEL said, "The woman talked to the boss in Colombia, and you know what he said? That those guys there bought them for twenty there, and they were going to buy them for twenty. Fuck." DELCID said, "Get the fuck out." SAMUEL continued and said, "They got up to three out of one, the son of bitches. . . . [H]e's going to send and that fucker is coming 97.3%, dude, pure." DELCID responded, "Almost one hundred!" (TT3 #2,256).

87.   On April 16, 2012, CONCEPCION spoke with UCC #13 about a shipment of cocaine that he was sending soon. UCC #13 provided the name of the courier (UCC #14) and said that there was glass in the frames in which the cocaine was concealed. (TT4 #166). Later that day, UCC #13 sent CONCEPION a text message asking for DELCID's phone number (TT4 #170), and then sent another message asking CONCEPCION to tell DELCID to call UCC #13.

He explained, "I need to work because I need money and have some things to pay and that is a good option for me." (TT4 #171). CONCEPCION then spoke with DELCID and gave him UCC #13's phone number and told him to call UCC #13. CONCEPCION went on to explain that UCC #14 was bringing the frames with glass, but that there was no need to worry if the glass broke because there was other protection for the cocaine. (TT4 #175). As described later in the affidavit, UCC #14 was caught on April 20, 2012, at George Bush Intercontinental Airport in Houston, Texas, with frames and other items, concealed inside of which was a total of approximately 1.3 kilograms of cocaine.

### E.    Other defendants

88.    Interceptions over the Target Telephones revealed that other defendants also deal directly with sources of supply in Honduras. Examples follow.

### i.    Mario

89.    SAMUEL spoke with MARIO on February 19, 2012, and MARIO explained, "I came to send the money to [UCC #7]. . . . I sent $2,000 one day and $2,000 today, so that would be $4,000, right? . . . I think he is going to be owing me, right?" SAMUEL asked, "So then you didn't owe him from before?" MARIO said, "No. Look, I sent him $2,000 that other day, and now I'm sending $2,000, and so I gave him $4,000. And you came with three right?" SAMUEL said, "No, no, $4,250 is what you have to send for him. . . . I told you to keep an account." MARIO said, "That's why I'm calling you because right now I sending the money, not in my name but under [Name redacted], I'm sending the money under the name of [Name redacted]." SAMUEL went on to say, "I didn't know you had other accounts pending with him. . . . [T]hat's another story between you guys." (TT2 # 437).

### ii.   Mauricio

90.    In a conversation on March 8, 2012, between DELCID and another one of his own sources, I believe DELCID said that while he adulterates his cocaine with other substances (known as "cutting," which increases the quantity that can be sold but decreases the quality of the total product), he does not do it as much as MAURICIO, who he said works with UCC #5. (TT3 #608). And on April 21, 2012, SAMUEL said that MAURICIO had given SAMUEL a sample of cocaine that UCC #3 had recently sent MAURICIO. (TT2 #13,120).

### iii.   Wilson

91.    On February 24, 2012, several text messages were intercepted between BARRERA and UCC #18, a source of supply in Honduras, about WILSON inspiring BARRERA to want to receive kilogram-quantities of cocaine at a time. BARRERA sent a text message that asked, "How much is a whole cheese worth there?" (TT1 #5,857). UCC #18 responded, "From ten eleven and twelve thousand." (TT1 #5,861). BARRERA replied, "I am going to buy one so as not to fill the mouths of those idiots who are only sending anesthesia today. [Why] don't you go to Copan and buy a dozen frames and you will see that the money stays within family you have to be intelligent papa." (TT1 #s 5,863, 5,864). BARRERA explained, "Why the fuck should I be allowing someone else to earn thousands by being able to take the whole slice?" (TT1 #5,865). He then sent another text message saying, "I think Wilson made the light bulb go off for me. [T]hat guy is going to go to Honduras next month and he already has about 7 travelers and he is going to send about 6 cheeses he says and then he is coming here to receive them." (TT1 #5,866). "That is why Wilson has money because he is smart. Tell me why you're going to be making [list of seven sources of supply, to include, UCC #2, UCC #3, UCC #5] and so many more rich." BARRERA continued, "When you can eat the

whole cake yourself. . . . [G]et on the bandwagon because Wilson gave me the idea and next week I want a whole cheese." (TT1 #5,870).

92.     On February 27, 2012, BARRERA asked WILSON when he was leaving. WILSON said he would be there by April 1st. (TT1 #6,511). On April 15, 2012, BARRERA spoke with a source in Honduras and asked if WILSON was still there or if he left already. The source explained how he had helped WILSON grind up a kilogram of cocaine with six ounces of cut. BARRERA recounted how WILSON was planning on sending "seven animals," which I believe to mean seven kilograms of cocaine, with seven "travelers," that is, couriers. BARRERA said he was going to pick up the cocaine for WILSON. (TT1 #16,990).

93.     On April 18, 2012, BARRERA sent UCC #3 a text message that said, "Tell me how that thing comes. If it is only one package or if not, I'm not leaving here. I don't want to be farting around wasting time like the last time." (TT1 #17,610). UCC #3 responded, "Brother in law, you asshole. It is only one large box. Don't get upset." (TT1 #17,612). BARRERA replied, "Yes, but I hope only mine and wilson's and pablos's are in there." (TT1 #17,613). I believe BARRERA sent these messages because he wanted to know how many different boxes the cocaine shipment contained, as he only wanted to pick up the box of cocaine destined for WILSON, PENA, and himself.

94.     That WILSON has direct connections with sources of supply was further illustrated in a series of text messages between BARRERA and UCC #3 between April 22 and 23, 2012, in which BARRERA complained about the quality of cocaine UCC #3 had sent. BARRERA began, "You want to explain to me what that shit is that you sent me? It's the same as Wilson's. That was really ugly." (TT1 #18,908). BARRERA explained, "I don't want that trash, I spent an hour and a half and I couldn't even strain an ounce, it's impossible, it gets stuck

like gum when you pass the bottle and it sticks to the bag and doesn't strain anything." (TT1 #s 18,954 and 18,955). "I swear to you that there is no way to strain this, is the same one as Wilson, no wonder Wilson told me that it was the same . . . ." (TT1 #18,957). "Who is going to buy me this brother[?] I'm going to lose the good clients from Washington. . . . [I]t's just that I've spen[t] 2 hours working it and I've only been able to strain 21 grams . . . ." (TT1 #18,963). UCC #3 suggested, "Take it to Washington. I'm telling you, they'll like it because it's for rock." (TT1 #18,965).

### F.   Co-conspirators in United States supply one another

95.     Despite their direct relationships with sources in Honduras, the investigation has revealed that co-conspirators in the United States sometimes supply one another with cocaine because, for instance, they sell out of their own cocaine before they could receive another shipment, or law enforcement at an airport catches a courier carrying their cocaine.

96.     By way of example, on April 5, 2012, DELCID told SAMUEL he was waiting at a location in Maryland to sell someone "half a block" for "fourteen," by which I believe he meant half a kilogram of cocaine for $14,000. DELCID explained that while it was not the best price for a half, he "cut the bejesus out of it last night and it's still potent." He then said he had gotten rid of most of his stash, and so asked SAMUEL if he could have one frame on loan. SAMUEL said he had a couple of frames, though MAURICIO had asked for some as well. DELCID asked for just one with "eight," that is, eight ounces of cocaine, and SAMUEL told him that would not be a problem. (TT2 #9,926).

## IV.   COURIERS

97.     The conspiracy uses numerous couriers to fly cocaine from Honduras into the United States on a regular basis. Interceptions over the Target Telephones and evidence collected

during airport interdictions have established that couriers are paid by any number of people, to include members of the conspiracy, to bring with them an assortment of goods that combined often fill several bags. Some of these items are not contraband, like clothing, foodstuffs and Honduras-related trinkets, and are destined either for resale in the United States or delivery to family and friends of people living in Honduras who sent the items with the courier. To an unknowing eye, then, the items inside of which the conspirators hide cocaine could blend in with a courier's cargo and likewise appear not to be contraband.

98.     Typically different sources of supply will give their items to the same courier to take on a single trip, differentiating their items based on size and design (*e.g.*, how large a frame is and what decoration adorns the front), by markers on the items like colored dots, and/or by writing a name and phone number for the intended recipient(s) on the items or surrounding packaging. Sometimes they use fictitious names or the real names of people other than the actual recipient in order to keep the couriers from learning the true identities of the recipients. I believe the couriers fly into different airports across the United States and then go to a residence where they live or stay temporarily while they await return to Honduras. I further believe that generally members of the conspiracy go to these residences to pick up their items, and sometimes items destined for other co-conspirators, which they keep intact until they return to a place where they deem it safe to open them and extract the cocaine (though sometimes they sell the items intact or open them in front of a purchaser so the purchaser can tell it has not been adulterated).

99.     A discussion between BARRERA and SAMUEL on February 21, 2012, typifies the interconnected relationship between the sources of supply, couriers, and co-conspirators in the United States like BARRERA and SAMUEL who receive cocaine directly from the sources. BARRERA said, "They were going to send me some today, but it had to stay there. That fucking

bitch's bag was full." SAMUEL replied, "Yes, it was full. She was supposed to bring me some stuff as well." Later, in discussing the source who tried to send SAMUEL cocaine, SAMUEL said, "[H]e could not find a traveler. So I told him if no one gives you a traveler you have to find one on your own and that I could not give it to him either. So [UCC #5] gave him some room but the bag was full." (TT2 #872).

100.   What follow are examples of couriers bringing cocaine into the country just since February of this year after interception of Target Telephone #1 began. Some of these couriers were interdicted by law enforcement and found to be in possession of items containing hidden cocaine.

A.   **February 19th**

101.   On February 19, 2012, several calls were intercepted between SAMUEL and DELCID discussing the arrival of a courier. At approximately 12:39 p.m., DELCID called SAMUEL and told him that a courier was coming and that there were two packages for SAMUEL to pick up. DELCID used codes to describe the contents of the packages, saying the first had "four souvenirs and two t-shirts," while the second had "three pictures, one towel and a t-shirt." DELCID then told SAMUEL the names of the senders of each package and the intended recipients, none of which, to your affiant's knowledge, belong to known co-conspirators. (TT2 #416). Five minutes later, SAMUEL called DELCID and got the courier's phone number. (TT2 #417). SAMUEL then made two calls to the courier's phone number, but no one picked up. (TT2 #s 418, 423).

102.   At approximately 1:17 p.m., the courier called SAMUEL and said that he had a "package" for SAMUEL that he was bringing down from Pennsylvania. They agreed to meet in

43

Herndon, Virginia, at 2:00 p.m. During the conversation, SAMUEL used the name DELCID had given him for one of the recipients of the packages. (TT2 #425).

103.    SAMUEL called DELCID at approximately 1:50 p.m. and said that he had spoken with the courier. SAMUEL said that he was there, by which he meant Herndon, but that he was waiting for the courier to arrive. DELCID said, "Call me if anything comes up, then." SAMUEL said that he would call DELCID "once I have everything." (TT2 #428).

104.    Earlier that day, at approximately 9:09 a.m., the courier called BARRERA's telephone and asked for a man whose name was different from BARRERA's. BARRERA claimed to be that man. The courier said he was the "guy of the package" and that he was traveling from New York and would be in Herndon at 1:00 p.m. BARRERA asked the courier to text him the address where they would meet. (TT1 #4,555). At approximately 9:12 a.m., the courier did so. (TT1 #4,557).

105.    At approximately 2:00 p.m. and thereafter, law enforcement conducted surveillance of the address in Herndon, an apartment complex, in order to try and observe the various co-conspirators meeting. During the surveillance, a black Honda Civic with Pennsylvania license plates arrived at the complex. In addition to the driver, there was also a passenger inside the vehicle. Pennsylvania Department of Motor Vehicles (DMV) revealed the Honda Civic was registered to the same person who was listed in the subscriber information on telephone number the courier used to communicate with BARRERA and SAMUEL. Law enforcement observed three instances of what appeared to be co-conspirators picking up packages containing cocaine.

106.    One of the subjects was BARRERA. He and other unidentified subjects were observed meeting with the passenger of the Honda, who handed the subjects a bag or package.

BARRERA was observed taking money out of his wallet and giving it to the passenger before departing. After leaving, BARRERA sent a text message that said, "[UCC #2] sent me 8 and I already have them." (TT1 #4,684).

107.   A silver Toyota Celica with Virginia license plates that is registered to CONCEPCION arrived at complex as well. The Toyota was occupied by SANTOS, who was driving, and SAMUEL, and was observed driving deeper into the complex towards the area where the Honda was parked. It left a short time later. Law enforcement was not in a position to be able to observe any meeting between the people in the Honda and SANTOS and/or SAMUEL. At approximately 2:58 p.m., SAMUEL called DELCID and said that "the cake is in hand in the car." DELCID told SAMUEL that he would see him soon. (TT2 #439). I therefore believe that SAMUEL and/or SANTOS did in fact meet with the people in the Honda and obtain cocaine, and that, as SAMUEL said he would do, he called DELCID and told him the transaction had been successful and the two arranged to meet to divvy up the cocaine.

108.   DELCID later that day told SAMUEL that a package intended for DELCID had been left behind with the courier. During a conversation at approximately 4:21 p.m., DELCID told SAMUEL that he "already sent a guy to go pick it up" and that the person was already near the location. SAMUEL confirmed that he would see DELCID soon. (TT2 # 453).

109.   At approximately 5:06 p.m., agents observed a white Chrysler minivan with Maryland license plates registered in AVILA's name arrive at the apartment complex in Herndon. The van parked in front of the Honda. AVILA exited the van and walked towards the area where the courier and others were known to be congregating in the parking lot, which was just out of the vantage point of the agents. AVILA was out of view for a very short time before he was observed walking towards the van carrying a moderately sized package that likely

45

contained cocaine. Law enforcement conducted a traffic stop of the van after it departed the area, and AVILA was identified during the traffic stop as the driver and sole occupant of the van.

**B.   March 7th**

110.   Based on intercepted communications over the Target Telephones, agents learned that a courier had arrived from Honduras in the New York/New Jersey area of the United States. One example of a call indicating a courier would be traveling to the United States occurred on March 6, 2012, when PENA told BARRERA that he received a call from a woman in Honduras who "said that for the day after tomorrow; tomorrow or the next day it'll be leaving. . . . But, wait and see, dude. . . . I'm afraid. . . . I imagine that on that poor woman . . . how much are they going to load on that poor traveler?" (TT1 #7,862). SAMUEL answered that question, telling DELCID: "Three-and-a-half kilos. [UCC #3] alone sent one-and-a-half and the rest is broken up. . . . It's going to New York." (TT2 #3,494).

111.   In a call between UCC #3 and BARRERA, UCC #3 explained that a "whole animal," which I believe is one kilogram of cocaine, was for BARRERA, and that the courier would also be bringing cocaine from other sources, including UCC #5, hidden in frames and shoes that were intended for other people, including SAMUEL. UCC #3 explained there would be two packages and he gave BARRERA the courier's phone number and the names he was to use for the respective senders and recipients of those packages. It was clear from the conversation that BARRERA would be picking up the packages. (TT1 #7,920).

112.   In the morning of March 7, 2012, BARRERA called the number UCC #3 gave him. A man answered and BARRERA gave one of the two false recipient names provided by UCC #3. BARRERA confirmed they had his package and asked for the man to text him the address in New York where they could meet. (TT1 #8,103). BARRERA then immediately called

46

PENA and said, "Get the suitcases ready, get the suitcases ready. I'll be back there shortly. Let's go. Let's go." PENA replied, "Let's go. Let's go. Let's go." (TT1 #8,104). Approximately two hours later, a woman called BARRERA and asked if his name was the other false recipient name UCC #3 had given BARRERA. BARRERA said it was, and then she asked where the package would be delivered He told her he would pick it up from her in New York and asked for the specific address. She gave him one in Hempstead, New York. (TT1 #8,136).

113.   Law enforcement conducted physical surveillance of that address in Hempstead on March 7, 2012, and observed two men inside a blue 2006 Honda van with Virginia license plates that is registered to BARRERA arrive in the immediate vicinity of the address. BARRERA was observed entering the residence and exiting with several large boxes, which he carried to his Honda. He departed the area a short time later. When BARRERA discussed the trip the next day with BARRIOS, he said, "I was up last night dude, I went to New York." BARRIOS said, "I don't believe you." BARRERA replied, "Flaco and I went to bring milk." (TT1 #8,403). "Flaco" is PENA's nickname, and I believe he went to New York with BARRERA to pick up the cocaine.

114.   On March 8, 2012, BARRERA and SAMUEL were intercepted numerous times discussing a time and location to meet so SAMUEL could obtain his portion of the cocaine shipment. During one call, SAMUEL asked for BARRERA's address so SAMUEL could meet with BARRERA. (TT1 #8,267). BARRERA sent SAMUEL a text message with a Vienna, Virginia, address located in the same apartment complex where BARRERA is known to reside. (TT1 #8,269).

115.   At approximately 12:45 p.m., agents conducting physical surveillance observed SAMUEL, SANTOS, and GORDITO arrive together at BARRERA's apartment complex in the

47

silver Toyota Celica registered to CONCEPCION. SANTOS was driving. At approximately 12:48 p.m., SAMUEL called BARRERA and said he was at BARRERA's van and wanted to know if he should wait there or come inside. BARRERA told him to come inside because he (BARRERA) "does not sell tamales in the street." (TT1 #8,311). SAMUEL and GORDITO were observed walking towards BARRERA's apartment building. SANTOS stood outside the vehicle and waited for them to come back.

116. While SAMUEL, GORDITO, and BARRERA were inside BARRERA's residence, SAMUEL was intercepted calling DELCID and asking him how many of the frames belonged to him. DELCID said two and that they should be tinted on the back. When SAMUEL said he did not see any that matched the description, DELCID said he would call Honduras and ask them to describe the images on his frames. (TT2 #3,932). SAMUEL also called one of his Honduras suppliers, UCC #5, to try and sort out what he sent. During the call, SAMUEL asked UCC #5, "Hey man, get it together. Hey, what was it that you sent on that one thing. It was two pairs of shoes and what else?" UCC #5 responded, "It was two pairs of shoes, two small frames, and a big one. That was my stuff." UCC #5 went on to describe frames that other sources sent. (TT2 #3,936).

117. At approximately 1:14 p.m., SAMUEL called DELCID and said, "Hey, dude, shit, this son of a bitch got 500. . . . I'm going to stop by your place then so." DELCID asked, "Yes, there's no problem. . . . How many packages do you have more or less?" SAMUEL replied, "I have about thirty in all." (TT2 #3,939). I believe what SAMUEL told DELCID is that he paid $500 to BARRERA for picking up the packages and that he was on his way to DELCID's house to deliver DELCID's portion. Furthermore, SAMUEL told DELCID that he had about thirty frames containing cocaine.

118.   Law enforcement observed SAMUEL and GORDITO walking towards SAMUEL's vehicle at approximately 1:17 p.m. SAMUEL was carrying a large box and GORDITO was carrying two bags. SANTOS opened the Toyota's trunk and they placed the items inside. All three got into the Toyota, and SANTOS drove the vehicle out of the area. Law enforcement surveilled the Toyota arrive at DELCID's apartment building in Falls Church, Virginia, at approximately 1:42 p.m.

### C.   March 22nd

119.   Numerous calls were intercepted between co-conspirators on or about March 21, 2012, discussing the anticipated arrival of a courier. One example occurred at approximately 1:49 p.m., between DELCID and CONCEPCION. DELCID said, "And I was thinking about this lady right now because they're sending you ten." CONCEPCION asked, "[T]hey're sending me ten?" and DELCID replied, "Yes, they're sending you ten and the other ten are coming with another one." CONCEPCION replied, "Oh. Okay. Okay . . . So the la -- your wife sent for me, sent twenty?" DELCID said, "She sent twenty but . . ." CONCEPCION interrupted and said, "Ten with this lady and ten with the other?" DELCID said, "Uh huh. But I'm somewhat pensive because I see it's [UI]. They say this lady is coming very loaded." (TT3 #1,682). I believe that DELCID was concerned about the incoming courier who was bringing a large quantity of cocaine with her, a portion of which that had been supplied by DELCID's wife in Honduras. Furthermore, DELCID explained that his wife sent ten ounces of cocaine intended for CONCEPCION with the one courier and his wife was sending an additional ten ounces of cocaine intended for CONCEPCION with a different courier.

120.   Based on intercepted communications and other evidence, law enforcement was able to identify the suspected courier and determine that she was scheduled to arrive at Dulles

International Airport, within the Eastern District of Virginia, on March 22, 2012, at approximately 2:30 p.m. That afternoon she arrived at Dulles with in excess of ten bags of checked luggage, containing dozens of items, to include cheese, food, clothing, and other property that the courier had been paid to deliver to individuals in the United States. A search of the courier's property by agents with U.S. Customs and Border Protection revealed approximately twenty-five wooden frames of varying sizes and eight shoes. A further search of a sample of the frames and shoes revealed they contained secreted cocaine. A conservative minimum estimate of how much cocaine was hidden in those items is two kilograms.

121.   The courier, a female Honduran citizen with a United States Visa who had two small children with her, was interviewed further and said she had no knowledge as to what was in the frames and shoes, and she was asked simply to transport the items into the United States, similar to the other items found in her bags. Intercepted communications tended to corroborate her account, and thus she was not arrested.

122.   That same night, UCC #3 called SAMUEL and spoke about the courier, who SAMUEL said had been detained at Dulles Airport. UCC #3 replied, "That's where they got me. . . . Thank God I didn't send anything." UCC #3 later said, "That sucks dude. I'm going to send another shipment but to another state. It doesn't matter if I have to pay one of two but they can go pick them up somewhere else. You can't send it through Dulles anymore." SAMUEL replied, "They won't be able to send it there anymore. Especially since they detected the wood." (TT2 #6,834).

123.   About an hour later, UCC #6 texted BARRERA the following message: "Brother-in-law, do you think that what they are saying around here is true?" (TT1 #11,331). UCC #6 followed up with another text message that said, "Well, there's been some problems because it

seems that the shirts didn't arrive. You didn't get a call, did you?" (TT1 #11,333). BARRERA responded with, "No way it hasn't arrived. Samuel is after me asking me to sell him three since I have some because [UCC #3] sent me forty the day you sent yours." (TT1 #11,334). UCC #6 wrote, "But [name redacted] says that a lady has been detained, but they don't know who she is." (TT1 #11,340). BARRERA wrote back, "I don't believe you. Samuel hasn't told me anything about that because he was going to bring me those tamales." (TT1 #11,341). BARRERA then called SAMUEL, who confirmed the courier had been detained and said that people in Honduras were worried. UCC #5, according to SAMUEL, had a premonition before the courier left and so did not give her anything to take to the United States. (TT1 #11,342).

124.    The next day, DELCID was intercepted numerous times communicating with co-conspirators about the suspected loss of cocaine. For instance, he spoke with SAMUEL, who explained that CONCEPCION had gone to the house where the courier was supposed to be staying in Virginia to try and determine what was going on, and that CONCEPCION said, "That the lady had a problem and that the son told her that they have her detained at the airport." DELCID responded, "Son of a fucking bitch, dude." Later in the conversation, SAMUEL said referring to the female courier, "they gave her too much cargo. They gave her a shitload of animals that the poor woman was bringing." DELCID responded, "Yes, but it shouldn't be because of the cargo. If the kid is the problem, [she] won't have problems with the cargo." Later in the conversation DELCID said, "No, man, forget that, dude. I haven't even eaten, thinking about it. Don't fuck around. No, look, it's, it's, with the, with the part that the brother shipped in, it's almost like . . . thirty are mine." (TT2 #7,027). I believe DELCID was claiming ownership of approximately thirty ounces of cocaine that the courier had brought with her.

### D.     April 2nd

125.    Based upon intercepted calls of DELCID, law enforcement learned a cocaine courier had arrived from Honduras to Virginia on or about April 2, 2012. That day, he wrote a text message that said, in part, "I'm going to where the traveler is." (TT3 #2,764). He later called CONCEPCION and told her he had picked up the shipment from the courier and that "the boxes are not even broken . . . they are the same way as they sent them." He told her she could come by and pick up her portion in the afternoon. (TT3 #2,768).

126.    DELCID then called one of his sources of supply in Honduras, UCC #8, to tell her that the he had the boxes and was at home. He expressed that he was worried when he picked up the boxes from the courier's house because he saw six law enforcement patrol cars nearby. Next he asked UCC #8 what part of the shipment belonged to him, and she explained that everything in the small box was his, which amounted to four frames that UCC #5 had supplied. UCC #8 then asked if he had opened the big box, and DELCID said he was doing it as they spoke. UCC #8 said that there were three frames with the number "6" written on the back, all of which were for DELCID, and then proceeded to describe several other frames that were for other co-conspirators. DELCID agreed to pay UCC #8 7,000 "pesos" to cover half the cost of the trip, which UCC #8 said cost 14,000. (TT3 #2,769).

127.    DELCID told a person later that night that he was happy because GLORIA, his girlfriend, had given him a number for a "lady from the south" and that he was able to have a shipment sent to him of seventy-five. (TT3 #2,804). I believe that DELCID was saying he received seventy-five ounces of cocaine.

128.    GLORIA called DELCID a few minutes later, and he asked her if she was coming. She asked, "You'll need the passport, right?" He said, "Yes, bring it." (TT3 #2,806).

Approximately one hour later, DELCID sent a text message to a person in Honduras saying, "[T]here goes 1,500 via Western Union, this is the number [redacted], in the name of Gloria Elena Oliva Castro." (TT3 #2,808). That is GLORIA's full name.

129.    An hour later, at approximately 10:42 p.m., DELCID spoke with CONCEPION about her picking up her frames. DELCID said he was not at home, and she asked if he could go back there and bring the frames down to her. He asked if she was going to take the ones for SAMUEL as well, and she said she would. (TT3 #2,826).

130.    At 10:52 p.m., DELCID called CONCEPCION and asked if she was already there. She said she was, but could not find parking. DELCID forgot to hang up his phone, and so when he met with CONCEPCION soon thereafter, their ensuing conversation was intercepted. GLORIA was with DELCID during this meeting. DELCID was overheard providing CONCEPCION her frames and explaining that GLORIA was responsible for the cocaine arriving via the courier. DELCID said, "Here are yours, look." CONCEPCION said, "Ok, ok. The other ones, the little ones, the other ones, are whose? Samuel's?" DELCID replied, "Yes." Later he said, referring to GLORIA, "It's that she wired some money today." CONCEPCION said, "Oh, you wired the money? Your girlfriend is pretty. Are you dating or friends?" CONCEPCION asked GLORIA, "Are you from El Salvador?" and she replied, "No, from Honduras." DELCID explained, again referring to GLORIA, "She's the one who gave me the number." CONCEPCION asked, "Is this the first time you send what that traveler?" and DELCID said, "Yes, first time." Later CONCEPCION asked DELCID, "And here, the ones that you're giving me. How many?" DELCID replied, "There are, oh, 16." (TT3 #2,827).

131.    The next day, DELCID and SAMUEL were intercepted discussing, among other things, the previous evening's transaction with CONCEPCION and GLORIA. DELCID said,

"Conchis met my girl yesterday. . . . I was with her when we gave her the frames." SAMUEL said, "You were with her? When she got there? She told me this morning that she had gone to you to pick up the frames." DELCID said, "Yes. . . . She said my girlfriend is pretty." DELCID went on to say that when he told CONCEPCION that GLORIA was obtained the courier's telephone number for him, CONCEPCION became very fond of GLORIA. DELCID said, "When I said, 'She's the one who has gotten the numbers for me,' Conchis got happy and said those favors are appreciated." DELCID continued to say GLORIA had gotten him four couriers to import the cocaine, "She has gotten me four travelers . . . and brand new ones." DELCID explained that GLORIA had sent drug proceeds for him and that he was worried she may get caught due to her high volume. DELCID said, "She's the only one who's been sending the money for me. Just in the three months she has sent like $14,000 dollars. I have to stop because I'm afraid they will grab her by the hair." SAMUEL said, "Yes, because her address is always on it," to which DELCID replied, "And the passport." DELCID and SAMUEL discussed sending wire transfers in other people's names, but DELCID pointed out, "The problem is that you can do it with other names but only less than 1,000, but not over. . . . If the wire gets lost, you can't claim it without ID." (TT3 #2,884)

### E.    April 20th

132.    Based on intercepted communications and other evidence, law enforcement was able to identify a suspected cocaine courier, UCC #14, who was scheduled to arrive at George Bush Intercontinental Airport in Houston, Texas, ("George Bush Airport") on April 20, 2012, with a final destination of Dulles Airport. UCC #14 arrived at George Bush Airport, and a search of her property by agents with U.S. Customs and Border Protection revealed approximately ten frames and three wooden statues. A further search of the plaques and statues revealed they

contained secreted cocaine. The cocaine located within the plaques and statutes were found to have a gross field weight of approximately 1.3 kilograms.

133. UCC #14, a Honduran citizen with a United States Visa, was interviewed further by agents with Homeland Security Investigations ("HSI") assigned to the George Bush Airport. In sum and substance, UCC #14 said she had received the frames and statues from an individual in Honduras who asked her to deliver them to his brother within the United States. UCC #14 was going to be paid $7,000 for delivering the items. As the interview progressed, UCC #14 told agents she suspected cocaine was concealed within the items because by themselves they had a low resale value, and she was in turn going to be paid $7,000 for delivering them. UCC #14 did not during the interview identify any of the co-conspirators, and the HSI agents did not confront her with information learned during the course of this investigation for fear that it would compromise the investigation. UCC #14 remains in custody after her arrest by HSI agents.

134. As discussed in Section III.D, UCC #13 gave the cocaine to UCC #14 and it was intended for CONCEPCION, DELCID, and other co-conspirators. On April 24, 2012, CONCEPCION called a relative of UCC #14's in Honduras and identified herself with the false name of "Yolonda." CONCEPCION explained she was calling from the United States to check on UCC #14's whereabouts because CONCEPCION claimed she was told UCC #14 had trouble with her documents in Houston and had not arrived to Virginia. The relative responded, "Yes, with the documents. That is why she has not been able to deliver the things because she is trying to fix the problem now." (TT4 #608).

F.    **April 24th**

135. Law enforcement also learned that another courier, UCC #15, arrived in the United States at the Miami International Airport, in Miami, Florida, on April 24, 2012, inbound

from Honduras, with a final destination of his home in Maryland. UCC #15 was suspected of being a courier of legitimate goods that he sells to individuals in the United States, but who oftentimes also brings in the frames that contain cocaine. A search of his property by agents with U.S. Customs and Border Protection revealed approximately twenty-seven frames containing secreted cocaine, which had a gross field weight of approximately 1.7 kilograms.

136.    UCC #15, a United States Citizen who resides in Maryland, was interviewed further by HSI agents assigned to the Miami International Airport. In sum and substance, UCC #15 said he did not know there was cocaine secreted inside the frames. UCC #15 did not identify any of the co-conspirators, but said he had delivered similar packages to subjects in the United States before. UCC #15 said he was paid a certain amount by the pound of each package he delivered. UCC #15 did not during the interview identify any of the co-conspirators, and the HSI agents did not confront him with information learned during the course of this investigation for fear that it would compromise the investigation. UCC #15 also remains in custody after his arrest by HSI agents.

G.    April 25th

137.    Based on intercepted communications and other evidence, law enforcement was able to learn that suspected cocaine couriers, UCC #16 and UCC #17, were scheduled to arrive at George Bush Airport on April 25, 2012, with a final destination to the Washington, D.C. metropolitan area. UCC #16 and UCC #17 are Honduran citizens with United States Visas. When they arrived, a search of their property by agents with U.S. Customs and Border Protection revealed that UCC #16 had inside her luggage approximately 90 grams of cocaine concealed within shoes, and UCC #17 had inside his luggage approximately 1.7 kilograms of cocaine concealed within frames. HSI agents interviewed UCC #16 and UCC #17, and both denied

knowing there was cocaine concealed within the shoes and frames they were importing. They were charged by the local Houston authorities.

138.    Numerous calls have been intercepted discussing the fact that so many couriers were being stopped for one reason or another. During an intercepted conversation between SAMUEL and a Honduras source of supply on April 27, 2012, they discussed the issue. The source said of UCC #15, "And the one who was caught, the one who was caught was a so called [UCC #15's name]. People say he was the one who would go to the parking lot. Oscar told me that [UI] twenty-four. I didn't send there. Mine was through another way, through Maryland." SAMUEL said, "You sent some with [UCC #17]?" The source replied, "Yes, yes. . . . Uh well, just think that you just sent forty-five. They sent it with that so called [UCC #15's name]." SAMUEL went on to say, "Oh shit! What a mess. [Name redacted] sent me some in there, with [UCC #16]." (TT2 #14,345).

139.    During a call later that day, SAMUEL said to another person, "I wanted to tell you. Things are hot now, three travelers were busted. . . . They caught [UCC #16] from Woodbridge, [UCC #17] from Maryland and [UCC #14], another one from Springfield." (TT2 # 14,488).

## V.    DISTRIBUTION

140.    The members of the conspiracy who receive cocaine directly from sources of supply in Honduras distribute the drug in this country for profit. Though, on occasion, some may sell small amounts to end users, I believe the vast majority of their business comes from supplying wholesale quantities to co-conspirators who are themselves street-level dealers, or who supply other street-level dealers. I further believe many of these co-conspirators are aware of how the cocaine is coming into the country and that they are part of a broader organization. What

follows is a discussion of some of the co-conspirators with and through whom BARRERA, DELCID, and SAMUEL distribute their cocaine.

## A.    Barrera's network

141.    On February 24, 2012, BARRERA told another cocaine dealer that "I got 3,000 on Saturday, in a single day. . . . Just on a Thursday, Friday, Saturday, and Sunday, in four days, I made almost $7,000." The other dealer responded, "Son of a bitch," and BARRERA boasted, "I'm sharp, right? Uh huh." BARRERA further said, "I only sell halves," and the other dealer agreed, saying, "Yes, man, me too. Me too. By halves and eighths." (TT1 #5,883). I believe that BARRERA was saying that, at a minimum, he sells half-ounces of cocaine at a time, and that he is making thousands of dollars a week doing so. This was corroborated throughout the investigation, to include the controlled purchases of cocaine from him on October 21, 2011, and January 13, 2012, discussed above in Sections I.B and I.E, respectively.

142.    I believe the network of people BARRERA supplies with cocaine for further distribution includes the following co-conspirators: PENA, BARRIOS, WILSON, LOPEZ, and REYES. Each is discussed in turn.

### i.    Pena

143.    As discussed in Section I.C, PENA was living with BARRERA on October 21, 2011, when FCPD officers searched the residence and found in PENA's bedroom cocaine and distribution paraphernalia. Also in the bedroom and on his person was almost $3,000 in U.S. currency, which I believe are likely to be proceeds from the sale of cocaine. Furthermore, in Section IV.B, I detailed the evidence that shows PENA traveled with BARRERA to Hempstead, New York, on March 7, 2012, to pick up 3.5 kilograms of cocaine from a courier and transport it back to Virginia.

144. Interceptions revealed that PENA works for BARRERA. For instance, on February 5, 2012, BARRERA sent PENA a text message that said, "Go to [named redacted]'s, [he] wants one right now." (TT1 # 1,031). I believe BARRERA was directing PENA to deliver cocaine on behalf of BARRERA. The next day, BARRERA sent a text message that said, "Your client has been terrible, and you let him die and he was mad." (TT1 #1,379). PENA responded, "What a great client that when he wants it on credit then he calls." (TT1 #1380). I believe BARRERA was upset that PENA had not been attentive to a customer's needs, and that PENA responded by expressing frustration with the client for only calling and wanting the cocaine fronted.

145. That PENA sells cocaine was confirmed through CS #6, who made the following four controlled purchases of cocaine from PENA: two grams for $100 on September 28, 2011; 3.5 grams for $150 on October 13, 2011, 3.5 grams for $150 on November 3, 2011, and December 29, 2011; and approximately half an ounce for $500 on February 17, 2012. PENA used the same telephone to communicate with BARRERA that he used to communicate with CS #6. CS #6 has been providing information to law enforcement since approximately February 2011 after CS #6 was arrested and found to be in possession of cocaine by local law enforcement. CS #6 is not a convicted felon and does not have arrests/convictions for crimes of deception. CS #6 agreed to cooperate with law enforcement for consideration in the local possession charge. Based upon information provided by CS#6, the pending possession charge is anticipated to be dismissed. CS #6 has provided information that has been independently corroborated by law enforcement.

###### ii.   **Barrios**

146.   In Section I.E, I described how BARRIOS sold an ounce of cocaine to CS #4, and then set up a deal where BARRERA sold CS #4 another ounce. BARRIOS told CS #4 that BARRERA was his cousin and could get CS #4 kilograms of the drug. Interceptions since those controlled purchases have shown that BARRIOS continues to obtain cocaine from BARRERA to sell to others. The telephone BARRIOS used to communicate with BARRERA is the same he used to communicate with CS #4.

147.   On February 5, 2012, the two exchanged a series of text messages in which BARRIOS wanted BARRERA to supply him. BARRIOS wrote, "Fucking asshole, bring me something. I was left waiting last night." (TT1 #936). BARRERA responded, "I didn't go because Pablo [PENA's nickname] told me that he had stopped by there." (TT1 #940). BARRERA said he could not come see BARRIOS because he was with his family, and suggested that BARRIOS reach out to PENA. (TT1 #942). BARRIOS said, "You tell him. I don't have money, I'll pay you tomorrow." (TT1 #943). BARRERA then sent a text message to PENA: "Garrobo [BARRIOS's nickname] says he wants something." (TT1 #945).

148.   That BARRIOS deals in wholesale quantities that he sells to other people was evident throughout his communications with BARRERA. For instance, on February 20, 2012, BARRIOS called BARRERA and said that another person called BARRIOS and wanted to know the price for an "entire orange," which I believe to be an ounce of cocaine. BARRIOS then said he wanted to buy two or three. (TT1 #4,985). Then on March 8, 2012, the day after he and PENA returned from New York with the 3.5 kilograms, BARRERA sent a text to BARRIOS saying, "Today there is milk like rice at wholesale get on the ball." (TT1 #8,355). Then BARRERA

followed up with, "Get contacts lined up." (TT1 #8,356). BARRIOS wrote back, "Ok, I'm going to call a guy right now." (TT1 #8,360).

### iii.   Wilson

149.    WILSON, as laid out in Section III.E.iii, has direct contact with sources of supply in Honduras himself. But the investigation has shown that, for at least two years, he has obtained cocaine from BARRERA to sell to others. On February 10, 2012, BARRERA told SAMUEL that WILSON wanted a "half," referring to half-an-ounce of cocaine, and that WILSON would pay $450 for it. BARRERA said of WILSON, "I supply that asshole but I don't have anything today. I have been supplying for him for two years. . . . He's a cousin of ours. He's the only one that bails us out when we're locked up." (TT1 #2,379). WILSON and BARRERA both have the name "Guevara" in their respective surnames, corroborating BARRERA's claim that they are related.

150.    The next day, WILSON was intercepted talking with BARRERA about getting frames with cocaine from SAMUEL. During the call, BARRERA said, "Look, that asshole Samuel will sell one little frame, sealed, of three. [Name redacted] will get one. Let me know if you want a half." WILSON said, "Get it for me then." BARRERA said, "He will give it to me at eight. I'm just doing you a favor." WILSON said, "That's fine. I got one from that one as well." BARRERA then explained that UCC #3 was going to send BARRERA additional cocaine but he had to go to Georgia to get it. WILSON, acknowledging that he was in contact with UCC #3 and was expecting cocaine from him, said, "He said Thursday. He will send two for me and he'll give them to you." BARRERA said, "Yes, that's what he said. He called me today. I'll take advantage that the asshole said he would not have time to sell it because he has to go get that with Mauricio. I was like, 'Fine, give them to me.' The son of a bitch said he will bring them in

one hour." WILSON said, "Yes, leave a half for me." (TT1 #2,581). On February 16, 2012, WILSON followed up about the cocaine UCC #3 was sending him: "Do you know when the 2 that [UCC #3] was going to send me will arrive?" (TT1 #3,822).

151.    In addition to BARRERA referring to WILSON by his first name and also saying that they are cousins, which is corroborated by their shared surname of Guevara, WILSON has been further identified as follows. Law enforcement records show he was issued a traffic citation on April 27, 2011, by Prince William County Police. At that time, he provided a home address in Manassas, Virginia. One of the two telephone numbers he uses to communicate with BARRERA is registered at that same Manassas address and in the name of "W Jose Guevara." WILSON uses two telephones to communicate with BARRERA. Western Union records collected in this investigation show a wire transaction from August 30, 2011, in which WILSON was listed as the sender, and which included his Texas driver's license number, the same Manassas address, and the other telephone number he uses to communicate with BARRERA.

####     iv.    Lopez

152.    Based on the investigation, I believe LOPEZ purchases cocaine from BARRERA regularly and in ounce quantities, which I know to be inconsistent with personal use, as exhibited by these communications over just a one month period. On February 28, 2012, they discussed a meet location and BARRERA said, "I'm going to Maryland and its better if . . . give me the order before I leave, so I can take it with me." (TT1 #6,810). The next day, LOPEZ said, "I was going there to see [UI] work." BARRERA said, "Oh, the same kind?" LOPEZ said, "Uh, huh". BARRERA said, "Come on then . . . the same as yesterday?" LOPEZ said, "Uh, huh. . . . Give me one." BARRERA responded, "Ok." (TT1 # 7052). On March 3, 2012, LOPEZ asked where they could meet, and BARRERA said at the same place they always meet. (TT1 #7,412). And on

March 8, 2012, they agreed to meet again, this time by "Fairfax Mall" "where we went that one time . . ." LOPEZ agreed and told BARRERA to "Give me one." (TT1 #8,286).

153.    LOPEZ has also smuggled cocaine into the United States for BARRERA. On February 3, 2012, LOPEZ told BARRERA, "I'm going to El Salvador now, until I get back." BARRERA said, "Ah fuck, bring a couple of frames man." LOPEZ said, "I'm coming back on the 21st." BARRERA asked what month and LOPEZ said "This month." BARRERA again said, "Ah, no, [UI] bring [a] cuadro [frame]. I'll have someone bring it to you over there." LOPEZ said, "Bah, balls." BARRERA laughed and said, "Fuck, have a pair of shoes on, carrying them on." (TT1 #275). Flight records confirmed LOPEZ departed on a Taca Airlines flight out of Dulles Airport on Friday, February 10, 2012, to San Salvador, El Salvador, and returned to the United States on February 21, 2012.

154.    On February 25, 2012, the two spoke and arranged for LOPEZ to deliver the frame to BARRERA. BARRERA said to LOPEZ, "Fuck, you're back already?" LOPEZ said, "What then nephew?" BARRERA said, "You came back from over there?" LOPEZ confirmed he was back and asked BARRERA, "Do you have something good for me?" BARRERA said, "Did you bring me the frame?" LOPEZ responded saying, "What a bitch, I don't want to be an asshole and get stuck there. . . . I'm telling you I'm screwed, I'm scared." BARRERA said, "Yes it's fucked, to lose the freedom and the documents." LOPEZ said, "Right." LOPEZ asked BARRERA if he was going to be close by to which BARRERA said, "I don't know. Do you want to meet somewhere around, so you can give me . . . what you brought me from over there." LOPEZ said, "Yes, no, the uncles sent you a little something there." BARRERA and LOPEZ then agreed on a meet location. (TT1 #6,047).

155.    LOPEZ is the subscriber of the telephone number he uses to communicate with BARRERA, and the address listed for the subscriber is one LOPEZ provided BARRERA during a call on March 16, 2012, in which LOPEZ asked BARRERA to come to his house. (TT1 #9,998).

### v.    Reyes

156.    REYES purchases half-ounce quantities of cocaine from BARRERA on a frequent basis, as these examples of intercepted calls between them illustrate. On February 6, 2012, REYES told BARRERA "Alright then, bring me the same as always, the half." BARRERA responded, "That's fine." (TT1 #1,415). On February 16, 2012, REYES asked BARRERA, "Is there some?" BARRERA said, "Yes, right now, yes." REYES then said, "Oh, ok, then come over and bring me the, the same as always. The half." (TT1 #3,911).

157.    On February 23, 2012, REYES asked for one ounce of cocaine split into two half-ounce packages, indicating he was going to be selling them to other people. BARRERA told REYES he was headed to buy a pizza and then "I'll bring you yours." REYES said, "Alright then but bring me the, the, bring me the big pizza but divided." BARRERA said, "Ah, one by itself?" and REYES said, "Yes." BARRERA said he understood and REYES said, "Divided." BARRERA replied, "Without grinding it, right?" REYES said, "Yes, not grind." BARRERA said, "That's fine. I'll bring it." (TT1 #5,621).

158.    The next day, REYES called BARRERA to pass on a complaint from REYES's customer that one of the half-ounce packages, which should have been fourteen grams, was short about two grams. REYES asked BARRERA, "Fuck, look, do you weigh the thing or does another dude weigh it there?" BARRERA said, "No, I weigh it. Why?" REYES said, "It's just that I don't think it's complete dude. Isn't it fourteen that you have to give me?" BARRERA

said, "Yes, fourteen, complete." REYES said, "It's just that, the truth is that I gave one, one was for me to give and . . . twelve for the dude." BARRERA asked, "What did he tell you, that how much came out?" REYES said, "He told me that only twelve. And it's true dude; I was there and saw it, you see." BARRERA and REYES went on to discuss the shortage in great detail, in the course of which BARRERA asked if REYES had a scale. REYES indicated he did, but that he had issues with it. BARRERA said he had one he would give REYES, in addition to two grams of cocaine: "I'll bring what's missing there and I'll bring you the scale too." (TT1 #5,847).

159.    I believe REYES knows that BARRERA is trafficking in much more substantial quantities of cocaine. On March 8, 2012, the day after BARRERA picked up the large shipment of cocaine in New York, he asked REYES, "[D]o you want five all at once?" REYES said, "No, shit. Fuck." BARRERA explained, "We went to get like fifty animals yesterday, no shit. . . . I'm in so much debt that I'm going to get a cold to pay for that shit. . . . I owe about $30,000." REYES responded, "Fuck, but you're going to make it like that too, man." BARRERA replied, "Like that, little by little." REYES said, "Bring me something there, the same as always." BARRERA answered, "No, I'm going to give it to you, bitch. [UI] invest right now because that one was begging right now. There's plenty right now to give it to you worked very well." REYES agreed, saying, "Ok, that's good. Because, I, like I told you, I pass it too. I pass it there . . . a little more." (TT1 #8,380).

160.    The telephone number REYES uses to communicate with BARRERA was listed under the name "Nelo" in BARRERA's cellular telephone that was seized by law enforcement on October 21, 2011, and later searched. "Nelo" is a shortened form of REYES's first name, and it is what BARRERA has referred to him by in intercepted conversations. Furthermore, REYES's telephone number is subscribed to in the name of "Annelo Argueta" (REYES's full

name is Annelo Argueta Reyes) at an address in Falls Church, Virginia. Records from Western Union show a wire transaction from January 11, 2012, on which REYES's was listed as the sender and that included his telephone number and the Falls Church address on the subscriber information for his telephone number.

## B.   Delcid's network

161.   As DELCID explained to one of his Honduras suppliers while ordering a shipment of cocaine, "This will go fast dude. I have a lot of people right now. Chinese and Hispanics." (TT3 #608). The investigation has confirmed his statement. DELCID supplies cocaine to Hispanic co-conspirators, as well as to co-conspirators he meets through his employment at a restaurant in the Eden Center, which was discussed in Section II.E. DELCID has expressed particular satisfaction with the latter co-conspirators, telling SAMUEL on several occasions how much money he makes through them: "Just the day before yesterday, just from the Chinese shopping center, I had 3,000 dude." (TT3 #951). "I go to that fucking shopping and I bring up to 1,100, 2,000, 3,000. I had 5,000 the other day. . . . Only the Chinese." (TT3 #1,183). And he explained to SAMUEL that the reason he makes so much money through them is that they ask for the cocaine to be "pulverized," which allows him, I believe, to be able to cut it with adulterant. (TT2 #9,926).

162.   That DELCID does not work alone in dealing cocaine is illustrated by a series of controlled purchases an undercover FCPD officer (UC #2) made from him. On February 17, 2012, UC #2 spoke with DELCID over the phone and arranged to purchase fourteen grams of cocaine that same day. DELCID did not arrive at the agreed-upon deal location, but rather sent another man to deliver the cocaine to UC #2 in exchange for $450. On February 23 and 29, 2012, UC #2 did meet with DELCID in person and paid him $900 for an ounce of cocaine. Both times,

however, DELCID had someone else give the ounce to UC #2. On March 7, 2012, UC #2 ordered another ounce from DELCID for $900. DELCID said he could not come to the deal himself because his tooth hurt, so he sent a man to deliver the ounce and pick up the money. On March 14, 2012, UC #2 paid $1,800 to DELCID for two ounces. Again, though DELCID took the money, he did not deliver the cocaine himself. Another man showed up and provided it to UC #2. Finally, on April 24, 2012, UC #2 arranged to purchase two ounces of cocaine from DELCID for $1,800. DELCID arrived at the pre-arranged meet location in a vehicle as the passenger. UC #2 paid $1,800 to DELCID and the driver of the vehicle supplied UC #2 with the two ounces of cocaine.

163.    The following co-conspirators are, I believe, part of DELCID's distribution network: GLORIA, AVILA, UCC #19, UCC #20, UCC #21, UCC #22, and UCC #23. They are discussed in order.

### i.    Gloria

164.    GLORIA is DELCID's girlfriend, and, as previously discussed in Section IV.D, she helps him further the conspiracy by remitting drug proceeds back to Honduras and finding couriers to import cocaine from Honduras into the United States.

165.    An example of GLORIA's involvement in wiring drug proceeds comes from a call on March 14, 2012. DELCID told her, "I'm bagging money like crazy." She replied, "I can come help you if you want." DELCID said, "Come then. . . . I'm always asking you to come help me and you never want. I think I'm getting a fever from counting that shit. I have to send a lot of money. Do you have your passport there? So that I can send a part on your name." GLORIA explained that her passport was in her other purse and her husband was questioning her as to why she took the passport with her last time. (TT3 #1,160). In another call later that same day,

DELCID said, "I want to send a lot. I want to send 8,000 tomorrow. . . . The other day you sent some, you [UI] 3,000." GLORIA responded, "Let's split it in two. Look, there are two places nearby where you can send money." (TT3 #1,161).

166.    Two days later, DELCID bragged to GLORIA about the amount of money he was making and sending to Honduras. He said, "They might lock me up a shitload of years for being greedy. . . . Look, I have no peace with this shit. God forbids. When I called you yesterday and told you I had something to do, they were calling me on the other phone, [saying] the woman was coming from Prince William. She brought me 3,150. . . . Imagine, just yesterday alone I sent 8,000 and I had made 7,000 by the afternoon." (TT3 #1,262).

167.    On March 25, 2012, DELCID told GLORIA to call a friend of hers and "and tell her to bring the passport. . . . And we'll send money tomorrow [using] hers. . . . Do you think it can [be done]?" GLORIA replied, "I'll ask her and see if she has a passport." DELCID said, "Or whatever she has. If she has ID, there's no problem with that. . . . I have to a send a shitload tomorrow, like 7,000." (TT3 # 2,102). A week later, DELCID told GLORIA to come to his place, saying "Come because I'm practicing here." GLORIA said, "You'll need the passport right?" and DELCID said, "Yes, bring it." (TT3 #2,806).

168.    It appears that GLORIA is being paid for her role in the conspiracy. On March 2, 2012, DELCID told her, "I want you here to help me. Leave that fucking job at Tequila and I'll support you and you help me." GLORIA said, "Really?" And DELCID asked, "How much do you make per week at Tequila?" GLORIA responded, "Like 500." DELCID said, "I'll give you 1,000 per week. . . . How much do you think I pay the kid? That kid does not worry about paying rent or food." GLORIA said, "That's fine." DELCID went on to explain that his brother was

coming to Virginia from North Carolina tomorrow "to bring," by which I believe he meant cocaine. (TT3 #109).

169.   GLORIA has been identified in many ways. First, DELCID commonly refers to her as "Gloria," which is her first name, when he speaks to her or about her with other co-conspirators. He used her full name in a text message to a person in Honduras saying, "[T]here goes 1,500 via Western Union, this is the number [redacted], in the name of Gloria Elena Oliva Castro." (TT3 #2,808). Second, the telephone number GLORIA has been intercepted using to communicate with DELCID was listed on a pawn transaction from September 6, 2011 at First Cash Pawn in Alexandria, Virginia, that was in her name and that also listed her date of birth and passport number. Her name and the same telephone number were listed again on another pawn transaction dated April 17, 2012, at First Cash Pawn. Third, Western Union records also revealed approximately three wire transfers in GLORIA's name between February 27, 2012 and March 15, 2012, for a total of approximately $5,000. Two of the three wire transfers listed DELCID's telephone number, Target Telephone #3, as the associated phone number.

### ii.   Avila

170.   Intercepted communications between the two have established that DELCID supplies AVILA with cocaine that AVILA then sells to other people. For example, on March 3, 2012, AVILA said to DELCID, "[M]y brother and [name redacted] say that they want one. . . . Well my brother . . . my brother says he will give you the money on Friday." DELCID told AVILA to have someone come to DELCID's house to "pick it up," and AVILA said, "My brother said that on Friday, he will give you the money." (TT3 #208).

171.   Then on March 17, 2012, AVILA asked DELCID for cocaine when he said, "You don't have anything? At all?" DELCID replied, "I have a little but it is not broken down. It's not

broken down." AVILA said, "Give me it though and I'll break it down now. . . ." DELCID asked

AVILA if he was nearby and AVILA said, "I'm here outside of your house." DELCID told

AVILA to "Come over towards the dumpster, because I'm downstairs already." (TT3 #1,437). I

believe AVILA called DELCID asking for cocaine to purchase and the only cocaine DELCID

had was not mixed with a cutting agent, which AVILA said he would do on his own.

172.     Not only does AVILA obtain cocaine from DELCID, he is also aware the cocaine

is imported into the country from Honduras. As discussed above in Section IV.A, AVILA was

observed on February 19, 2012, meeting with a drug courier in Herndon, Virginia, and departing

the area with what I believe was cocaine that was destined for DELCID. And on March 22, 2012,

which was the day law enforcement intercepted a courier at Dulles Airport, DELCID complained

to AVILA, "The worst part is that I set up that trip [UI] this old woman, and I set up another one

for the same date. . . . Dude, if they detected them in that shit, I lost it all." AVILA said, "Yeah,

because they'll be on alert. If they got the frames, they'll know it's the frames." DELCID

replied, "They'll be checking, but shoes are coming as well." AVILA said of law enforcement,

"Some days they go like 'Why is this woman bringing so many of this material?'" (TT3 #1,814).

173.     In addition to being identified by law enforcement during a traffic stop after he

picked met with the courier on February 19, 2012, a record of a Western Union wire transfer

transaction from February 12, 2012, had AVILA's name as the sender, and listed his telephone

number as the same that he has been intercepted using to communicate with DELCID.

### iii.     UCC #19 and UCC #20

174.     On March 18, 2012, DELCID spoke with SAMUEL about how he uses UCC #19

and UCC #20 to distribute cocaine for him. DELCID said, "That son of a bitch [UCC #19] is

running back and forth and Cuzuco is worse, [UCC #20]. . . . I call [UCC #20] Cuzuco." Later in

the conversation SAMUEL said, "The problem is that Cuzuco and [UCC #19] are the only ones you have, so the assholes can go out and do your running." DELCID replied, "No, I only have [UCC #19] and Cuzuco, and I give [UCC #19], I give him one so he can work on his own, small quantities. . . . [H]e only gives me the money from the stuff that I give him." SAMUEL asked what price DELCID sold the cocaine to [UCC #19] and DELCID replied, "I give it to him at seven, all fixed up and with everything, and the bags. . . . [H]e takes charge of going about dividing it up and weighing it all and all." I believe DELCID was saying he sells UCC #19 an ounce of cocaine for $700, which UCC #19 breaks down into smaller quantities to sell to other people. SAMUEL and DELCID discussed UCC #19 further and SAMUEL said, "Yes, that day that I, along with him, I opened the frame in front of him." (TT3 #1,477).

175.    UCC #19 has been intercepted numerous times communicating with DELCID about the distribution of cocaine, with DELCID often directing UCC #19 to bring DELCID cocaine or deliver it to someone else on DELCID's behalf. For instance, on March 25, 2012, DELCID called UCC #19 and said, "Another fucker just called me. . . . He needs two ground up." UCC #19 asked, "When?" DELCID replied, "Right now." UCC #19 said, "I'm here at the shopping [center]." DELCID said, "Go and deliver them quickly." UCC #19 responded, "I'll just finish up a business I was doing." (TT3 #2,077). A few minutes later, the two spoke again and DELCID said, "[Have them] weighed correctly. . . . The same. How much do you put on it? Put 28.7 because some was missing because of the weight of the bag." (TT3 #2,079).

176.    Another example is from April 8, 2012, when DELCID said to UCC #19, "I want you to look for a bundle that I have there, but it's not the same one I have in the big bundle. Do you understand? It's a small bundle that I have there and I was saving it for those fuckers. But I don't remember where it is, that's the truth. Have you seen it?" UCC #19 said, "No, I don't

know. A bundle?" DELCID replied, "Yes, it's like a, the one I told you that came separate. I haven't mixed that one up. . . . Look in the briefcase where the frame was. . . . There's one there. Look and see how it is. UCC #19 said, "One that sits there with a ground-up package?" DELCID said, "Yes, but the big one is like cream. It looks very good. . . . That's the one I need. Bring out the big bundle, send it with Cuzo [a shortened form of Cuzuco, UCC #20's nickname]." DELCID went on to say, "Wait until you hear what I have to say. Send that one and send two from the big bundle. . . . Two whole ones." UCC #19 said, "Call [UCC #20]. Where the fuck is he?" DELCID said, "I'll tell him to go there right now." (TT3 #3,283). I believe DELCID directed UCC #19 to get cocaine from where DELCID had some stored in his residence, and to give it to UCC #20 who would deliver it.

177.    That UCC #20, who the evidence suggests is DELCID's brother, also helps distribute cocaine for DELCID has been confirmed through interceptions over DELCID's telephone. On March 15, 2012, for instance, DELCID told him, "Listen to what I'm going to tell you. Go in the room. . . . I left a little bag in the drawer, like cologne [box]. UCC #20 said, "The drawer where you [UI] the things? DELCID said, "Yes, yes, yes, in the drawer. . . . [L]ook, there are four inside. Get one out and bring me three, with the little box and all. Come here and wait for me at the Tienda Latina [PH]." UCC #20 said, "I only bring you three? DELCID replied, "Yes, only three wrapped up in the little box." DELCID further instructed UCC #20 not to call when he arrived as DELCID would be looking for him. (TT3 #1,234).

178.    On March 20, 2012, DELCID spoke with UCC #20 and again directed him to bring DELCID cocaine: "Go in the drawer. I think I left it there. I don't remember well. Bring me the black little animal." UCC #20 said, "The scale?" DELICID said, "And one bag." UCC #20 said, "The little ones or the big ones?" DELCID replied, "The big ones. . . . It's in a condom

box in there." (TT3 #1,631). And on March 26, 2012, DELCID told UCC #20, "Don't count the money in front of people." UCC #20 said, "Alright." (TT3 #2,192).

      iv.    **UCC #21**

179.    Like UCC #19 and UCC #20, I believe UCC #21 works for DELCID to help him distribute cocaine, about which they have been intercepted communicating dozens of times. For instance, DELCID frequently calls UCC #21 and directs him to bring DELCID cocaine. On March 3, 2012, DELCID called UCC #21 and said, "Bring me another one wide animal with the seal because there is only one here." (TT3 #198). On March 7, 2012, DELCID sent UCC #21 a text message that said, "Dude, [name redacted] needs three ears outside of Tequila." UCC #21 replied via text message, "Tell [him/her] to go behind the CVS, I am on my way. Let me know if [he/she] is going so I can go." (TT3 #s 552, 553). On March 10, 2012, DELCID called UCC #21 and said, "Bring me a little package and the, to fill up. . . . No, only one . . . two, not more." (TT3 #793). On March 13, 2012, DELCID called UCC #21 and said, "Hey, listen, get that bottle down and check how many baggies are there." UCC #21 said, "Ok." DELCID said, "The one that is up, get it out because that is not broken up. . . . [Name redacted] is telling me that he needs ten." UCC #21 said, "I will tell you now, the one on top has, one, two three, four, five six, seven, eight. It has eight." DELCID said, "So the other one will have to be broken up, to make ten. Break it up a little with a glass or something." (TT3 #1,061). I believe these examples illustrate that UCC #21 helps DELCID by storing, packaging, and delivering cocaine at DELCID's direction.

180.    On March 22, 2012, UCC #21 asked DELCID about the status of the courier scheduled to arrive that day at Dulles Airport. UCC #21 asked, "Did you go there?" DELCID replied, "I went but there is nothing dude. They say that the old lady will arrive at 4:00." UCC

#21 said, "Fuck! I don't know what to do with this sons of bitches. I am not answering the phone . . . ." Later DELCID told UCC #21, "I am going to fix one and I will give you all the material and will set a price. Whatever you make extra, is your profit." UCC #21 said, "Deal. That is what we are going to do." (TT3 #1,785). I believe UCC #21 inquired with DELCID as to whether the cocaine had arrived with the courier as UCC #21 was getting lots of calls from cocaine customers wanting product. Furthermore, DELCID and UCC #21 agreed that DELCID would provide UCC #21 with cocaine at a specific price and UCC #21's profit would be however much UCC #21 could make above and beyond the set price.

     **v.**    **UCC #22**

181.    UCC #22 is a cocaine dealer and interceptions over DELCID's telephone revealed that DELCID supplies UCC #22 with the cocaine he sells. On March 3, 2012, the two spoke and UCC #22 asked, "Did you give the number to a friend yesterday?" DELCID said, "Yes. . . . Why? Is he your client?" UCC #22 said, "[Y]ou gave him a small card, right?" DELCID said, "No, no I did not. I am not dealing with little things." UCC #22 said, "No, he told me." DELCID then said, "No, I did not. Tell that son of a bitch not to be a blabber mouth." Later in the call, DELCID told UCC #22 he had cocaine for him if he wanted. DELCID said, "There is some fixed up already, if you want." UCC #22 replied, "No, I will call you tonight." (TT3 #173).

182.    On March 25, 2012, three days after the courier was caught with cocaine at Dulles Airport, DELCID and UCC #22 talked about cocaine DELCID may supply UCC #22 and referenced recent losses they had both suffered. DELCID said, "Do you want some or not?" UCC #22 said, "We'll talk, because fuck, it was bad this week." DELCID said, "What about me! I lost a whole lot. I will tell you about it in person." (TT3 #2,064).

183. On March 30, 2012, UCC #22 told DELCID, "I need two," by which I believe he meant two ounces of cocaine. DELCID said, "Fuck, how do you want them old man?" UCC #22 replied, "You know. The same as always." DELCID replied, "I don't have anyone at home to prepare them for me. [UI] When do you want them for?" UCC #22 said he wanted at least one that evening as he didn't have any more and he had the money at home. DELCID said he would see what he could do and UCC #22 said, "Cool, then. Two complete ones." (TT3 #2,525).

184. The next day, UCC #22 complained about the quality of the cocaine he had been provided. UCC #22 said, "No, the issue is that many are rejecting it." DELCID said, "Yeah, it smells much like gas." UCC #22 said, "They prepared it with gasoline. . . . Honestly, I like to keep my clients." DELCID replied, "No, I will have some better on Monday." (TT3 #2,573).

185. On April 5, 2012, UCC #22 was intercepted requesting four ounces of cocaine from DELCID. UCC #22 said, "Well, I need four." DELCID replied, "Four in one shot! . . . [G]o ahead. I will give them back to you in about forty-five minutes." UCC #22 replied, "No problem, if you can't at least two. . . ." DELCID said, "I will give you the four for sure. . . . I will call you in about forty-five minutes because I need to dry them and grind them." (TT3 #3,090).

### vi. UCC #23

186. UCC #23 obtains multi-ounce quantities of cocaine from DELCID and sells the drug to other people, which is evident by controlled purchases made from him and numerous intercepted conversations between him and DELCID.

187. On April 5, 2012, CS #3 conducted a controlled purchase of approximately seven grams of cocaine from UCC #23 for $250. On April 12, 2012, in another controlled purchase, UCC #23 sold CS #3 fourteen grams of cocaine for $500. CS #3 then introduced an FCPD

undercover officer (UC #3) to UCC #23, and on April 24, 2012, UC #3 made a controlled purchase of approximately twenty-eight grams of cocaine from UCC #23 for $900.

188.    The same telephone number that UCC #23 uses to communicate with CS #3, he also uses to communicate with DELCID. The following examples illustrate his involvement and relationship with DELCID.

189.    On March 23, 2012, DELCID and UCC #23 discussed the courier that was intercepted at Dulles Airport the day before. UCC #23 asked, "So, can it be done where you are or what?" DELCID replied, "Look, right now, right now, is the last thing I want to talk about this thing. That bitch was busted in Dulles." UCC #23 replied, "Yeah." DELCID said, "Yeah, am broke man with all that loss." UCC #23 asked, "You don't have anything?" DELCID said, "No, not even for a hit for me." UCC #23 said, "That is messed up, I do have a little bit." DELCID said, "I am fucking screwed big time now. Everything I earned I lost it in a heartbeat." UCC #23 said, "Yeah? The other day I bought some from the guys, your guys. . . . [I]t is better to deal with the main guy because it is bad." DELCID asked, "Whom did you buy from?" UCC #23 said, "I don't know [UI] Santos, and who know who, [UCC #19], I told Santos that I was not going to buy anything." DELCID asked, "And now what the fuck are you going to buy, if none of those sons of bitches have any?" UCC #23 replied, "No, no, I have someone that has, but, I was going to buy from you." DELCID said, "Wait, wait and I will give good stuff, but we have to see what the fuck, if they let that damn lady go or not. Let's see what happens between today and tomorrow. I am such a mess because I am so nervous." UCC #23 said, "I want to deal with you, man. I don't want to deal with them anymore." DELCID replied, "Ok, I will call you. Once I have some, I will give you a call so that we can sign a deal." (TT3 #1,891).

190.    On March 26, 2012, UCC #23 asked DELCID, "So, in case we want some, is it ready?" DELCID replied, "Look man, I can get you some, but with a friend. But that asshole gives eight." UCC #23 replied, "Not right now, I just want to know if I can count on you on Wednesday. . . . I have an order ready, but I have more orders. I am just confirming that you have some so that I can count on it." DELCID replied, "Look, I got one but it already left. But the guy has and he told me that if a friend needed some, to just send them his way." UCC #23 replied, "That is what I am saying. So you have, therefore I can count on you and if the guy calls me that he is coming, I know where to go." DELCID replied, "Okay, then. Just give me a call and I will tell him to bring it to you at the shopping. . . . [T]hat shit is 1,000 percent. It means that it is good." (TT3 #2,194).

191.    UCC #23 frequently purchases half-ounce quantities and above from DELCID as illustrated by the following series of intercepted calls. On April 4, 2012, UCC #23 called DELCID, who was at work, and asked, "There with you. Do you have some? Material, do you have it there?" DELCID replied, "Of course. . . . How long for you to get here? . . . Half right?" (TT3 #2,963).

192.    On April 8, 2012, UCC #23 called DELCID and asked, "Listen, maybe [UI] half there." DELCID replied, "I will call you when it is ready." UCC #23 asked, "Are you going to call me from another phone?" DELCID replied, "No, I will call you once it is ready for you to come over." UCC #23 replied, "[W]hat I wanted to say is that I will give you 300 now, well not now, when I get there. And at night I will give you the rest whenever I see you." DELCID said, "Okay, that's fine." (TT3 #3,285).

193.    UCC #23 called DELCID on April 12, 2012, and asked for another half-ounce of cocaine. DELCID asked, "How much do you want?" UCC #23 replied, "Half." (TT3 #3,646).

194.    And on April 15, 2012, UCC #23 again requested a half ounce. UCC #23 said, "I want to order half a chicken. I will be there shortly." DELCID said, "Okay," and UCC #23 replied, "Get me some baggies please." DELCID replied, "Okay, no problem." (TT3 #3,944).

### C.    Samuel's network

195.    Like BARRERA and DELCID, SAMUEL has a large group of people with and through whom he distributes the cocaine he receives from Honduras. The following members of SAMUEL's distribution network are discussed in order: CONCEPCION, MARIO, SANTOS, JURADO, GOMEZ-RIVERA, LIZAMA, NOEL, VANEGAS, ABREGO-MANCIA, RUDY, UCC #24, EDWIN, SARAVIA, GORDITO, JULIO, FLORINDA, MARIA, ENRIQUE, JUAREZ-LOPEZ, and ELMER.

#### i.    Concepcion

196.    As discussed above in Sections III.D and IV, CONCEPCION has direct contact with a source of supply in Honduras and helps to facilitate the importation of kilogram-quantities of cocaine into the United States for her, SAMUEL, DELCID, and others to sell. Beyond that, CONCEPION also helps remit proceeds back to Honduras. Western Union records reflect that, between November 2009 and January 2012, she sent fifty-one transfers to Honduras totaling approximately $47,595.

#### ii.    Mario

197.    In Sections III.B and III.E.i, I discussed how MARIO has a direct connection with sources of supply in Honduras and is aware that SAMUEL does as well. Investigation has further shown that MARIO is related to SAMUEL and they work together to import and distribute cocaine.

198. For example, on February 20, 2012, MARIO and SAMUEL were intercepted discussing, among other things, MARIO selling cocaine to other people. SAMUEL asked, "How many did you give him?" MARIO replied, "Just two." SAMUEL confirmed, "[T]wo little animals?" and MARIO replied, "Uh huh, for twenty-four. I mean they were twenty-eight because I added cut." (TT2 #649). I believe MARIO explained that he sold two ounces of cocaine, each of which contained twenty-eight grams because MARIO added a cutting agent to increase the quantity.

199. On February 25, 2012, the two were intercepted discussing the arrival of a cocaine courier from Honduras, and SAMUEL discussed how some of the cocaine was good quality to make "rocks," which I believe to be crack cocaine. During the call, SAMUEL asked MARIO, "Do you have the name of the traveler who is going to pick it up, or what's going on?" MARIO replied, "Yes, it's a man named [UCC #17]." Later in the conversation SAMUEL said, "Look, the material that [UCC #5] is sending is great to make rocks." He added, "I will stop by so you can lend me the packaging stuff since I don't want to go down there to buy some." MARIO said he would call someone to let SAMUEL into MARIO's apartment, and gave SAMUEL directions on where the find the packaging material: "[T]here is a red backpack, the bags are there, in the closet." (TT2 #1,629). Later that day they spoke again, and SAMUEL said, "I'm going to give you some advice: Don't keep that shit at your apartment. Don't have it there. . . . That material that you have is not any good, dude. . . . I'm going to get some good material. Well, you're going to pay 500 bucks for some material that is useful. . . . Look, if you want to have a client, put twenty-four, or look, twenty-three of the good one, and add five of the cut and fix it." (TT2 #1,653).

200.    Another example of MARIO's knowledge of other co-conspirators and involvement in the conspiracy is described in an intercepted call between he and SAMUEL that occurred on February 27, 2012. MARIO said, "I'm here at the house wrangling a frame." SAMUEL asked, "How many frames did that dude sent?" MARIO said, "Six frames. . . . [T]wo are mine and two that I will gave to [name redacted] and two that go to Nelson." Later in the conversation SAMUEL described the front of a frame that was sent containing cocaine and said, "Frame Olimpia. It says right there for Nelson but since you were the one that put the name in there and this one of Olimpia, the one with the little tiger he told me that he's the owner." (TT2 #2,124). I believe of the six frames sent containing cocaine, two belonged to MARIO and two belonged to NELSON, one of which had a tiger on the front labeling.

201.    SAMUEL refers to MARIO by his first name, both when speaking with him and speaking about him, and physical surveillance has placed MARIO and SAMUEL together. Agents were able to positively identify MARIO by comparing surveillance photographs against a jail booking photograph taken of him previously. Furthermore, the telephone MARIO uses to communicate with SAMUEL is subscribed to "Mario Pineda." Finally, Western Union wire transfer records revealed MARIO's name and intercepted telephone number as being on approximately ninety-nine wire transfers sent to Honduras between June 2010 and January 2012, for a total of approximately $41,300. On several of the Western Union wire transfers, MARIO's Honduran passport number also was listed.

### iii.    Santos

202.    SANTOS and SAMUEL are cousins. As described above in Sections IV.A and IV.B, SANTOS was observed driving SAMUEL to pick up frames on February 19, 2012, and March 8, 2012, thus demonstrating his knowledge of the conspiracy's importation of cocaine

from Honduras. Beyond that he has been intercepted numerous times communicating with SAMUEL about the trafficking of cocaine, and surveillance has observed SANTOS meeting with SAMUEL and other co-conspirators on several occasions when, based upon wire intercepts, the purpose of the meetings was to deliver cocaine to other co-conspirators. Many of those communications involve SAMUEL telling SANTOS to bring him (SAMUEL) cocaine, which leads me to believe that SAMUEL is using SANTOS's residence as a stash house. For as SAMUEL said to MARIO: "I'm going to give you some advice: Don't keep that shit at your apartment. Don't have it there." (TT2 #1,653).

203.   On March 4, 2012, SAMUEL gave SANTOS instructions about to whom he was to distribute a frame. He said, "[Name redacted] is on his way. Give him the big one." SANTOS said, "Only the big one?" SAMUEL said, "Yes, leave the little one there. Send me the two." SANTOS replied, "Why don't you weigh it here and I'll take it." (TT2 #3,202).

204.   On March 12, 2012, SAMUEL said, "[B]ring me a little frame of those ones, the ones that are there, the ones . . . ." SANTOS said, "Ok, you want a frame then?" SAMUEL confirmed he did and SANTOS said, "There are two pairs of shoes and three little frames." SAMUEL responded, "Uh huh, three, one big, one and two medium ones. Looks like it, right?" (TT2 #4,614).

205.   On March 17, 2012, SAMUEL called SANTOS again and directed SANTOS to bring him additional frames. SAMUEL said, "Bring me the, the frame just like it is. Roll it up, like it is, but I need the little bag because I'm going to deliver a half to the Argentinean." SANTOS said, "Ok, I'll bring you the whole bag. Don't worry." SAMUEL replied, "Don't bring the frame up here so we don't carry it. Just take the little bag out and bring it up here and leave

the thing in the car." SANTOS agreed and said he would be there in about twenty minutes. (TT2 #5,657).

206.    On March 26, 2012, SANTOS and SAMUEL were intercepted talking about a cocaine customer in Virginia Beach. SANTOS said, "That guy from Virginia Beach is calling me, man." SAMUEL said, "Yes, go take that frame, son of a bitch, that's there at the house. . . ." (TT2 # 7,617). I believe that the person they were discussing is ENRIQUE, a co-conspirator who is discussed below.

207.    The next day, SAMUEL told SANTOS that the "butter" was coming that night, by which I believe he meant cocaine. SANTOS asked SAMUEL how many "uniforms" he had asked for this time. SAMUEL said it was between "forty and sixty," just for SAMUEL, which I believe meant forty to sixty ounces. Later in the conversation SAMUEL said he had $2,500 to wire to Honduras, and SANTOS said he would do it for him at a Viamericas store (a money transmitter), where he would not be bothered. (TT2 #7,941).

208.    On April 20, 2012, SAMUEL called SANTOS and told him to deliver to "Diablo" and "the guy from near El Delicias." (TT2 #12,976). "Diablo" is the nickname for LIZAMA, a co-conspirator discussed below.

209.    Agents identified SANTOS by comparing surveillance photographs with prior DMV and jail booking photographs of him. Furthermore, his SANTOS name is commonly used during intercepted conversations, and the telephone number SANTOS uses to communicate with SAMUEL and other co-conspirators is subscribed to a variation of his name.

### iv.    Jurado

210.    JURADO has been intercepted communicating with SAMUEL on numerous occasions, several of which have revealed JURADO's knowledge and involvement in the conspiracy. Examples of intercepted calls follow:

211.    As discussed in Section IV.A, SAMUEL and SANTOS obtained cocaine from a courier on February 19, 2012. That same day, SAMUEL told JURADO that he was with "the cousin" and, "I'm going to go run another errand in Sterling. There are some little things coming with a traveler. We'll go see if we can pick them up." (TT2 #398)

212.    On March 3, 2012, at approximately 7:20 p.m., SAMUEL and JURADO were intercepted discussing who was going to pick up cocaine. JURADO said, "Who are you with? Carbajal [Santos's nickname]?" SAMUEL said, "Yes, with Carbajal, just the two of us. If we go over there, only you and Mario, because going with a lot of gang is tough." JURADO replied, "Like I said, if you want, [UI] over there and I go with Mario, because Mario says he has some things to do that he has to deliver." SAMUEL replied, "Go ahead, I'm going to do something else here. . . . Go only with that one." JURADO said, "Call me when you come so we meet in the parking lot." I believe JURADO and MARIO were going to go and pick up additional quantities of cocaine on behalf of SAMUEL, and SAMUEL instructed JURADO to only go with MARIO because going with a large amount of people could be dangerous. (TT2 #3,081).

213.    The next day the two discussed distributing cocaine. JURADO said, "Oh, what should we do then? I don't want to leave Mario here [UI] over there, and deliver the things I have there. I can go right now if you want. I'll tell Mario that we'll [UI] over there." SAMUEL replied, "You said you had a little one, right?" to which JURADO said, "No, I have a big one there." SAMUEL asked, "There aren't any of the small ones?" and JURADO said, "No, just big

ones. I don't have the little one. I have the big one there." Later JURADO asked, "How much do you want me to bring for you?" SAMUEL responded, "Put a tostonsillo [little 50] there for us." (TT2 #3,272). I believe JURADO was with MARIO while MARIO was making cocaine deliveries, and JURADO had a quantity of cocaine from which SAMUEL wanted a fifty-dollar bag.

214.   On March 8, 2012, at SAMUEL asked of JURADO, "Do me a favor. Go give a forty to the Argentinean. . . . I came over here in Vienna and I forgot and I have it right here. Take it and gauge it in a little bag. Bring him enough for a forty because he does not pay more for that shit." JURADO said, "Tell me how much I put." SAMUEL said, "You have the scale there right. . . . [P]ut a point seven." JURADO said, "Ok." (TT2 #3,916). I believe SAMUEL told JURADO to weigh .7 grams of cocaine and deliver it to an Argentinean customer.

215.   Intercepted calls on March 9, 2012 and March 14, 2012 revealed JURADO assists SAMUEL with the wiring of drug proceeds to Honduras. During an intercepted call on March 9th, JURADO said, "What company do you send the money through [UI] last time?" SAMUEL replied, "Depends. You can send it through Western Union, Banco Atlantida . . . ." JURADO said, "The one we sent it through. What was the name?" SAMUEL said, "We sent it through Vigo, [UI] Banco Atlantida in Honduras." JURADO replied, "Ok, I'll send it through Vigo then. . . . I'm going to send the money." (TT2 #4,192). And on March 14, 2012, SAMUEL called JURADO and asked, "Do you think you can do me a favor and send money to Honduras. . . . I have to send 4,700 dicks right now." JURADO said, "Yeah . . . come here and we send them." (TT2 #5,038).

216.   On March 22, 2012, the day the courier was caught at Dulles Airport, SAMUEL called JURADO and told him she had been caught with "the shit." JURADO asked what names

were on the packets, by which I believe he meant the frames, and SAMUEL said there were a lot of names. SAMUEL implied that he was out of cocaine and that he was going to try and find "two" that he could buy. He ended the call by saying he would look for JURADO later so they could determine whether they could work that weekend. I believe SAMUEL was saying that, with the courier caught and the cocaine shipment seized, he hoped to find cocaine elsewhere that he and JURADO would be able to sell and make money that coming weekend. (TT2 #6,808).

217.   SAMUEL called JURADO on March 30, 2012, and told him that the Argentine wanted to see JURADO. JURADO said to tell the Argentine it would be half an hour. SAMUEL explained that he could not meet with the Argentine because he (SAMUEL) was up in Maryland, but he had told the Argentine that he had left "five animals," which I believe is five ounces of cocaine, with JURADO. JURADO said he had them, but reiterated he would need half an hour. SAMUEL agreed. (TT2 #8,615).

218.   Several times on April 19, 2012, JURADO was intercepted calling SAMUEL and ordering cocaine that JURADO was going to supply a customer. JURADO spoke in coded conversation initially and said, "I'm saying I ate some fish and they left me dirty and I have bad breath and need two gum." SAMUEL asked, "But who are they for?" JURADO replied, "[A] dude that is [UI] friend of mine." JURADO asked for a "five zero," to which SAMUEL said, "I don't have that like that already done because, you know, right?" JURADO went on to say, "The thing is that the dude wants it between, right now [UI] me." SAMUEL replied, "Oh, you're going to deliver it right now then." JURADO answered affirmatively and SAMUEL went on to say, "I will make the, will make the, will make the 3.5." (TT2 #12,695). I believe JURADO was ordering cocaine from SAMUEL that JURADO intended to sell to a third party, and SAMUEL agreed to sell JURADO 3.5 grams of the drug.

219.    On April 28, 2012, JURADO said to SAMUEL," No man, that dude [UI], like he doesn't want to come. The price, he wants the same price. . . . How much does [name redacted] give it at?" SAMUEL replied, "I think that he gives it at two fifty. . . . We should have given it to him like that anyways." JURADO said, "I'll call them and let them know that we're going to give it then." SAMUEL said, "Tell him to give it like that, no problem." JURADO replied, "The only thing is that the whole at seven [UI]." SAMUEL replied, "That's right, it goes whole, uh-huh." (TT2 #14,691). I believe JURADO was brokering a cocaine transaction with a customer who used to purchase the cocaine from another source, and SAMUEL directed JURADO to sell the cocaine to the third party at the same price as the previous source. In addition, JURADO and SAMUEL talked about how a whole ounce of cocaine would be sold at $700.

220.    The next day when JURADO called SAMUEL asking for cocaine to supply a third party, JURADO said, "Because I told him that we were going to give him the same price as those dudes, you understand? . . . That is to say the same price as we have been giving it, that is [to say] at one [UI]. Yes, what [he] wants is a three-and-a-half." (TT2 #14,934). I believe that JURADO was again ordering 3.5 grams of cocaine from SAMUEL so that he could sell it to another person.

221.    JURADO identified himself with his full name during a call with SAMUEL on March 16, 2012, saying it is "Jose Nelson Jurado Mejia." (TT2 #5,409). The telephone number he uses to communicate with SAMUEL is subscribed to in a variation of JURADO's name. And that same telephone number, along with JURADO's name, Virginia driver's license number, and address are listed on Western Union wire transfer records from January 2012, which show he sent two wire transfers to Honduras from the United States for a total of approximately $2,500. One of the recipient names in Honduras is a known cocaine supplier in Honduras. CS #9 also

positively identified JURADO from a photograph, as described below in the section discussing ELMER.

### v.    Gomez-Rivera

222.    GOMEZ-RIVERA distributes cocaine that he gets from SAMUEL. Below are examples of intercepted calls showing GOMEZ-RIVERA's knowledge and involvement in the conspiracy.

223.    On February 18, 2012, GOMEZ-RIVERA and SAMUEL discussed what I believe to be a half-ounce of cocaine that GOMEZ-RIVERA wanted to purchase. GOMEZ-RIVERA asked, "Do you have any of the t-shirts from the last time?" SAMUEL said, "Don't worry about that. . . . That's the least important thing. You can take a look at them and see if you like them." GOMEZ-RIVERA said, "You said the twelve ones, but untouched." SAMUEL responded, "Oh, you want them like that? Ok." GOMEZ-RIVERA said, "Of course. The twelve ones untouched." (TT2 #191). The two spoke again later that day, during which conversation SAMUEL said, "If you want to come get them, I made them . . . it goes pretty solid. I put it for 14.4." GOMEZ-RIVERA said, "But you didn't give me the twelve. I told you untouched." SAMUEL responded, "No, the thing is I don't have the thing here at home because I don't keep anything here because the conditions are not convenient for me. . . . The only thing I did with this is I left it solid so that you work the thing. Don't worry this thing goes well. Better yet, I'll put the fifteen." GOMEZ-RIVERA said, "Good because I'll almost let that go whole. . . . I'll come back for the rest later because I'll give this one to the guy that [UI] I've known him for a long time." (TT2 #227).

224.    SAMUEL called GOMEZ-RIVERA on February 22, 2012, and GOMEZ-RIVERA asked to buy a quarter ounce of cocaine for $225 to sell to another person. GOMEZ-RIVERA said, "I'm taking it easy. Wanting to make some money, but some guy just called me

[and] he wants a boy, but he wants us to sell him half. I don't know if you'll give me half for 225. Half of that one goes for 450, but I want half of that." SAMUEL asked, "You want a quarter?" and GOMEZ-RIVERA replied, "Yeah, that, for 225 so that I can make some. At least pin some 50 on him." (TT2 #999). About an hour later, they spoke again and arranged where to meet and when. GOMEZ-RIVERA asked SAMUEL about the quality of the cocaine and if it was going to be a "quartillo," that is, a quarter. SAMUEL told him it was and that there would be a little bit extra as well, for a total weight of "7.9," by which he meant grams. SAMUEL told him he added the almost additional one gram to that GOMEZ-RIVERA would know how "good" SAMUEL is. (TT2 #1,014).

225.    On March 2, 2012. GOMEZ-RIVERA ordered another quarter ounce from SAMUEL, saying he wanted "a quarter of beans" for 225. SAMUEL made sure he understood, asking," We're talking about one quarter?" GOMEZ-RIVERA said he would meet SAMUEL in twenty-five minutes. (TT2 #2,807). A few minutes later they spoke again, and SAMUEL said he would be giving GOMEZ-RIVERA "7.4." (TT2 #2,815).

226.    On March 9, 2012, GOMEZ-RIVERA said to SAMUEL, "I wanted to get the, always the complete one today, the one of twenty-eight." SAMUEL explained that he was leaving to Honduras at the end of the month and SAMUEL's cousin was going to stay in Virginia and continue the distribution. SAMUEL said he was going to be sending cocaine from Honduras, and told GOMEZ-RIVERA that he "will personally send it and I will send it at twenty-eight and sealed. . . . [I]f I'm going to send you one that you would break it, but I will send it of twenty-eight. . . . They will just give it to you . . . they won't be mixing nothing to it." GOMEZ-RIVERA said, "Yes, of course. . . . No, better to send it to me like that." SAMUEL replied, "I'm going to send it at twenty-eight, the CD, but you will have to detach it." GOMEZ-

RIVERA said, "That's fine, that's fine." (TT2 #4,181). The next day, SAMUEL asked GOMEZ-RIVERA how much he needed and GOMEZ-RIVERA replied, "Only half a mandarin," which I believe to mean a half ounce of cocaine. (TT2 #4,344).

227.    I believe GOMEZ-RIVERA also obtained cocaine from SANTOS, as described during an intercepted call on February 28, 2012. SAMUEL said, "Come when you want to come because the guy is around there, the one bringing you the little things." SAMUEL explained he was in Baltimore so GOMEZ-RIVERA needed to call SAMUEL's cousin. SAMUEL said, "He's my cousin, no problem. Just give him the papers and you know the drill." GOMEZ-RIVERA asked for the telephone number to SAMUEL's cousin and SAMUEL provided the known telephone number of SANTOS, which has been intercepted communicating with SAMUEL about drug trafficking. GOMEZ-RIVERA asked for the name of SAMUEL's cousin, and SAMUEL told him it was "Santos." (TT2 #2,406).

228.    GOMEZ-RIVERA has been identified in two ways. First, the telephone number he uses to communicate with SAMUEL was listed on a pawn transaction dated December 16, 2011, along with GOMEZ-RIVERA's Maryland driver's license. Furthermore, on March 29, 2012, GOMEZ-RIVERA was intercepted talking with SAMUEL about having police contact the day before. During the call, GOMEZ-RIVERA described how he had been stopped after making a cocaine delivery and said, in reference to the police, "[T]hey fucked up because I knew they were going to come after me, they were behind me. They got me when I delivered the paint for them to paint, but I had already delivered it." GOMEZ-RIVERA claimed, "[T]hey followed me to the house, they didn't go in, but stayed in the parking lot. I went in the house and I threw everything out, I put it down that thing, you know. All of it. I was thinking they would come

back later in the night." (TT2 #8,369). Law enforcement database inquires confirmed GOMEZ-RIVERA had contact with FCPD on March 28, 2012, and was issued a traffic citation.

### vi.   Lizama

229.    As the following intercepted communications demonstrate, SAMUEL supplies cocaine to LIZAMA that LIZAMA sells to other people. LIZAMA's nickname is "El Diablo," and he is often referred to by that name in intercepted calls.

230.    On February 19, 2012, LIZAMA asked SAMUEL for cocaine because his customers were calling him. LIZAMA said, "Come again because a shitload of people from Baltimore keep calling me." SAMUEL said, "Look dude, I have half a grapefruit here. That bitch has less than a gram from the fourteen songs. I came to bring you that bitch and I qualified it for rock. I just came to Washington to bring one animal and I have this as left over. I can't add anything with that woman. I can bring it to you if you accept it like that and you can fix it." LIZAMA said, "Alright then. . . . A shitload of people are calling me." (TT2 #402).

231.    On February 22, 2012, LIZAMA was intercepted asking SAMUEL to come visit him and sell him cocaine. SAMUEL responded, "Look dude, I was headed to Springfield to pick up a package. Do you have an emergency?" LIZAMA said he could wait and asked if SAMUEL would give him "fourteen," referring to fourteen grams. SAMUEL said, "Alright, then. I'll bring it to you." (TT2 #1,012).

232.    On February 25, 2012, LIZAMA sent SAMUEL a text message that said, "Bring me half an orange and bring packing supplies." (TT2 #1,613). SAMUEL wrote back, "I'll be there around 11." LIZAMA replied, in part, "Bring it at 15." (TT2 #1,616). SAMUEL answered, "Why don't you ask for a twenty, it's better, you fucking liar." (TT2 #1,617). LIZAMA said, "Of a 22 and you know that I have a scale, fucking you shorty." (TT2 #1,621). Later they spoke over

the phone because LIZAMA said that his clients did not like the quality of cocaine SAMUEL had provided. SAMUEL disagreed and said, "[T]hat type of material, you look at it, and that bitch is deadly. Of course the color and the shine. Look at the shine it has. It's spongy, like a scale. It's not yellow. . . . I know the product is good dude. It's quality. You should have seen how I worked that shit last night, tight dude." LIZAMA said, "I have no problem, but . . . ." SAMUEL said, "I'll bring you another one when I get back. . . . I'll break the, I'll take it apart with the guy and I'll bring the rest because I have one sealed frame here." SAMUEL told LIZAMA not to touch the cocaine he had provided LIZAMA earlier, saying "I don't want you to screw it up." LIZAMA replied, "I have it there because those Mexicans cook it, and it's not done like that dude." SAMUEL said, "If they cook it . . . I don't think it's for cooking. I don't think it's ready for cooking." LIZAMA complained, "Then they argue with me later and I have to give them the money back." (TT2 #1,646).

233.   On March 1, 2012, LIZAMA complained again about the quality of cocaine that SAMUEL recently sold him. LIZAMA said, "You brought me the same thing you brought the other day. . . . You've giving me the Mexican one again. This shit is cut the hell out, doesn't even have rocks man. It's all ground up." SAMUEL responded, "I have a frame there but I don't have it here. But that son of a bitch has nine. It's [tough] to open up that shit. I don't even have it here in the house because I have three of the ones I brought for you." LIZAMA complained, "[F]uck, I have the clients on top of me." (TT2 #2,684).

234.   On March 8, 2012, LIZAMA asked when SAMUEL was going to come with the cocaine because his customers were calling him. SAMUEL said, "I'll bring you half even. . . . I'll adjust that shit to twelve and I'll get another two from the other one, so that I don't add any of that shit, and you like it." LIZAMA replied, "Alright, bring me one then." (TT2 #4,015).

235.  On March 22, 2012, SAMUEL told LIZAMA about the courier getting caught at Dulles Airport and how they were all going to "suffer." LIZAMA responded, "Fucking bitch." (TT2 #6,829).

236.  The telephone number LIZAMA has been intercepted using is subscribed to a variation of LIZAMA's name, and it was also listed on approximately twenty-nine Western Union wire transfer transactions to Honduras to the United States from May of 2010 through September of 2011, totaling approximately $16,100. LIZAMA's name and address were also listed on those transactions. In addition, agents obtained a search warrant for GPS location-based services on LIZAMA's telephone, and on March 22, 2012, physical surveillance was conducted of LIZAMA after the GPS pings placed his telephone within four meters of an address in Reston, Virginia. Surveillance agents were able to obtain a photograph of LIZAMA at the location, which matched jail booking photographs of LIZAMA. Furthermore, at the direction and under the surveillance of agents, a FCPD officer had contact with LIZAMA on March 22, 2012, during which encounter LIZAMA provided his telephone number, which is the same number he has been using to communicate with SAMUEL.

vii.  Noel

237.  NOEL purchases cocaine from SAMUEL that he sells to others, For instance, on February 22, 2012, NOEL called SAMUEL and asked for a half ounce of cocaine. NOEL said, "I wanted to get the half of a mandarin." During the call SAMUEL referred to NOEL as "Noelito", and NOEL said, "Make it thirteen, but like you know." (TT2 #1,076). NOEL texted SAMUEL on March 3, 2012, saying, "Hey old man, and us here without any?" (TT2 #3,122). SAMUEL wrote back, "I'll supply you early." (TT2 #3,123). And on April 12, 2012, NOEL asked SAMUEL if he had "everything." SAMUEL said he had "the mandarins already peeled."

238.    Interceptions also revealed that one of NOEL's clients lives in Maryland, and that NOEL and SAMUEL sometimes travel together to supply cocaine to the client. On March 25, 2012, for instance, NOEL sent a text message to SAMUEL that said, "We're going to deliver food to that dude from MD, man." (TT2 #7,517). SAMUEL called NOEL to coordinate when they could leave together to deliver to the man. During the conversation, SAMUEL told NOEL that the client would be happy "because the t-shirts are brand name," by which I believe he meant the cocaine was of high quality. (TT2 #7,518).

239.    On April 1, 2012, NOEL called SAMUEL and told him that the Maryland client wanted NOEL there at 11:00 a.m. the next day, so NOEL and SAMUEL agreed to meet at 10:00 a.m. to go there together. SAMUEL said that the next morning he would "prep that half calf for the dude," and added, "the guy is doing good work." (TT2 #9,062).

240.    SAMUEL told NOEL on April 20, 2012, that he was sent "some material from Honduras that is almost pure." NOEL explained that he was going away for a short while, so that if "the guy from Maryland calls today or tomorrow," NOEL would ask SAMUEL to deliver to the man. NOEL added that he knew another person on Route 1 who wanted a "whole papaya." (TT2 #12,965).

241.    NOEL already was aware that SAMUEL receives cocaine from Honduras, as evidenced by a call between the two on March 22, 2012, before the courier was caught at Dulles Airport. SAMUEL said, "the traveler supposedly came yesterday. . . . She will arrive at 2:00 p.m. today and will start delivering at 4:00." (TT2 #6,720). The next evening, SAMUEL told NOEL he was "too happy," to which NOEL replied he was "trying not to cry." (TT2 #7,123). I believe that was a reference to the courier being intercepted and the cocaine shipment being lost.

242.    NOEL has also met DELCID and is aware he is a member of the conspiracy. On February 28, 2012, NOEL called SAMUEL and said he was "looking for little packages" but was only finding the "bigger ones." I believe that NOEL was referring to small plastic bags used to repackage cocaine for street-level distribution. SAMUEL said he wished he had some for NOEL, but he did not. He explained that a "friend" of his could get some for NOEL, and that the friend was in Seven Corners by "where the lions are." NOEL asked if it would be 100 bags, and SAMUEL said yes. NOEL asked SAMUEL to call the friend and see if he had some. (TT2 #2,366). The next call SAMUEL attempted to make was to DELCID, (TT2 #2,367), and thus I believe he was referring to the Eden Center when he spoke about Seven Corners and the lions, as the shopping center is at Seven Corners and there is a pair of stone lions at the entrance gate. SAMUEL was not able to reach DELCID, so he called NOEL back and gave him DELCID's telephone number. He instructed NOEL to call DELCID and say he was "Samuelito's friend." (TT2 #2,375).

243.    In addition to NOEL's first name being commonly used during intercepted calls, the telephone number NOEL uses to speak with SAMUEL is subscribed to in a variation of NOEL's name. Furthermore, NOEL told United States Park Police officers that the telephone number was his during contact he had with them on February 22, 2012, after those officers arrested his girlfriend. Finally, Western Union wire transfer records listed NOEL's name with the same telephone number on approximately thirty-eight wire transfer transactions from the United States to Honduras between September 2010 and February 2012, totaling approximately $11,640.00. On several of the transactions, NOEL's Florida driver's license number also was listed.

244.   With respect to his girlfriend's arrest, NOEL explained to SAMUEL on February 23, 2012, that "I had some shit in the girl's car and they pulled her over." He said the police searched her car and found a "potato peeler" or "colander." (TT2 #1,215). A review of the United States Park Police arrest report showed that a consent search of her vehicle revealed a small white plastic bag containing a filter that had some residue of a white, chalky substance consistent with cocaine. Also located in the bag were several small empty Ziploc baggies. When asked about the items, NOEL's girlfriend said the bag was not hers and it belonged to her boyfriend who was involved in cocaine.

### viii.   Vanegas

245.   VANEGAS regularly purchases at least half-ounce quantities of cocaine from SAMUEL that he then sells to other people. For instance, on March 5, 2012, VANEGAS told SAMUEL that the next day he would need "the CD with fourteen songs," which I believe to mean fourteen grams of cocaine. (TT2 #3,452). The next day, SAMUEL called VANEGAS to confirm, "You want fourteen songs, right?" VANEGAS said he did, and then asked "how the little meat is?" SAMUEL said the "meat is good" and that he would "combine it so it tastes good." He explained that he had two different types, one of which he said was "snow colored." VANEGAS said he likes the "one that looks like when it snows." VANEGAS told SAMUEL that "he wants to keep people happy," by which I believe he meant his cocaine customers. SAMUEL told him that the one he would be delivering to VANEGAS was "untouched," that is, not cut. (TT2 #3,471).

246.   On March 10, 2012, VANEGAS told SAMUEL, "I want the half orange, but let's see how it is." SAMUEL replied, "It's good, dude. But you would have to wait for me. I'm on 495. . . . You want half a mandarin?" VANEGAS said, "Give me the half orange and [UI] like it

95

was before." As the conversation continued, VANEGAS and SAMUEL talked about the quality of cocaine that SAMUEL had sold VANEGAS the past few occasions. VANEGAS said, "The last time, all good. We don't have issues with that. We can talk it out but the last three half mandarins that . . ." SAMUEL interjected, "I have nothing to say because you're not the only one telling me that. . . . The one I just met asked me for a discount, but I had to give him a discount." SAMUEL said he wanted VANEGAS to inspect the cocaine he would be getting from SAMUEL: "You will see a distinguished color from the white, but I want you to see it while you're there with me and I want you to try it out. . . . Yeah, I have something for you at seventy [percent], but it will go. Give me a chance right now because you're always there. I don't want you to exchange me for another son of a bitch. Because you can get another guy. I'll do what I can for you right now. Is it 6:52 right now? I'll be ready to deliver at 7:45 or 8:00. . . . I'll bring it and I want you to test it." VANEGAS said, "Of course," and SAMUEL followed up with, "I want you to feel good so I can feel good." (TT2 #4,359).

247.    On March 16, 2012, VANEGAS and SAMUEL again discussed cocaine quality, as well as VANEGAS's concern about one of their mutual clients. VANEGAS said, "I don't know if [name redacted] called you already or if you'll need him today or tomorrow, but there's a situation I want to talk to you about. I've noticed that some of the players I had on my team have not called all week and they were looking for him today. I don't know why, but these things happen. You have nothing to do with that?" SAMUEL replied, "I don't deal with him the way I deal with you. The most he has asked me for is seven songs," which I believe meant seven grams of cocaine, or an eighth of an ounce. VANEGAS said, "I know they're looking for what's there for the weekend. Like I said, they would ask him for the one for Friday." (TT2 session 5482) I

96

believe VANEGAS was concerned that many of his cocaine clients have not called and VANEGAS was concerned SAMUEL may be taking them through a third party.

248.    On March 21, 2012, SAMUEL and VANEGAS were intercepted discussed the impending arrival of the courier who the next day was caught at Dulles Airport. VANEGAS asked, "Tell me something: how would it be in this case, what will happen when all of this is gone. What will you do tomorrow?" SAMUEL responded, "The traveler [female] left today. . . . If she doesn't get busted at the airport, god willing, they won't bust her because she has several equipment, several boxes of t-shirts." VANEGAS asked, "The equipment would arrive tomorrow?" SAMUEL replied, "Tomorrow, after midday." VANEGAS went on to say, "My situation is, you know how we work. We've made a good team. What I want to do with the one coming is . . . I'll talk to you later but I need [UI] with the one coming." SAMUEL replied, "That's what I'll try to do man. It will be more expensive to me but the important thing is that you pay what I bring to you because that's what I'm looking for. Like I said, what I have at home, I paid eight for that dude. But that bitch is, I reassure you dude [OV] it's original. What's coming tomorrow could be better than this one but the only thing I will do from now on is to try and work fine and not have any complaints." VANEGAS said, "You do what you can. The last time, what happened, is that the guy who was with me, wasn't too happy. Now he went to [name redacted]. That doesn't matter but I want to [UI] with something. I have to recover the people that [OV]." SAMUEL said, "If we are going to work, we would bring half a mandarin so that you can see it and I [UI], try to give you the best I can." VANEGAS agreed, "It's always been that way. We're still there." (TT2 #6,602). I believe SAMUEL explained to VANEGAS that the cocaine courier would be arriving the following day, and that VANEGAS referenced he and SAMUEL's relationship and that VANEGAS would be getting high quality cocaine from the

new cocaine shipment arriving. Furthermore, VANEGAS needed good quality cocaine to recover some of the customers he had lost.

249.    VANEGAS does more than obtain cocaine from SAMUEL. On March 11, 2012, SAMUEL asked if VANEGAS was willing to sell SAMUEL a gun. SAMUEL said, "I was wondering if you're interested in selling the nine." VANEGAS replied, "The device?" SAMUEL said, "Um hum," and VANEGAS responded, "Yes, of course, I have it there like I said. I'll wait for the guy that brought that. He told me he would have another one, other ones. But like I said, that's going nowhere. Whenever you want it, there's no problem." SAMUEL said, "If you can get a nine that is bigger." VANEGAS said, "So, he said it's possible he will get a .45, a bigger one." SAMUEL replied, "I have one of those at home in Honduras. I have a .45." (TT2 #4,442).

250.    The telephone number VANEGAS uses to communicate with SAMUEL is subscribed to in VANEGAS's name. Agents also obtained a search warrant for GPS location-based services on VANEGAS's telephone, which data frequently places VANEGAS within the apartment complex listed in the subscriber information for his telephone number. On May 1, 2012, physical surveillance was conducted of VANEGAS after the GPS data placed his telephone within six meters of an address in Bowie, Maryland. Surveillance agents conducted a "spoofed" telephone call with VANEGAS while he was under surveillance. During the "spoofed" call, VANEGAS identified himself as "Jose," which is VANEGAS's first name. Surveillance photographs taken of VANEGAS during the "spoofed" call were compared to prior arrest photographs of VANEGAS and confirmed to be the same person.

### ix.    Abrego-Mancia

251.    ABREGO-MANCIA used to work with LINDOR, but turned to SAMUEL when LINDOR was arrested. He has since been intercepted communicating with SAMUEL on

numerous occasions about drug trafficking and revealing his knowledge of the overall conspiracy and involvement.

252.    On February 25, 2012, ABREGO-MANCIA was intercepted identifying himself to SAMUEL and discussing the arrival of cocaine destined for ABREGO-MANCIA. ABREGO-MANCIA said, "Look I'm a guy who . . . I've spoken to you and they told me there was a little package for me there. . . . I'm a friend of Lindor. . . . They told me they sent a package for me from over there." SAMUEL replied, "Oh, I've not picked that up, I'm going to do that right now. I don't know how things are, you know? . . . [UCC #3] already told me, but he hadn't told me it was you, you know. . . . If it's for you, did he tell you what it is? How much it is and all that?" ABREGO-MANCIA said, "He said it was one frame." SAMUEL replied, "Let's do this. We can't do anything today. I'm going to go pick this up right now and if you want to come over here tomorrow then [OV]." ABREGO-MANCIA said he lived by Reston and SAMUEL said he lived in Arlington. SAMUEL then said, "No problem, we can't do anything right now, you know. He's in there and I have to work on his behalf. I'm all fucked because I have to do everything for him in there you know. I'm the only one he has. The other friend he had turned on him. If you want to work with them it's fine. If they sent something for you, I'll give it to you gladly. You know the deal." SAMUEL went on, "My brother went to pick it up and I don't know how much he paid for driver and ride. I'll ask him how much you will pay for that but I don't get involved with that." ABREGO-MANCIA said, "You let me know how much it is." (TT2 #1,800).

253.    I believe ABREGO-MANCIA was expecting one frame with cocaine concealed inside that SAMUEL would be receiving. Furthermore, I believe ABREGO-MANCIA knew

LINDOR, and SAMUEL explained how he was conducting business on LINDOR's behalf while LINDOR was incarcerated.

254. The next day, SAMUEL and ABREGO-MANCIA had a follow-up conversation about the frame. SAMUEL asked, "Will you come pick up the thing today?" ABREGO-MANCIA said, "Where do you live at? So I can find someone to take me." SAMUEL and ABREGO-MANCIA then discussed meeting at SAMUEL's residence and ABREGO-MANCIA asked how much he owed SAMUEL for the frame. SAMUEL said, "I think he wants 100 pesos because he paid for . . . the dude that drives them knows what he's going to get, you know. If I had gone I wouldn't have charged you, just the package. But they, they . . . the dude who takes them know what they will pick up so he tightens the rope, you know." (TT2 #1,919). I believe ABREGO-MANCIA was being charged $100 dollars because the person who picked up the cocaine frames knew what it was they were getting and therefore wanted $100 for the risk they were running carrying the drug.

255. On March 27, 2012, SAMUEL and ABREGO-MANCIA spoke about the courier being intercepted on March 22nd at Dulles Airport and the acquisition of more cocaine. SAMUEL said, "We've been having some problems and since one of the travelers went down . . . . I've been waiting maybe, but he's not sending me. I'm waiting for some other way." ABREGO-MANCIA said, "I had asked him for something there but it's fucked like that then, right?" SAMUEL said, "Yes, man. These days they made them painful that the woman went down. . . . [S]he had with her like seven calfs there." SAMUEL was explaining that the couriers were now going to a different airport when he said, "That's why they're going somewhere else. . . . [R]ight now I am not trying to get too much because I'm going somewhat slow. I have a problem with some clients too." ABREGO-MANCIA said, "How are things there with you? To

want to get some there from you, how could that be done?" SAMUEL said, "Ah, well, we could make a deal, cousin, no problem. . . . I'm not going to say that I would give it to you at $2,000 because, fuck, I have to pay, pick up." SAMUEL went on to say, "They're charging you so much but, sometimes it's all stepped [cut] from over there." ABREGO-MANCIA asked, "So around how much do you think you handle there?" SAMUEL replied, "I'm going to pick them up tomorrow and when I pick them up I will call you so we can talk about that, no problem." (TT2 #8,035).

256.    On March 28, 2012, the two spoke again about how much and at what price SAMUEL would sell cocaine to ABREGO-MANCIA. SAMUEL explained how he had expenses to cover and SAMUEL said, "And since one always [UI] sending the wire transfer and all of that, doesn't spend, well, have to find someone who can send all those wire transfers because I can't be sending those money wire transfers to those people over there all by myself." SAMUEL explained how he usually sold an ounce of cocaine for $950 or $1000, but since ABERGO-MANCIA "has worked with those" SAMUEL would sell it to him for another price. ABREGO-MANCIA said, "How much do you think that you would give it to me? For $1,000 the problem I have is that I'm not working that way, I'm selling it at half and complete like that. That [guy] would sell it like that then." SAMUEL said, "I'm going to give it to you legit, the way it comes but [UI] it's at eight. . . ." SAMUEL and ABREGO-MANCIA went on to discuss the different quantities SAMUEL had available. ABREGO-MANCIA asked, "But what I was going to tell you man, the way you have it, it comes the way those other came, no?" SAMUEL said, "Yes of course, yes." ABREGO-MANCIA said, "Three and three always? You don't have two?" SAMUEL replied, "I would get it out, but, if you tell me one or two, but in front of you so that you can see where I get it from. . . ." (TT2 #8,300).

101

257.    I believe SAMUEL agreed to sell each ounce of cocaine to ABREGO-MANCIA at $800 instead of $950 to $1,000 per ounce because ABREGO-MANCIA had done business with suppliers in Honduras in the past and because ABREGO-MANCIA explained that he sells cocaine at half-ounce and ounce quantities, meaning he would not make any money if he himself paid $950 to $1,000. Furthermore, SAMUEL was going to give the cocaine to ABREGO-MANCIA directly from the frame(s) as SAMUEL received it so that he could show it came directly from the frame without the addition of any cutting agent.

258.    On April 8, 2012, ABREGO-MANCIA called SAMUEL and the two discussed the quality of cocaine SAMUEL had at the time. SAMUEL described it as "almost cream colored" and "not solid," but rather "powdery" and with "clumps." SAMUEL said "the aroma is good and the kick is good" and that he had not received any complaints about the product. He said it was so good, in fact, that he was almost sold out of "this lot," and that he was "waiting to open two large frames" that he described would be "badass." ABREGO-MANCIA said he would take "one, the same way I got it the other day," by which I believe he meant one ounce. The two then discussed conducting the transaction later that day, either in person or through surrogates. (TT2 #10,640).

259.    ABREGO-MANCIA's first name of "Isaias" is commonly used during the intercepted calls, and the telephone number he uses to communicate with SAMUEL subscribed to in ABREGO-MANCIA's last name. Furthermore, on October, 31, 2011, ABREGO-MANCIA, who is an illegal alien, was taken into custody by officers with Immigration and Customs Enforcement subsequent to his arrest by local police officers in Herndon, Virginia, on a domestic assault charge. Once in the custody of ICE, ABREGO-MANCIA's fingerprints were submitted through a law enforcement database, which confirmed his identity. Finally, the

telephone number ABREGO-MANCIA provided when he was arrested is the same number he uses to communicate with SAMUEL.

> **x.    Rudy**

260.    RUDY, whose nickname is "Colocho," resides in Maryland and distributes cocaine he receives from SAMUEL. The two talk often. Examples of their calls follow.

261.    On February 21, 2012, SAMUEL told RUDY about a woman who turned cocaine into crack cocaine. SAMUEL said, "She almost messed up two animals. . . . The bitch started boiling the water and all that shit when I was there, and she took some out and said, 'I'll grab this, and if I mess it up, I'll pay for it.' . . . You should see dude, the thing on top qualified. You know sometimes with the milk for the kids the front stays on top, and the [UI] goes to the bottom. You won't believe it dude, I left and I was sending some money to a dude over there, and she calls me to come see the shit. I went there and the shit turned into dough. At least she should have put a little quarter but she put it all in. I got all pissed in front of her and I broke out one of the animals I break for you. She liked it so much that she called me the next day." (TT2 #919).

262.    On February 25, 2012, the two spoke about SAMUEL selling RUDY a portion of sealed frame with six ounces of cocaine concealed inside. RUDY asked, "Do the tortillas come in a bag?" SAMUEL replied, "Since you told me to bring it sealed, so I brought it like that. But I have to take yours out because I have to deliver the rest." RUDY asked if SAMUEL brought "the little device," that would be used to open the frame and extract the cocaine, and SAMUEL said, "No dude, I would have brought it if we had spoken. Don't you have it handy? . . . Look, this is what we can do. We can come to an agreement. I think the thing comes with six mandarins. Let's do this, we'll talk about it, so that I can take one apart and you keep the other part, because there

are more than twenty-four in each." RUDY said, "Ok, that's fine. Wait for me there. I'll stop by later." (TT2 #1,687).

263.    On March 7, 2012, RUDY asked SAMUEL for additional cocaine. RUDY said, "Look, like I said the other day, if you have ten brushes, bring them because I'll look for people here." SAMUEL replied, "It's one animal of eight. The son of a bitch is there, sealed. Eight or nine, don't know. We'll take it out and scale it. . . . You should see how yummy that one is. It's proven because I took it to the woman in Washington and she cooks it in front of me." RUDY then attempted to speak in a coded language as he compared distributing cocaine to painting, "That's what I want dude because it has been approximately a month that some dudes want to show me, they're doing some construction and they want me to paint at least one room for them, and see the coverage." I believe RUDY wanted to receive cocaine from SAMUEL and he had clients that were bothering him for at least one ounce of cocaine, in order to see the quality.

264.    SAMUEL and RUDY went on to discuss a cocaine business arrangement between the two of them. SAMUEL explained how he had gone to Baltimore, which is not convenient for him, where a person wanted to buy one ounce of cocaine for $800. SAMUEL said, "I went to Baltimore, took my brother because it was his guy, but fuck man, it's not convenient. That guy has been calling me and I don't even want him because one at a time. He offered eight and I was like, no way man. Why would I come just for one piñata, one mandarin?" SAMUEL and RUDY continued to discuss the Baltimore client and SAMUEL offered to give the client RUDY's telephone number so RUDY, who lives in Maryland, could supply him instead, out of convenience. RUDY said, "Connect him if you want. [UI] if he agrees then it's fine." SAMUEL said, "I'm going to get the number and I'll call him. And I'll tell him that a guy is going to

.

supply. I'll give him your number." RUDY replied, "Tell him that you have me here, so he trusts me." (TT2 #3,643).

265.   On March 17, 2012, SAMUEL discussed supplying RUDY with additional cocaine and that approximately forty-five ounces were arriving on Monday. SAMUEL said, "Listen Colocho, I will get a product . . . that if the product arrives on Monday as it should, we'll be good. I will be getting forty-five classified whores!" SAMUEL continued and said, "What I will take to you will be good. I took some to Washington to this lady and she cooked them in front of . . . and she said that they were good, because it produced a bit of oil at the bottom. . . . This is just for the weekend because I don't know how you are there." RUDY replied, "I have almost nothing." SAMUEL then replied, "Son of a bitch! I will take those four for you then! Even if I get screwed because I can't leave empty handed." RUDY replied, "Yeah, so you know, four, three is fine. You know." SAMUEL explained further, "I will take it as it is, in the frame. I broke it, but just got half, and the other half is in there." RUDY said "Ok, that is fine. . . . [W]henever you want come by." (TT2 #5,638).

266.   The next day, UCC #24 called SAMUEL and said, "Give me Rudy's number because [name redacted] wants it. He's going to get something from him." SAMUEL said, "Ok, I'll give it to you right now. I'll call him. I'll give you Rudy's number right now. Hold on. [Phone number redacted]. Don't make a lot of noise with that number, you hear me?" (TT2 #5,868). After speaking with UCC #24, SAMUEL spoke with RUDY, who said he was ready to prepare the product but he wanted to confirm that the customer really wanted it and wasn't going to change his mind when RUDY was half way there. (TT2 #5,874).

267.   On March 22, 2012, SAMUEL spoke with RUDY about the courier being intercepted by law enforcement at Dulles Airport, telling him not to worry because an additional

courier would be arriving with cocaine. SAMUEL said, "But I don't worry because there's another trip coming, Colocho. Another trip is coming the day after tomorrow, I think. [UCC #16], the one from Springfield, is coming." SAMUEL talked about getting additional cocaine and hiding it so he would have it available for RUDY in the future, and how this was the second time this has happened since SAMUEL and RUDY had been working together. SAMUEL said, "So that I can have some because this is the first, or two times this has happened since I've worked with you, Colocho." (TT2 #6,802).

268.    In addition to being referred to as "Rudy" in some intercepted calls, the telephone number RUDY uses to communicate with SAMUEL is subscribed to in RUDY's first and last name and to the address listed on his Maryland driver's license. United States Postal records confirmed RUDY to be a listed customer receiving mail at the subscriber address as of April 2012. Furthermore, RUDY's nickname, "Colocho," is Spanish slang for someone with curly hair. In reviewing a prior jail booking photograph of RUDY, in addition to a Maryland DMV photograph taken in April 2012, RUDY has collar length curly hair, which is consistent with the given nickname. Finally, a search of Western Union wire transfer records containing RUDY's name revealed numerous transactions, one of which listed his Maryland driver's license number, his address on file with Maryland DMV as of July 2011, and a telephone number ending in 9708. The telephone number ending in 9708 was listed as a contact number on the subscriber information for the telephone number RUDY has been intercepted using to communicate with SAMUEL.

### xi.    UCC #24

269.    UCC #24 resides in Baltimore, Maryland, and sells cocaine that he obtains from and through SAMUEL. Surveillance and intercepted calls of UCC #24 include the following.

270.    On March 1, 2012, UCC #24 asked SAMUEL to bring him cocaine that UCC #24 was going to sell to a third party. UCC #24 said, "Look, then, [UI] over here but I just talked with [name redacted] and the dude told me, he's telling me right now that it's not a problem, to come over. He's going to go to the bank right now and withdraw some money, that's what he told me. . . . He's going to send them to me so I can leisurely go get him one." SAMUEL said, "What I can do is, it comes as twenty-four. But he wants it of twenty eight and doesn't want it touched, so I'm going to see if I can handle the four of the, the four songs of striped music, you understand?" I believe SAMUEL was offering to add four grams of cut to twenty-four grams of cocaine in order to produce a full ounce. UCC #24 said, "Look, to this dude, I haven't put, the ones I have sold this dude, I have sold it cut because [UI]." SAMUEL said, ". . . how are you going to be giving him twenty-eight knowing that they're sending it to you at twenty-four from over there?" UCC #24 said, "That's why I'm telling you that the dude, I have given it to him, but . . . I've given to him at twenty-eight because I think that, I know that the dude is a good client, you know?" UCC #24 continued, "This dude has bought three times. Look, one time he bought, the very first time, I gave him twenty-eight and the second time he bought another half, and from there he bought another half from me. . . . [T]he first one I did give it to him at twenty-eight, a whole one, I gave him a whole one and then he said that dude has bought him two for all then." SAMUEL agreed to bring "twenty-eight" to UCC #24's residence. SAMUEL said, "Send me the address where you live there but don't send me shit if you don't know which is the address, don't [UI] . . . [S]end me the address because I'm putting it in the GPS." UCC #24 said, "But, I'll send it right now." SAMUEL said, "Sent it good. Don't be sending me shit that don't, completely with zip code and everything." UCC #24 said, "[UI] I will send it. I have it on hand right now. I'll

send it right now." (TT2 #2,664). UCC #24 then sent SAMUEL a text message with the an address in Baltimore, Maryland.

271.   Physical surveillance was established in the area of that address on March 1, 2012, in an effort to observe SAMUEL showing up to deliver the ounce of cocaine. During that time, a black Toyota Corolla with Virginia license plates that is known to be used by SAMUEL parked in front of the address UCC #24 sent SAMUEL. An individual, believed to be SAMUEL, was observed getting out of the vehicle and entering the address. A few minutes later, an individual was observed exiting the residence and entering the Toyota Corolla, which then departed the area.

272.   During an intercepted call on April 3, 2012, UCC #24 discussed meeting so UCC #24 could pay SAMUEL money owed for cocaine previously provided. UCC #24 said, "I was coming to bring you the money or maybe you could go over there." Portions of the conversation were inaudible as SAMUEL and UCC #24 talked over one another, but at one point SAMUEL said, "Call Mario and see if he's going to give you a thing like I give it to you at six [UI] what's there, this shit is not mine, it's not mine and the money is not mine or yours, dude." (TT2 #9,576). I believe UCC #24 asked SAMUEL for additional cocaine and SAMUEL directed UCC #24 to call MARIO and see if MARIO would sell it to UCC #24 at $600. Furthermore, SAMUEL explained to UCC #24 that the money and cocaine did not belong to either SAMUEL or UCC #24, but rather to the suppliers in Honduras, who front the cocaine to SAMUEL and other co-conspirators.

273.   On April 4, 2012, UCC #24 called SAMUEL to ask about how much cutting agent UCC #24 should add to the cocaine. UCC #24 said, "The brother-in-law told me to ask you. He said call Samuelito and ask him [UI]." SAMUEL said, "I have a lot of that shit. . . . I put

in five spoons of . . . five spoons, four or five spoons of that thing in the bottle, the ochre. Then I also put in five of flour and then you mix it and it is good." UCC #24 asked for clarification and SAMUEL said, "About four of that thing [ochre] and four of flour." (TT2 #9,811).

274.   In a conversation on April 9, 2012, the two continued to discuss cocaine that SAMUEL provided to UCC #24 and how the money belonged to the suppliers in Honduras. UCC #24 said, "[T]he important thing is that [UCC #5] was saying [UI] get what is mine. No, But we'll see. But that's why I'm telling you." SAMUEL said, "[OV] what doesn't belong to one, it doesn't belong. That money is not yours or mine it belongs to those people over there. . . . Because I'm not telling you nothing about cutting that shit. I gave it to you the way it arrives from over there." UCC #24 replied, "[W]hen are you going to give me the other one then?" SAMUEL said, "[A]s soon as I give the money to this woman, I will give you the other one when I can." SAMUEL went on to explain how he almost got arrested the past weekend because "I was there, inside the apartment, when they got Martin, he helped Mario." SAMUEL also talked of another co-conspirator who had been arrested recently. SAMUEL said, "He's keeping Lindo company". (TT2 #10,816). I believe UCC #24 was concerned about the product and/or profit he was making in distributing cocaine, and that SAMUEL explained he provided the cocaine to UCC #24 without adding a cutting agent and as it was received from Honduras. In addition, SAMUEL explained how he had almost been arrested when JUAREZ-LOPEZ was arrested on April 6, 2011, which incident is described later in this affidavit, and how others were going to join Lindor at the Fairfax County jail.

### xii.   Edwin

275.   EDWIN also lives in Maryland, and he purchases cocaine from SAMUEL, cooks it into crack cocaine, and sells it to other people. On March 9, 2012, EDWIN called SAMUEL

and reminded him that they had a mutual acquaintance through whom EDWIN had twice gotten cocaine from SAMUEL, which EDWIN had tried to cook into crack cocaine. EDWIN explained that the most recent cocaine he received "turn[ed] to foam" when he tried cooking it. He said to SAMUEL, "I don't know what they put in it." SAMUEL replied, "You know what the problem is, too? That the bitch [UI] of twenty-eight, that no, that the there is twenty-four, and one has to adjust it to reach twenty-eight. I think that's what messes with that shit." Despite his complaint, EDWIN arranged to meet SAMUEL later that day to discuss business further. SAMUEL said he was going to "open up an animal that came yesterday to see how it arrived," that is, I believe, to check the quality of the cocaine inside the frame. (TT2 #4,081).

276.   Approximately half an hour later, SAMUEL called EDWIN and told him that, with respect to what he received yesterday, it was "the kind that you want . . . the cream." SAMUEL said he would give it to EDWIN "the way it came" so that EDWIN could see "how this material is." When EDWIN asked how much for a "quarter of that one," SAMUEL replied that "half the mandarin is at six," by which I believe he meant a half ounce normally sells for $600. But SAMUEL said that was not necessarily the price he would charge EDWIN because EDWIN might want to work with SAMUEL in the future. SAMUEL continued to explain that the cocaine was sent by "the very big wigs from there," and that this was "the first time I have gotten this kind of material." EDWIN described the previous cocaine as "shit" and "not good for anything," and said that he would need "a little [of the new cocaine] to cook. And if it's good to cook, then I will get it." SAMUEL told EDWIN to come meet him anytime and he would have it ready. (TT2 #4,095).

277.   Since that time, interceptions have shown that EDWIN has been regularly purchasing cocaine from SAMUEL. For instance, on March 11, 2012, SAMUEL told EDWIN,

"I was trying out a thing and it makes the thing you like, but I don't know. I could separate one for you and we can check it out later." EDWIN said, "That's fine. Leave it for Thursday or Friday." SAMUEL said, "Ok, just call me and I'll have another kind by that day. I asked for the one that they say is [fish] scale, the one that shines." EDWIN replied, "Ok, is it good?" and SAMUEL said, "Call me and I can deliver it quick with a friend. . . . What's your name so I can save the number?" and EDWIN replied, "Edwin." (TT2 #4,452).

278.     On March 27, 2012, a call between EDWIN and SAMUEL revealed that the former was driving to the latter's residence. (TT2 #7,817). Shortly thereafter, EDWIN called SAMUEL and asked for his building number and SAMUEL provided it. EDWIN explained he had passed it. (TT2 #7,821). SAMUEL said he would go down and open the door, which was confirmed by surveillance that captured SAMUEL standing in the doorway and appearing to be waiting for someone. Shortly thereafter, SAMUEL and EDWIN were observed meeting with one another. The next day, SAMUEL sent a text message to EDWIN that said, "Did the thing qualif[y], old man?" I believe SAMUEL supplied cocaine to EDWIN on March 27th and wrote him the next day to see if it properly cooked into crack cocaine.

279.     On March 30, 2012, SAMUEL wrote EDWIN and asked, "Are you going to come and see paint, old man?" (TT2 #8,620). "Paint" is a common codeword for cocaine. A few days later, SAMUEL wrote EDWIN again and said, "Edwin, I have something good for you over here." (TT2 #9,446). EDWIN wrote back, "Ok, let me know when you're over there[.] I want half." (TT2 #9,454). I believe EDWIN meant he wanted a half ounce of cocaine. On April 8, 2012, SAMUEL called EDWIN and asked him "how was that stuff?" EDWIN said he was "almost out," so SAMUEL said he would give EDWIN a "sample." (TT2 #12,556).

280.   EDWIN has been identified through the following means. First, as described above, EDWIN told SAMUEL that his first name is "Edwin." Second, agents compared a photograph of EDWIN from the Maryland DMV to the surveillance video obtained of the person on March 27, 2012, who met with SAMUEL at SAMUEL's residence, and determined them to be the same individual. Furthermore, agents also obtained a search warrant for GPS location-based services on EDWIN's telephone. GPS data frequently placed EDWIN within the immediate vicinity of an address in Riverdale, Maryland, and one GPS ping on April 29, 2012, at approximately 9:45 p.m., was within four meters of that address. On April 30, 2012, physical surveillance was conducted of that address in Riverdale, Maryland, during which a vehicle registered to EDWIN was parked in the driveway. EDWIN was also seen exiting the front door of the residence for a short time before returning inside the residence. Finally, Prince George's County Tax Assessor records associate EDWIN's name with the residence.

### xiii.   Saravia

281.   SARAVIA sells cocaine that he receives from BARRERA and SAMUEL, and he also is in touch with UCC #3 in Honduras. SARAVIA's last name was intercepted during a conversation between him and SAMUEL on March 30, 2012, when the two spoke about picking up cocaine that had recently arrived. During the conversation SAMUEL, who was using BARRERA's cellular telephone at the time, said, "Hey, Saravia, this is Samuel." SAMUEL told SARAVIA, "I'm here at the [guy's], man, the one that's going to go pick up the shirts over there. . . . I saw that the package is here and that guy is saying that, since he's going out . . . are you coming right now, right?" SARAVIA said he was in Warrenton at the moment and SAMUEL said, "[S]ince I know that you're getting sufficient enough, I told [name redacted] that I'm with you, that you're going to work with him. But I told him like those, like those I gave [you] the last

time . . . I bought them here, I bought them at $750 that same day." SAMUEL and SARAVIA continued to discuss prior transactions between the two of them and how they have not had any issues. SAMUEL said, "I know because you have never done me wrong or anything and well, if you are working with him, well then, the whole world has a right to what is best for one and, um, I'm also thankful because we have been working several months." SAMUEL went on to say, "just think these days I bought eighteen animals at $750." (TT1 #13,417).

282.    On February 20, 2012, the two were intercepted discussing the sale of cocaine to SARAVIA. SARAVIA said, "That's why I was asking you if some five or something is coming, so that I can get it right away." SAMUEL said, "The thing is that I don't know. I would have to ask them over there, so I can give it to you sealed because if I give you three or four, or five . . . I haven't spoken to them. I just picked up and all of it is there, sealed. . . . I'll give you whatever you want, no problem. You don't ever fail." SARAVIA said, "Alright then. I'll come tomorrow but I'll call you first." (TT2 #557).

283.    The next day, they discussed the cocaine SAMUEL had recently received and the quantity SAMUEL was going to supply SARAVIA. SAMUEL told SARAVIA, "I was trying to make sure that one is coming and I'll take one of those apart, or else I'll wait because it's [not good] to have that thing opened there. I won't open it for no reason." SARAVIA said he would arrive around noon and SAMUEL asked, "How many should I fix for you dude?" SARAVIA said, "Fix only two. . . . How many does that come with?" SAMUEL said, "The son of a bitch comes with eight, dude. I'm not sure because I haven't called them, but it comes with several big ones. . . . I'll break it open and if you want to take some four or I don't know. Do you want them fixed up?" SARAVIA said, "No, because I had a problem. The guy came and he left [OV]. . ." SAMUEL interjected, "I won't touch them then." SARAVIA said, "He came and returned one,

the one he had. I need one good one to mix it up." SAMUEL replied, "I can also give you the cut I add to it." SARAVIA replied, "No, that's the problem. He doesn't want the cut." SAMUEL went on to say, "You said you need one that's good." SARAVIA confirmed and SAMUEL said, "Then take two or three, you know." SARAVIA then said, "Prepare three." (TT2 #695).

284.    On March 14, 2012, SARAVIA told SAMUEL he wanted "The same dosage . . . and half more, it would be two-and-a-half." SAMUEL said, "You mean two mandarins and half?" SARAVIA said, "Um-hum." SAMUEL said, "Ok, [OV] I have some good ones there because I know you don't like just anything." SAMUEL went on, "What will happen is, the one that brings that vanilla color . . . I think there's one and half of that one, you know, but I have some that is snow. But the fear of the music shows, you know. . . . So, I'll try to make you feel good. Anyhow, it would be two, one and one, and a separate half." I believe SAMUEL was going to supply SARAVIA with two-and-a-half ounces of cocaine, but that each ounce would be of slightly different quality. (TT2 #5,011).

285.    On or about March 29, 2012, BARRERA traveled to New York and picked up a shipment of cocaine. That day, BARRERA was frustrated that he picked up cocaine for other parties and exchanged a series of text messages with SARAVIA. In the morning BARRERA received a text message from UCC #3 stating, "Brother in law call this number so that you can go pick up the frames that are in the white bag, [phone number redacted], her name is [name redacted]." (TT1 #13,118). Later that afternoon, BARRERA received an incoming text message from SARAVIA that said, "Dude I'm the one who is going to go pick up the uniform that [UCC #3] has, give me a call." (TT1 #13,239). SARAVIA sent several text messages to BARRERA throughout the day trying to arrange a time to meet, all of which BARRERA ignored. In the early evening, SARAVIA sent BARRERA a text message that said, "Then why the fuck do you

take charge? You think I have all day here? Will you do it? Yes or no?" (TT1 #s 13,294, 13,296). BARRERA wrote back "Fuck you asshole I went to get what's mine I'm not a traveler why didn't you go get it to New York." (TT1 #13,297). He continued, "I brought it because [UCC #3] told me to bring it and to charge you but if you want I will send it by fedex xpres and you go get it in New York" (TT1 #13,299). "It's not my problem if you don't have time I told you I'm not a traveler so I'll be back tomorrow and if you don't have time go get them in New York." (TT1 #13,300). BARRERA then forwarded those text messages to UCC #3.

286.    The next day, BARRERA sent SARAVIA a text message that said, "Call Samuel and tell him to give them to you because he took them." (TT1 #13,384). SARAVIA and SAMUEL did speak, and SARAVIA described BARRERA as "rebellious." SAMUEL said "that's how he is" and told SARAVIA not to listen to him. SAMUEL explained that he and BARRERA were for them same place and have known each other for a while. (TT2 #8,472).

287.    SARAVIA was identified as follows. First, SAMUEL used SARAVIA's last name in referring to him in a conversation on March 30, 2012: "Hey, Saravia, this is Samuel." (TT1 #13,417). Second, the telephone number SARAVIA uses to communicate with SAMUEL and BARRERA about cocaine trafficking, which ends in 3463, has been listed on three Western Union wire transfers between January and February, 2012, all of which were under SARAVIA's full name ("Jose Lorenzo Saravia") and an address in Manassas, Virginia. The only other Western Union wire transfer under SARAVIA's full name was from October 2010, and it listed the same address in Manassas, but a different telephone number that ends in 3102. Subscriber information for that latter telephone number listed SARAVIA's name, date of birth, and Social Security number. Finally, a Western Union $1,500 wire transfer in April 2010 under the name "Jose Saravia" and with the same telephone number ending in 3102, though with a different

address in Manassas, was sent to UCC #3, who is one of the conspiracy's primary cocaine sources of supply in Honduras and is the person who sent SARAVIA a package with cocaine that BARRERA picked up in New York on or about March 29, 2012. Thus I believe that SARAVIA, the user of the telephone ending in 3463, is the same Jose Lorenzo Saravia who sent the respective wire transfers in April 2010 and October 2010.

### xiv.   Gordito and Julio

288.    GORDITO and JULIO work together to sell cocaine they obtain directly from sources of supply in Honduras, as well as from other co-conspirators in the United States, to include SAMUEL. They have been surveilled meeting with SAMUEL to pick up cocaine, intercepted on numerous occasions discussing drug trafficking with SAMUEL, and law enforcement has made controlled purchases of cocaine from both men.

289.    Starting first with the controlled purchases, they were conducted by FCPD officers through CS #5. CS #5 has been providing information generally to FCPD since approximately Spring 2011, and about JULIO (who he knows by his middle name, Giovanni) and GORDITO specifically since January 2012. CS #5 is not a convicted felon and has no convictions for crimes of deception. CS #5 has provided information to law enforcement in the past which has been proven credible and reliable, and for which FCPD arranged to have a traffic matter and marijuana possession charges pending against CS #5 dismissed. CS #5 currently is working with law enforcement for consideration with pending misdemeanor marijuana charges and traffic matters.

290.    CS #5 explained that he purchased cocaine directly from JULIO on several occasions and that a person he knew as "Gordito" was present during some of the transactions. CS #5 drew the conclusion that "Gordito" was JULIO's supplier because JULIO indicated he

generally distributed "crack" cocaine, and therefore needed to obtain cocaine for other customers through "Gordito." CS #5 identified surveillance photographs taken of GORDITO on February 14, 2012, and March 8, 2012, respectively, as "Gordito," JULIO's cocaine supplier. The March 8th surveillance was discussed above in Section IV.B.

291. On or about February 21, 2012, CS #5 provided law enforcement with a frame that had the back missing and was consistent with the other frames being used by the co-conspirators to conceal cocaine. CS #5 said he obtained the frame from JULIO a couple of months prior when JULIO bragged to CS #5 about how the cocaine they obtained was concealed inside such frames. CS #5 also said that a couple of months ago he had seen a box in GORDITO's residence that was full of similar frames.

292. On February 21, 2012, CS #5 conducted a controlled purchase of 3.5 grams of cocaine from JULIO. He did the same on March 1, 2012, and the transaction was audio recorded and there were consensually recorded telephone calls between CS #5 and JULIO leading up to the controlled purchase. According to CS #5, GORDITO was present when JULIO sold CS #5 the cocaine.

293. On March 26, 2012, under the supervision of law enforcement, JULIO agreed to sell CS #5 approximately seven grams of cocaine for $300 and $150 worth of crack cocaine. Officers conducting physical surveillance during the deal observed GORDITO and JULIO enter the restaurant where the controlled purchase was to take place. A short time later, CS #5 exited the restaurant and provided officers with one bag each of cocaine and crack cocaine. CS #5 returned $100 worth of buy funds and indicted he was only able to purchase five grams of cocaine. CS #5 explained that both GORDITO and JULIO entered the bathroom with CS #5 and

JULIO sold the drugs to CS #5. The controlled purchase was audio recorded and there were consensually recorded telephone calls between CS #5 and JULIO leading up to the deal.

294. CS #5 has provided law enforcement with telephone numbers that GORDITO uses to conduct drug trafficking, on which was intercepted using to speak with SAMUEL about cocaine and the conspiracy. Prior to CS #5 providing that information, agents had already been able to identify GORDITO's voice and other telephone numbers through surveillance, contemporaneous monitoring of SAMUEL's telephone, and other investigative techniques. For instance, on February 14, 2012, the day after SAMUEL made the trip to North Carolina to pick up cocaine that is discussed in Section II.C, GORDITO was surveilled arriving at SAMUEL's apartment building, presumably to pick up cocaine. Agents observed GORDITO use his cellular telephone in what appeared to be an attempt to reach SAMUEL in order to be buzzed into the latter's building. At that time, data from a court authorized pen register / trap and trace device on SAMUEL's telephone showed an incoming call from a telephone number that was later determined to be used by GORDITO.

295. Examples of intercepted calls between GORDITO and SAMUEL include one on February 17, 2012, in which GORDITO spoke to SAMUEL about a shortage in a frame he recently received: "I am missing half an ounce. . . . I have to speak with him, and good thing Mario came over to see that shit, if not, how the fuck would I have said anything, too? . . . Because only eight-and-a-half came out." (TT2 #31). I believe GORDITO was upset that a frame that was supposed to contain nine ounces of cocaine was short half an ounce.

296. On February 24, 2012, the two discussed UCC #17, a courier who had arrived with cocaine. GORDITO said, "Supposedly there's a little box coming for me." SAMUEL and

GORDITO discussed who may go to Maryland to pick up the shipment, and GORDITO asked, "Could be Mario?" SAMUEL said, "Who knows if he will go." (TT2 #1,429).

297.   On March 8, 2012, GORDITO spoke with SAMUEL about the cocaine shipment he received earlier that day from BARRERA and how it was short eight grams. GORDITO said, "I just opened that pot. . . . [T]his is good dude, but we have a problem. It's only 160 . . . eight are missing." SAMUEL and GORDITO continued to discuss the numbers and SAMUEL said he was going to get a calculator to assist with the math. (TT2 #4,043). I believe the numbers GORDITO was discussing were grams secreted in a frame, and that there were supposed to have been 168, which would equal seven "ounces" of twenty-four grams, but which only had 160 grams.

298.   Physical surveillance and video surveillance through use of a pole camera was conducted of SAMUEL outside his residence on April 9, 2012, which, in conjunction with intercepted calls over his telephone, revealed that he, GORDITO, JULIO, and SANTOS met together at SAMUEL's apartment complex parking lot.

299.   At approximately 3:06 p.m., SAMUEL and GORDITO were observed talking near the front door of SAMUEL's apartment building. At approximately 3:10 p.m., SAMUEL and GORDITO walked away from the entrance and SAMUEL was observed sitting with JULIO and GORDITO in front of the apartment complex. SAMUEL left GORDITO and JULIO and walked into his apartment complex at approximately 3:17 p.m. GORDITO and JULIO then walked behind another apartment building in SAMUEL's complex. At approximately 3:23 p.m., SAMUEL made an outgoing call to SANTOS and told him that his friend "Alex," which is a known name of GORDITO, needed a favor with "a piece of wood." (TT2 #10,862). Two minutes later, SAMUEL told SANTOS to bring him a "squared one with four." He said he and

"Alex" would wait for SANTOS to arrive, as "Alex" was going to take it. SANTOS said he would be there in a bit. (TT2 #10,864).

300.     After that, law enforcement observed the known Toyota Celica of SANTOS parked in the back of SAMUEL's apartment building. SANTOS was identified as the driver, and JULIO, GORDITO, and SAMUEL were observed getting inside the Celica. The Celica then departed the area and was followed to an apartment complex located in the immediate vicinity of the suspected address of GORDITO where SAMUEL, GORDITO, and JULIO were observed walking across the courtyard of an apartment complex. I believe GORDITO met with SAMUEL and asked for a frame containing cocaine, which SANTOS brought to them on behalf of SAMUEL.

301.     At approximately 11:41 p.m. that night, SAMUEL was intercepted speaking with GORDITO and JULIO during the same conversation about cocaine that SAMUEL had provided them that day. The intercepted call started with SAMUEL and GORDITO, but during the call GORDITO said, "I'll put Puma on." "Puma" is JULIO's nickname. JULIO got on the telephone and SAMUEL said, "Hey Pumita, all good?" JULIO replied, "Um-hum, those dudes are happy with the things. . . . [T]he dude told the ones he sells to over there, that this is 100 percent. . . . This material is good. It's good to work with that note." SAMUEL said, "Like I said, I don't have something like that all the time. But you know, they send it to us from over there." JULIO replied, "The note was good. You know when we said the price is 850, [UI] said it was good and we gave it to him. The dudes were happy. . . . We make our living off of them. Like he told me, [name redacted] himself told me, 'I will continue to come as long as you don't give me trash, and I'll make you money, and you'll make me money.' He said, 'But don't ever give me trash.'" (TT2 #10,952).

302.   Agents have not yet been able to determine GORDITO's true identity, but through interceptions and related surveillance have been able to obtain photographs and video of him on several occasions. Below is a one such photograph of GORDITO:



### xv.   Florinda

303.   FLORINDA resides in Baltimore, Maryland, and is the sister of SAMUEL and MARIO. She and her husband, UCC #25, obtain cocaine from SAMUEL that they sell to other people, as well as help coordinate the arrival of cocaine couriers into the United States from Honduras. Examples of her numerous drug-related calls with SAMUEL follow.

304.   On March 11, 2012, SAMUEL said to FLORINDA that, "I asked my cousin for ten ounces of that shit. Then my cousin comes and goes over to the house in Copan. He's there with [name redacted], buying things. And the ounces he's sending me is pure oil, extremely pure oil." He went on to say, "I told him, send them to me. If they're good, I'll take ten from you, and I'll tell my brother-in-law [UCC #25], my sister to take [UI]." FLORINDA responded, "Yes, no problem. Right now we need some." SAMUEL said, "[T]ell my brother-in-law that they are sending him a classified product." (TT2 #4,451).

305.   On March 21, 2012, SAMUEL and FLORINDA talked about customers not paying their cocaine debts. During their conversation, SAMUEL said, "What's screwing me over is that they owe me a shitload of money. . . . Just one dude owes me $8,000, another one owes me 3,000, another one owes me 2,000, 1,500, 800. I have it all written down in a notebook." FLORINDA replied, "You should not give them much. [UCC #25] went to [name redacted] because he owed him a lot and it started to weigh him down. And if he only owes 1,000, it's not much. But not more than 5,000 and up. [UCC #25] was there with that man, but he doesn't work with him anymore. But I think he still owed him 1,000 or 2,000, but I'm not sure. I don't know if he paid him. He would ask for four or five and [UCC #25] would tell him he didn't have any, you know. Because [UCC #25] didn't want to continue working with him. That's what you should do or else you won't end this." (TT2 #6,431).

306.   FLORINDA spoke with SAMUEL on March 31, 2012, and asked him what he was doing. SAMUEL said, "I'm opening a little frame because I want to bring two little toques to poor [name redacted] because he says he's drooling over there." (TT2 #8,812). And during a call on April 12, 2012, FLORINDA asked SAMUEL, "Did you know you're getting a box from over there? They sent some things for you as well." SAMUEL replied, "You already have them there?" FLORINDA said, "No, dude, the traveler just leaves today. I will pick them up on Saturday." SAMUEL retorted, "I know that. I'll call you when I leave. [Name redacted] wants to come with the brother-in-law, but the problem is I don't have chocolates at the house. I have them at Santos's. . . . I lost two animals right now with the fucking black bitch. . . . She cooked them and they didn't cook. . . . I gave her from the other ones." FLORINDA replied, "Be careful." (TT2 #11,516).

307.   Two weeks later, SAMUEL and FLORINDA spoke again about the arrival of a courier. SAMUEL asked, "Did the traveler come?" FLORINDA said, "You see, [name redacted], called him. You know that it's coming for us as well. . . . He asked for his name and all, and they said they searched him at Customs." FLORINDA went on to explain how the courier had arrived and that she was going to pick up the merchandise and bring it to SAMUEL: "Like I said, I'm going to go pick up those things and I'll bring you your things if we go tomorrow." (TT2 #11,836).

308.   Later that day, they spoke again about cocaine sent by certain suppliers in Honduras. SAMUEL said, referring to UCC #25, "The brother-in-law already knows how things are. He knows the four from [name redacted] are coming. So that he can help himself out. . . . He gave it to her for 5,000. It would be 20,000 pesos for [UCC #5]. [Name redacted] keeps the gain. . . . You could probably get from the other one so that she can help herself out." FLORINDA said, "He sent her the money right away the other day. That was the first thing he did." SAMUEL replied, "I don't like it when they keep asking for the money. That's why I don't like to get any from that one. The most I get is two, four. I send him the 2,000 pesos, and to hell with him. He thinks I owe him and I tell him I already sent the money to his father. He apologizes." FLORINDA added, "[UCC #25] doesn't like that either. One knows, when people is good pay, there's no need to ask for money. . . . All is fine dude. Hopefully the kid will pick those things up and everything goes well. I'll call [UCC #25] and see what he wants to do." (TT2 #11,863).

309.   On April 15, 2012, FLORINDA asked SAMUEL what he had given to a co-conspirator, UCC #26, the other day. SAMUEL said a "half. He said he had the money." FLORINDA explained, "He keeps asking [UCC #25] for a half. But [UCC #25] gives him some and I tell him not to. How will he pay later? That's why I was asking you if he paid you."

FLORINDA told SAMUEL, "Call him and ask him if he has the money so that I can come get it." (TT2 #12,027). I believe FLORINDA was upset with her husband for supplying UCC #26 with cocaine when UCC #26 did not have any money and could not pay SAMUEL back for cocaine UCC #26 got from him. FLORINDA offered to collect the money from UCC #26 on SAMUEL's behalf.

310.    FLORINDA was identified because she is often referred to by "Flor" in intercepted conversations, and on March 27, 2012, she provided her full name in a call with SAMUEL, saying it was "Maria Florinda Benitez-Pineda." (TT2 #7,850). Furthermore, records from Western Union showed wire transfers sent by FLORINDA from the United States to Honduras on which were listed her name, Honduras identification card, and the telephone number that she uses to communicate with SAMUEL.

### xvi.    Maria

311.    On January 13 and 20, 2012, an undercover FCPD officer (UC #3) purchased one ounce of cocaine from CS #8, each time for $1,100. On February 1, 2012, UC #3 met with CS #8 for the purpose of purchasing three ounces for $3,000. After the deal was done, CS #8 was placed under arrest. During his post-*Miranda* interview, CS #8 identified MARIA to be his cocaine supplier. CS #8 told law enforcement he had been purchasing cocaine for the past two weeks and he obtained the cocaine from MARIA. CS #8 said he had purchased a total of four ounces of cocaine, all of which he sold to UC #3. CS #8 said he was going to sell the three ounces of cocaine for $3,000 and he was going to make $300 in profit. CS #8 provided MARIA's telephone number and agreed to call MARIA to order additional cocaine.

312.    On February 2, 2012, under the direction and supervision of law enforcement, CS #8 called MARIA and ordered approximately five ounces of cocaine. MARIA agreed to sell CS

#8 the cocaine and to meet at a pre-arranged location. At approximately 5:52 p.m., an FCPD

officer conducted a traffic stop of MARIA's vehicle and subsequently placed him under arrest

after he was found to be in possession of approximately two ounces of cocaine.

313.    During a post-*Miranda* interview, MARIA confirmed the substance found in his

vehicle to be approximately two ounces of cocaine. MARIA said he picked the cocaine up from

a subject in Maryland whom he knew as "Jovanni." MARIA said he paid $1,400 for the two

ounces and that he intended to sell it for $1,600. MARIA said he had been selling cocaine for

approximately three months and that he sold to one person. MARIA was lodged in the Fairfax

County Jail where he received a $2,000 secured bond.

314.    Toll records of MARIA's telephone number revealed contact with SAMUEL on

February 2, 2012. Specifically, there were calls with duration at approximately 2:32 p.m. and

3:40 p.m., which I believe indicate MARIA had called SAMUEL to order the cocaine that

MARIA intended to sell to CS #8. This conclusion is further supported by an intercepted call

between SAMUEL and BARRERA that occurred on February 3, 2012, where SAMUEL told

BARRERA that "they," referring to law enforcement, had arrested his "woman's brother."

SAMUEL said, "You don't know about the crap that just happen?" BARRERA asked, "What

happened?" SAMUEL said, "They got my woman's brother. . . . [T]hey got him yesterday at

Bamboo." BARRERA asked, "What did they get him with?" and SAMUEL replied, "With only

four calves." BARRERA asked, "Were they checking him out or was it out of nowhere."

SAMUEL said, "[UI] two the day before yesterday and two yesterday and they got the son of a

bitch yesterday." SAMUEL explained how he was arrested late in the evening and that

SAMUEL "took him out last night, early in the morning," referring to SAMUEL bonding

MARIA out of jail. BARRERA expressed frustration that SAMUEL did not tell him about the

arrest so BARRERA could be on "alert." BARRERA asked, "How much was the bond?" SAMUEL replied, "$3,000." BARRERA asked, "How much did they get?" and SAMUEL replied, "four." BARRERA asked, "Four whole ones?" and SAMUEL said, "Yeah." BARRERA then asked, "Was the work yours?" meaning whether the cocaine MARIA was arrested with came from SAMUEL. SAMUEL said, "Yeah." (TT1 #432).

315. Subpoenaed bail bond records for MARIA revealed CONCEPCION posted bond for MARIA, while a "Wilfredo Pineda," which is a known alias of SAMUEL, was listed as a "reference" on the bond paperwork. SAMUEL's telephone number, Target Telephone #2, was listed as a telephone number for "Wilfredo Pineda" on the bond paperwork, further corroborating the intercepted call between SAMUEL and BARRERA where SAMUEL said he bonded MARIA out of jail.

316. MARIA has been intercepted numerous times communicating with SAMUEL and CONCEPCION about trafficking in cocaine. He has been identified as the user of the telephone number intercepted based on him providing his full name in calls and CONCEPCION referring to him as her brother. For instance, during an intercepted call between MARIA and CONCEPCION on April 26, 2012, MARIA asked CONCEPCION to deposit money into his account. MARIA provided his account number and CONCEPCION said, "And it is under your name right? Jose Maria Benitez-Pineda?" MARIA answered affirmatively. (TT4 #711). During another intercepted call on April 22, 2012, CONCEPCION told the person she was speaking with that she was on her way to work and her brother would be at the house to give that person some boxes. CONCEPCION said, "My brother will be here. I am on my way to work because it is already 10:00." The person said, "What is Jose's number? I don't have it handy."

CONCEPION gave MARIA's telephone number, which is the same one he used in the following intercepted calls. (TT4 #507).

317.   On March 8, 2012, MARIA was intercepted talking with SAMUEL about obtaining cocaine from SAMUEL. MARIA said, "Listen, I am putting that inside a black hat that is hanging from the door, with a green hat." SAMUEL said, "Okay. Hey listen, let's do something. . . . Take those five that are yours. . . . Hey listen, put the rest under the mattress." (TT2 #4,031). I believe MARIA was putting cocaine inside a black hat, and SAMUEL directed MARIA to take a quantity of cocaine and put the rest under SAMUEL's mattress.

318.   On March 22, 2012, SAMUEL spoke with MARIA about, among other things, his drug trafficking activity. SAMUEL said, "I have some fucking orders! I have this guy from West Virginia, that fucker gets fifteen in one shot. . . . The thing is that I give it to him sealed and cheaper, but fuck, in fifteen animals, in ten I get a profit of 2,000. . . . Without moving a finger. I give him 250-300 to Carbajal [a surname of SANTOS] and I keep 1,700. . . . Baltimore Rudy. Rudy owed me 10,000." SAMUEL then spoke about cocaine that had arrived in Miami that SANTOS was going to pick up. SAMUEL said, "I have the other one, the one to Miami, because ten to twelve mandarins arrived there." MARIA said, "Santos will go all the way over there?" SAMUEL replied, "Yeah, he says he will go." (TT2 #6,672).

319.   CONCEPCION told MARIA during an intercepted call on April 17, 2012, that she took $6,000 from SAMUEL the previous day and that he did not even notice. CONCEPCION said she used that money to purchase cocaine from Honduras: "Six thousand, look, I sent to go buy a bunch of whole cows over there." MARIA said, "Cows!" and CONCEPCION replied, "So they send them to me, you know." (TT4 #186).

320. Subpoenaed Western Union records revealed MARIA was the sender of approximately sixty-nine wire transfers to different names in Honduras between February 2008 and March 2012 for a total of approximately $141,898. One of MARIA's telephone numbers was listed on nearly all of the wire transfer records, and his Maryland driver's license number was also listed on approximately seven of the wire transfers.

### xvii. Enrique

321. ENRIQUE lives in the area of Norfolk, Virginia, and sells multi-ounce quantities of cocaine that he obtains from SAMUEL. ENRIQUE has been identified as having additional cocaine distributors in states other than Virginia, as well as having knowledge of how the cocaine is imported and that the cocaine can also be converted into crack cocaine.

322. ENRIQUE's name is commonly used during intercepted calls, and the telephone number he uses to communicate with SAMUEL is subscribed to in a variation of ENRIQUE's name. Additionally, the content of intercepted calls in conjunction with an undercover HSI Special Agent (UC #4) who was introduced to ENRIQUE in Norfolk in an undercover capacity confirmed ENRIQUE's identity. The details of the undercover operation are outlined in more detail below. But first, what follows are examples of intercepted calls between ENRIQUE and SAMUEL.

323. On March 15, 2012, ENRIQUE told SAMUEL, "Yeah, look, there's a client waiting in Charlotte, North Carolina, as well." SAMUEL replied, "That's good dude. There's none of this product down there dude. The shit these assholes have in Washington is only paste; that shit doesn't work. That's trash. . . . What comes from over there qualifies to make rock. Fuck, that's what people look for, the oil. . . . A woman from Washington just called me. That woman always gets three each week. She said, 'I want to see you tomorrow.'" SAMUEL

128

explained that he received four ounces of cocaine the previous night from a friend who had received twenty ounces. SAMUEL said, "Yes my friend. He got like twenty but he said, 'I can give you four or five tops, no more.'" (TT2 #5,112).

324.   On March 23 2012, SAMUEL talked with ENRIQUE about the courier caught at Dulles Airport the previous day. SAMUEL explained that there were "forty-six calves," by which I believe he meant ounces of cocaine, coming that were for SAMUEL. ENRIQUE replied, "You should see, I was thirsty for money." SAMUEL said, "Look man, first time this happens in three years I've been doing this. This has never happened to me dude." ENRIQUE replied, "Fuck. I should have met you before." SAMUEL said, "Look, they sent one whole calf for my brother-in-law cut in two pieces. . . . That woman, fuck, they took a shitload from the woman." ENRIQUE asked, "Could it be a snitch?" and SAMUEL said, "No, I think they started to check her out there." SAMUEL continued to say, "This woman for tomorrow is a connection I have with another guy. We had a deal before. Half was coming. There were ten that belonged to the woman." (TT2 #7,009).

325.   On March 28, 2012, ENRIQUE asked SAMUEL, "How many are you thinking about giving me?" SAMUEL replied, "The ones I got dude were sixteen, but a guy let me borrow five the other day [UI] so I have to get them from there. So I might have eleven left." SAMUEL explained that he paid someone else $300 to pick up the cocaine from the couriers in order to protect himself from law enforcement: "You know one has to take care of himself. . . . I send other people. The person gets $300 bucks for the trip." ENRIQUE asked, "Why don't you send me two from the ones you have there?" SAMUEL and ENRIQUE continued to discuss the quantity of cocaine that SAMUEL could supply ENRIQUE and at what price, and SAMUEL told ENRIQUE about the high quality of cocaine that had arrived. SAMUEL said, "Dude, I

opened a little frame and that bitch shines." SAMUEL said, "I would send you ten tomorrow at once, god willing. Nine to ten because the weekend is coming up." (TT2 #8,233).

326.    On March 30, 2012, UC #4 arranged to meet with ENRIQUE to negotiate the purchase of approximately half a kilogram of cocaine from ENRIQUE. Agents conducting physical surveillance of ENRIQUE's address in Norfolk, Virginia, prior to the scheduled meeting observed ENRIQUE leave the residence at approximately 4:20 p.m., enter a black Toyota 4Runner bearing Virgina license plates that is registered to ENRIQUE, and depart the area. ENRIQUE was followed by law enforcement to the pre-arranged meet location and where ENRIQUE met with UC #4.

327.    ENRIQUE identified himself as "Rick" and showed UC #4 a small plastic bag of white powdery substance believed to be cocaine. ENRIQUE presented the small amount as a sample of what the large load of cocaine would be like. ENRIQUE told UC #4 that the quality of cocaine would be different from shipment to shipment because the cocaine comes from Honduras and that was the way things worked down there. ENRIQUE showed UC #4 a picture of a frame which he said would contain approximately three ounces of cocaine, and that this is what ENRIQUE obtained from Honduras. ENRIQUE explained the process of obtaining the cocaine from within the frames. ENRIQUE agreed to sell UC #4 eighteen ounces of cocaine for $16,000. ENRIQUE then said he may not be able to obtain all eighteen ounces, but he would be able to get ten ounces. UC #4 asked ENRIQUE when he would be able to obtain the ten to eighteen ounces of cocaine, and ENRIQUE said he would call his guy in Washington, D.C., that day and should have the cocaine the following day. At the conclusion of the meeting, ENRIQUE sold UC #4 approximately .7 grams of cocaine. UC #4 positively identified ENRIQUE from a prior jail booking photograph.

328.   On March 30, 2012, less than two hours after ENRIQUE met with UC #4, he spoke with SAMUEL about obtaining cocaine. SAMUEL said, "I have the material here. I'll send the twelve tomorrow if you want." ENRIQUE said, "I'll do the math because I don't like to sell like that because I won't make much like that." SAMUEL said, "I'll send it like it comes, sealed, because I know you're working with me." ENRIQUE said, "Send them then. If you can't tomorrow, then Sunday." SAMUEL replied, "I can do it tomorrow, but if you want to wait so that you can send me as much cash as you can, then I'll wait for Sunday." ENRIQUE replied, "Depends on what I sell today." (TT2 #8,600).

329.   An intercepted call on April 2, 2012, confirmed that SAMUEL had supplied ENRIQUE with cocaine as they discussed, among other things, its high quality. ENRIQUE said, "I gave some to an American, and he was asking for more." SAMUEL said, "And this bitch is a thousand times better than the one I gave you the other day. If you put that bitch right there, see there's coke that is bitter, but that bitch puts you to sleep. . . . [O]n the lip or on the tongue, you touch it a little bit, it feels as if a scorpion stung you from the numbing. The thing is good." (TT2 #9,298).

### xviii.   Juarez-Lopez

330.   JUAREZ-LOPEZ has been intercepted ordering cocaine from SAMUEL, and has been discussed by SAMUEL, GORDITO, and other co-conspirators during intercepted conversations about his involvement in the organization and how JUAREZ-LOPEZ works for MARIO in the distribution of cocaine.

331.   CS #9 conducted a series of controlled purchases from JUAREZ-LOPEZ under the direction and control of FCPD officers. CS #9 has been providing information to FCPD since approximately 2009. CS #9 is not a convicted felon, but does have multiple arrests, one of which

occurred in 2008 for providing false identity to law enforcement, which was nolle prossed, as well as an arrest for forgery in 2011 that was also nolle prossed. CS #9 has a basis of knowledge in drug activity, and has prior arrests for controlled substance offenses. CS #9 received deferred action in federal immigration proceeds at the request of FCPD and works as a confidential source for monetary gain. CS #9 has been paid over $1,000 for information that has been provided to law enforcement since 2009, as information CS #9 has provided to law enforcement has been found to be credible, reliable, and independently corroborated on numerous occasions. CS #9 has provided information that has led to the arrest of over dozens of individuals ranging from narcotics offenses, prostitution, false identification, and other criminal matters.

332.    On March 13, 2012, CS #9 made a controlled purchase of approximately three grams of cocaine for $300 from JUAREZ-LOPEZ. On March 27, 2012, JUAREZ-LOPEZ sold approximately one gram of cocaine to CS #9 for $100 during another controlled purchase. Then, on April 6, 2012, JUAREZ-LOPEZ was arrested after selling CS #9 approximately three grams of cocaine for $300 in a controlled purchase. JUAREZ-LOPEZ attempted to flee the area on foot, and as he fled he discarded two baggies that between them contained approximately ten grams of cocaine. The number for the cellular telephone JUAREZ-LOPEZ was found to be in possession of that night and which he also provided to law enforcement at the time of his arrest was the same number JUAREZ-LOPEZ was intercepted using to communicate with SAMUEL. Examples of intercepted calls either between JUAREZ-LOPEZ and SAMUEL, or discussing JUAREZ-LOPEZ, are as follows.

333.    On March 23, 2012, JUAREZ-LOPEZ was intercepted speaking with SAMUEL. When SAMUEL asked who was calling, JUAREZ-LOPEZ responded with his first name, "Martin." JUAREZ-LOPEZ asked SAMUEL if he was going to be home and SAMUEL

explained he was waiting for a ride and for someone to bring him "a little diploma," and that JUAREZ-LOPEZ could "stock up the store there." SAMUEL said, "I'm going to give one to Chaparro [one of MARIO's nicknames] so he can work." JUAREZ-LOPEZ responded, "I'm like the people are hungry here. The fish are biting here." SAMUEL said, "I'm not going to keep you down, [he/she] is going to bring you a grapefruit, half, one." (TT2 #7,069).

334.    SAMUEL and other co-conspirators were intercepted discussing JUAREZ-LOPEZ's role in the conspiracy in the aftermath of JUAREZ-LOPEZ's arrest. It was learned through some of those interceptions that SAMUEL and other co-conspirators were in the same area as JUAREZ-LOPEZ when was arrested. It has also been learned that SAMUEL and others have been making efforts to ensure JUAREZ-LOPEZ does not speak with law enforcement.

335.    On April 6, 2012, SAMUEL called MARIO and said, "They got . . . they got [UI] Martin, there outside, no shit, and I threw the shit. . . . [O]ne of yours and, four of mine there. . . . I threw them in the toilet and the other one I threw in the shit [UI] to shit." MARIO asked, "Who did they get?" and SAMUEL replied, "Martin, the apartment outside of your house." (TT2 #10,153). I believe SAMUEL was saying he threw cocaine down the toilet after JUAREZ-LOPEZ was arrested in order to avoid law enforcement finding it.

336.    During an intercepted call with BARRERA on April 7, 2012, SAMUEL said, "[T]hey busted another guy that works with Mario, there in front of his apartment there. . . . Martin." BARRERA asked, "Didn't he live with Mario?" SAMUEL said, "Of course, he lived there, in an apartment." BARRERA asked if the police searched the apartment and SAMUEL said, "Look, thank god they didn't go there man. But fuck, he was stubborn that he didn't say, that he didn't [UI] where he lived. . . . [B]ecause you should have seen how dirty that apartment was there." (TT2 #10,368). I believe when SAMUEL said the apartment was "dirty," he meant

that there was cocaine inside that law enforcement would have found if they searched, but that JUAREZ-LOPEZ prevented that from happening by not revealing where he lived or his connection with his co-conspirators.

337. On April 8, 2012, SAMUEL was intercepted saying, "That son of a bitch Martin I like, that [guy] is a dog buddy. The fucker is a real man, very manly. . . . [T]hey [police] gave him shit so he could tell them where we lived...He didn't want to say shit. He told them he lived at the other apartment, at his mother's." (TT2 #10,628).

338. On April 9, 2012, SAMUEL and MAURICIO were intercepted speaking about JUAREZ-LOPEZ. SAMUEL said, "Yes, and Martin, the other guy that worked with Mario, they busted him too." SAMUEL explained how he was at the apartment building when JUAREZ-LOPEZ was arrested out front. SAMUEL said, "[H]e went outside to sell there and they got him outside. But son of a bitch didn't say where he lived and we were right there. If he had said it they would have shit on all of us man. . . . I threw a whole one to the toilet." (TT2 #10,786).

339. On April 10, 2012, SAMUEL and GORDITO were intercepted talking about meeting with JUAREZ-LOPEZ when JUAREZ-LOPEZ got out of jail. SAMUEL said, "[T]he problem is going to be . . . look, that I and you and el Chaparro [one of MARIO's nicknames], when Martin comes out, the four of us are going to meet." Later in the conversation GORDITO said, "[W]hat if he [Martin] loosens his tongue." SAMUEL said, "God willing, I would tell you to take care and be careful in that area, old man." (TT2 #11,103).

340. During an intercepted call on April 11, 2012, SAMUEL and another co-conspirator, UCC #27, were intercepted using SAMUEL's telephone to talk with GORDITO about making arrangements to meet with JUAREZ-LOPEZ. GORDITO said, "[L]ocate Martin and tell Martin to come over to this area, up here, dude. . . . [W]e can talk there at the laundry,

dude, because I'm not going to bring him here to my house. . . . Tell him that I need him to come over here." GORDITO went on and said, "Tell him to come to the laundry and you can come alone. . . . Come before with Samuel and he can come behind." (TT2 #11,220). I believe GORDITO, SAMUEL, UCC #27, and others were making arrangements to meet privately with JUAREZ-LOPEZ to ensure he did not talk with the police and to try and identify who may have been working with the police that led to JUAREZ-LOPEZ's arrest, as they were worried about information JUAREZ-LOPEZ could provide that may lead to their arrest or interfere with the organization's distribution network.

### xix.   Elmer

341.   ELMER obtains cocaine from MARIO and SAMUEL that he then further distributes, and he has been intercepted discussing drug trafficking with SAMUEL on numerous occasions, examples of which follow.

342.   On March 24, 2012, SAMUEL asked ELMER where he was and ELMER replied, "At Mario's." SAMUEL asked if ELMER had seen Chino [a nickname for JURADO], and ELMER said Chino had been at the El Salvadoreno, "but he told me he was going to do some things. But they called me [saying] they want some shits over there man. I'm going now to take them because I didn't have anything, neither did Chino or Martin [JUAREZ-LOPEZ]. . . . Chino told me he didn't' have any. . . . I have to take that shit right now." SAMUEL said, "That's fine, go see about that." (TT2 #7,338).

343.   During an intercepted call between SANTOS and SAMUEL on April 8, 2012, SAMUEL and SANTOS discussed ELMER. SAMUEL said, "He worked with you but he doesn't say anything to you but just me. I gave him three-and-a-half yesterday and he hasn't [UI]. [OV] has to have that money there." SANTOS said, "Tell him that the things are over there

and there's nothing that can be done until I get there." SAMUEL said, "I'll tell Elmer that we can help him out but he has to wait until tomorrow and he can tell you what he has there." (TT2 #10,647). I believe SAMUEL and SANTOS discussed supplying ELMER with additional cocaine, but they would not be able to supply him until the following day and that ELMER would need to pay SAMUEL and SANTOS the money owed for cocaine already provided.

344.   On April 9, 2012, at SAMUEL received an incoming text message from ELMER that said, "Old man, call Chaparro [MARIO's nickname] and tell him for them not make too many movements because the detectives' cars are by the office." (TT2 #10,850). I believe ELMER was in essence acting as a lookout or surveillance for SAMUEL and MARIO in order to assist SAMUEL and MARIO in avoiding law enforcement detection.

345.   Later that day ELMER was intercepted speaking with MARIO while using SAMUEL's cellular telephone. SAMUEL started out the conversation by calling MARIO, but ELMER got on the line shortly after and asked MARIO where he left ELMER's frames with cocaine. ELMER said, "Hear me out. Where did you leave the frames?" MARIO said, "The frames?" and ELMER replied, "Where did you leave the magazines?" MARIO said, "Those were the, I'll leave the two or three frames down there." ELMER said, "Oh, that's why. I was thinking that because I heard [UI] saying that one wanted them, and I was going to go drop it off over there." MARIO said, "I put them in the red backpack. I'll go drop them off at [name redacted]. You know, I'm afraid the police car may go there." ELMER said, "I came from over there and I thought, 'Fuck, there was nothing in there.' I went out and I'm here with Samuel and he locked the room and I didn't see anything there. I was thinking, 'Where did he leave that?'" MARIO and ELMER discussed how the frames had already been moved and how MARIO appreciated ELMER looking out for him. MARIO said, "Like I said, I thank god I have friends

around there. You [UI] and those guys and stuff like that. We can keep going because it's worth it when one knows and [UI] put things away. Some people don't do that for us because they get scared. Like I said, I have honest friends. The ones we bring know what up. The ones that don't know, fuck up." (TT2 #10,879). I believe ELMER, who was with SAMUEL, had been to MARIO's apartment and did not see the frames with cocaine anywhere so ELMER called MARIO to ensure everything was okay. In addition, I believe MARIO appreciated ELMER's efforts and looking out for MARIO and company.

346.    ELMER also assists SAMUEL with wiring drug money to Honduras as indicated during an intercepted call on April 9, 2012, when SAMUEL asked ELMER where he was and ELMER said, "At El Pueblo." SAMUEL said, "Perhaps you can send a wire for me to over there." ELMER said, "Yeah man, no problem." (TT2 #10,869).

347.    On April 21, 2012, there were a series of calls between SAMUEL, ELMER, JUAREZ-LOPEZ, and others about CS #9, who conducted the controlled purchase of cocaine from JUAREZ-LOPEZ that led to his arrest, because ELMER and JURADO saw CS #9. At approximately 5:12 p.m., ELMER called SAMUEL and told him that he found the suspected informant and was watching him. ELMER said, "The son of a bitch was with his wife, he looked at me and went to get pizza. So I told Chino [JURADO's nickname] to go see who the hell was over there and he went [UI]." SAMUEL replied, "Really, you should follow that son of a bitch to see where he lives." ELMER replied, "I'm going after him now." SAMUEL said, "Find out so we can visit him. That son of a bitch can't stay like that. . . . [I]f you need to get a ride, get it, I will pay for it . . . find him." SAMUEL went on to say, "He is the one who gave them Martin [JUAREZ-LOPEZ's first name], they had him there on Columbia Pike. . . . [J]ust go up to him and tell the son of a bitch that he is going to die, that we have him by the balls. Tell that son of a

bitch we got him by the balls for being a [UI]. . . . Tell that son of a bitch that he is going to die and he does not know when. Tell him he is trash and that he is going to get killed for being [UI]." SAMUEL told ELMER, "I'm going to call Martin to tell him that the son of a bitch is there. . . . Call me back, if you see that son of a bitch. You tell him that he is going to die." (TT2 #13,228).

348.    At approximately 5:18 p.m., SAMUEL called JUAREZ-LOPEZ and told him the person who turned him in was on Columbia Pike. SAMUEL identified JUAREZ-LOPEZ during the call by his first name of "Martin" and said, "I told that guy to tell him [the Mexican] that he is going to die for being a snitch. I told him to tell him [OV]." JUAREZ-LOPEZ replied, "Calm down dude. You know how heavy this phone is." SAMUEL replied, "Exactly, I know. But I'm pissed about what happened to you dude." JUAREZ-LOPEZ said, "Chino talked to him." SAMUEL told JUAREZ-LOPEZ the subject went to buy pizza at the El Salvadoreno and said, "[Feel like] shooting that son of a bitch. . . . Give him a good one and rip his balls off." JUAREZ-LOPEZ said, "Yeah, he needs to feel the presence, son of a bitch. But we'll talk soon. We'll see what we will do, but this will not stay like that." SAMUEL said, "Get a son of a bitch with balls and ask him how much he would charge and I'll pitch in. . . . I want to bring that son of a bitch down." (TT2 #13,229).

349.    SAMUEL called ELMER at approximately 5:33 p.m. and asked ELMER what happened with CS #9. ELMER said he found CS #9 eating and, "I told him to relax because no one will take notice when he shows up in pieces. . . . I told him he would be in a bag by the morning so to be chill and that one more time he was fucked. . . . I came to El Salvadoreno where Chino was waiting for me with a beer, so I'm here drinking." (TT2 #13,236).

350.    At approximately 5:39 p.m., SAMUEL called JUAREZ-LOPEZ and said, "Hey Martin . . . Elmer stopped that son of a bitch on Columbia Park and told him a bunch of shit [laughs]. He says that he was eating and dropped the food on the table. He said he told him that they were going to find pieces of him in a black bag for being a snitch and that he won't know who is the one who is going to kill him." (TT2 #13,238).

351.    At approximately 6:15 p.m., SAMUEL called and spoke with an unidentified man ("UM") and said, "Look there's a son of a bitch there who screwed over the guy that works with my brother [MARIO]. They went there right now and he shit on himself dude. . . . That's the son of a bitch who turned in the guy that works with my brother. The son of a bitch is down there and Elmer went to see him and [UI]." UM said, "Why didn't you tell me? Give me those jobs brother. What's wrong with you?" SAMUEL replied, "I think the son of a bitch is there. Be alert. I would pay some money to make that son of a bitch disappear dude." UM replied, "I'll take care of that brother." SAMUEL said, "Alright then. We'll see what happens dude. Serious shit. We can't talk much over the phone." (TT2 #13,248).

352.    At approximately 6:24 p.m., SAMUEL called and spoke with ELMER, who was in the area of CS #9. During the call, SAMUEL said, "That son of a bitch is good to give him a good killing man." SAMUEL and ELMER went on to discuss meeting and ELMER said, "Go up to the apartment. I'll come with the guy." (TT2 #13,259)

353.    CS #9 was contacted by FCPD officers and informed of the plan to harm him. CS #9 told law enforcement he noticed he was being watched and recognized one of the subjects watching him to be "Chino," who CS #9 previously identified from a photograph to be JURADO. CS #9 also later identified a photograph of ELMER as a person who was with

JURADO when CS #9 was being watched and followed. CS #9 said he was never approached or threatened on April 21st, and simply observed ELMER and JURADO staring at him.

354.    In addition to CS #9's identification, ELMER is commonly referred to by his first name during intercepted calls with SAMUEL and has also provided his entire name during some of those calls. During a call on March 30, 2012 at approximately 2:01 p.m., SAMUEL addressed ELMER by his first name and said, 'Give me your proper name. I'll send a wire right now with your name. I'm at the store." ELMORE replied, "Elmer Anzora." SAMUEL said, "Elmer Anzora, just like that?" and ELMER replied, "Yeah, just like that." (TT2 #8,507). During another call between them on April 13, 2012, SAMUEL asked ELMER again for his last name and ELMER replied, "Adilio Anzora Miranda." (TT2 #11,780). Western Union records show that the telephone number ELMER uses to communicate with SAMUEL has been listed on wire transactions in which "Elmer Anzora" was the sender, as recently as March 29, 2012, with an address in Arlington, Virginia.

## VI.    PROCEEDS

355.    As discussed throughout this affidavit, members of the conspiracy in the United States send money to cocaine sources of supply in Honduras via wire transfers through various companies, to include Western Union and Intermex. I believe that sometimes conspirators wire the money themselves and in their own names, and sometimes they have other people send the money for them in an effort to avoid detection by the wire transfer companies and/or law enforcement. I further believe the same is true with respect to the named recipients of the wire transfers: sometimes the recipient listed on a wire transfer is the actual conspirator for whom the money is intended, while sometimes the name of a third party is used.

.

356.   Agents have attempted to acquire records from Western Union and Intermex relating to wire transfers for which the sender and/or recipient is believed to be a conspirator or a person through whom conspirators are believed to use to send and/or receive wire transfers. The acquired records from Western Union span May of 2005 through April of 2012, while the records acquired from Intermex span May of 2007 through April of 2012. Combined those records reflect over $1,000,000 in wire transfers from the United States to Honduras.

## VII.   FIREARMS AND VIOLENCE

357.   In addition to the facts presented above, the following is a sample of intercepted communications that, I believe, demonstrate members of the conspiracy possess firearms and are willing to commit acts of violence.

### A.   Barrera sending a firearm to Honduras

358.   On February 5, 2012, BARRERA asked PENA, "Is it true La Perra showed you a firecracker?" which I believe was a reference to a gun. PENA and BARRERA discussed how the gun was rusty and described the weapon being similar to one used in the old movies and a "cowboy one that would cock to the front . . . ." PENA told BARRERA that La Perra "said he wanted to sell it." BARRERA said, "Well if he sells it – I [would get it] to send it because I would not keep that shit at the house, not even as a joke buddy. . . . [B]etter to just turn yourself in." BARRERA went on to say that if La Perra sold it, "I'll grab it because they are expensive in Honduras." BARRERA also said, "I can fix the papers then. [Name redacted] told me that he's able to get guns, but doesn't get [UI] nobody gets me any." (TT1 #915).

359.   The next day, BARRERA spoke with BARRIOS and they had a lengthy conversation about guns. BARRERA asked BARRIOS if he had knowledge of guns and BARRIOS said he did. The two discussed the different manufacturers of 9mm handguns and

BARRERA explained that he was "looking at an American one that says 9mm Ruger or Lugar." BARRIOS asked, "Does it have a key . . . a switch next to the trigger in the back?" and BARRERA confirmed it did. BARRIOS asked, "Does it have a serial number an all that?" BARRERA responded, "These weapons are American because it says high [UI] where they were made, Memphis, Ohio." BARRERA and BARRIOS continued to discuss the firearm and BARRERA asked, "Should I send you a picture to your cell?" BARRIOS replied, "Send it. . . . [H]ow much will they give to you for?" BARRERA responded, "Four tables." BARRIOS then asked, "How many magazines?" and BARRERA said, "Just one, but they can get more in Honduras." Later in the conversation BARRERA said, "If they catch you here with a gun you are fucked." BARRERA also said, "They can fix the paper for it over there. They said to just send it and they would fix the papers there without a problem." BARRIOS responded, "I know, last time I sent a 40. . . . I sent a 40 but with three magazines that I bought from an American over there in North Carolina. . . . [Y]eah get it, but don't keep it at home." (TTI #1,444).

360.   On March 11, 2012, BARRERA spoke with UCC #3 about how much guns would sell for in Honduras. UCC #3 said, "That rocket over here is between 12,000 and 14,000 [pesos]. I got a Ruger. Because they're American. I've got a .357 Ruger and they gave me a cow that had recently had a calf, so that cow that recently gave birth came to about 15,000 for me." BARRERA asked about a "nine," referring, I believe, to a 9mm caliber gun, and UCC #3 said, "Yes, but here they are around 12,000 to 13,000 pesos." BARRERA then said, "$400 dollars is good right?" to which UCC #3 replied, "Yes man. . . . [T]hat's why I told you to get it. . . . [I]f you had any idea of what is convenient for you, you get one of what I have man." BARRERA said, "I used to have a pistol. I don't like it. [UI] I know it's good to have it. But well hidden because I don't like to [UI]." UCC #3 described the level of violence in Honduras and a recent

142

family that had been killed. UCC #3 said, "Even the children. They took their little guts out. The two year old child . . . this shit is worse every day. . . . I saw that Honduras is number one right now in Central America." BARRERA said, "It looks like it beat Juarez. That shit over in Mexico." (TT1 #2,568).

361.   On April 4, 2012, BARRERA was intercepted talking with his mother and another individual in Honduras about what I believe was a handgun BARRERA had sent to Honduras. BARRERA's mother said, "Yes, [name redacted], gave it to me already, I saw this right now. It takes two shots, right?" BARRERA explained that "I needed to take it apart to put that thing in there," which I believe was a reference to how he had to dismantle the gun before putting it in the box he used to ship it to Honduras. BARRERA spoke with another man during the same conversation, who said he was going to try it out later and called the handgun a "C-9." The man said, "That's a C-9, that's the model." BARRERA asked, "Are they good?" and the man replied, "Yes, I saw it at the armory and there's some there and I think, I think that they're somewhat expensive. I have seen those little one's there." (TT1 #14,437). Based on my training and experience, I know that Hi-Point Firearms produces a 9mm pistol that is named the "C-9."

**B.   Threats to UCC #1**

362.   On February 27, 2012, BARRIOS and BARRERA were intercepted talking about what I believe to be the latter's upcoming court appearance in Fairfax County for his arrest on October 21, 2011, and his co-defendant, UCC #1, who they referred to among themselves and in conversations with other people as "burro," which means donkey. BARRERA told BARRIOS the trial had not started yet and it was pushed until May. BARRERA asked BARRIOS if he would "kick the donkey I told you about?" BARRERA said, "I have the nine, are you going to kick one? That bitch that is talking shit there, he wants to point the finger at me." BARRERA

asked, "Are you going to blow him"? BARRIOS said, "I want some money, old man. I want money and I'll go to hell." BARRIOS then said, "Why make so much racket? That chicken dude's neck can be twisted, son of a bitch." I believe BARRERA told BARRIOS he had a "nine," referring to what I believe is a 9mm handgun, and wanted BARRIOS to use it on UCC #1, his co-defendant. BARRIOS said he wanted money from BARRERA in order to take action against UCC #1, and BARRIOS then suggested they not make so much noise and simply "twist" the neck of the co-defendant as opposed to shooting him. (TT1 #6,490).

363.   On March 13, 2012, BARRERA and PENA exchanged several text messages discussing who I believe to be UCC #1. PENA sent BARRERA a text message that said, "Are you going to ask Burro not to make any noise?" (TT1 #9,426). BARRERA responded, "Tell him let's make Burro disappear and that's it." (TT1 #9,427). PENA replied, "Easy fool, what if they are reading our texts?" (TT1 #9,428). BARRERA said, "The texts are the only thing they cannot read, fool." (TT1 #9,431). PENA responded, "Keep thinking that they can't read them. That's the most reliable evidence they can present." (TT1 #9,432).

## C.   Samuel

364.   SAMUEL expressed what I believe to be his tendency for violence numerous times throughout intercepted calls after he learned of issues that were occurring in Honduras with his family. During one call, SAMUEL relayed a conversation he had with an individual with whom SAMUEL was having issues: "I told him . . . I have the balls to kill you. I could get you killed tomorrow from here if I wanted to." (TT2 #5,799). During another intercepted call, SAMUEL said, "I'm nobody dude, but if I want to get someone killed, I do have someone." (TT2 #5,936).

144

### D.     Delcid

365.    On April 6, 2012, DELCID spoke with SAMUEL about what I believe to be cocaine customers of DELCID who failed to pay him the amount he was owed. DELCID said, "Those sons of bitches fucked me over. They were going to give me fourteen but when the time came they only had nine." SAMUEL replied, "They would give you nine but didn't say if they would owe the rest to you?" DELCID said, "I told them from the beginning, cash on delivery. . . . I was [thinking they could] harm me because I had a son of a bitch with me with a fucking nine. . . . The son of a bitch told them, 'Nobody will be pulling a fast one here because I'll put out whoever pulls a fast one.'" SAMUEL asked DELCID who he was with and DELCID provided a name. (TT2 #10,030). I believe customers of DELCID failed to pay him the previously agreed upon price for cocaine DELCID supplied to them and that DELCID's associate was armed with a 9mm handgun during the transaction for security because DELCID was worried the customers may try to harm him.

366.    On April 23, 2012, DELCID spoke with UCC #13 via text message about what I believe to be them working together and DELCID providing UCC #13 with a firearm in Honduras. DELCID sent UCC #13 a text message that said, "Yes [name redacted], I'm going to help you, work for me." (TT3 #4,696). UCC #13 replied, "Ok, I'm willing to do anything for you because I need some money that I owe and I want to purchase a pistol because you know that I travel long distance and it's necessary." (TT3 #4,698). DELCID replied, "I'll give you mine if you need it." (TT3 #4,699). UCC #13 said, "Well, if you have one I would only get a permit to carry it." (TT3 #4,700). DELCID said, "Yes, just tell me by when you want it or I could buy you one." (TT3 #4,701). UCC #13 said, "Well, you decide that, when you can I'll pay you with work and I'll try not to fail because I like to be punctual." (TT3 #4,702). I believe UCC #13 agreed to

work directly with DELCID in the trafficking of cocaine into the United States. I further believe UCC #13 wanted to obtain a firearm for protection in conducting his drug trafficking activities, and DELCID agreed to send UCC #13 his own or to purchase one for UCC #13.

## CONCLUSION

367.   Based on the foregoing, your affiant submits there is probable cause to believe that between in and around 2006 and the present date, within the Eastern District of Virginia and elsewhere, the defendants did unlawfully, knowingly, and intentionally combine, conspire, confederate, and agree with other persons, both known and unknown, to unlawfully, knowingly, and intentionally distribute 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

368.   I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Glenn Mai
Special Agent
Federal Bureau of Investigation

Sworn and subscribed to me this 8th day of May, 2012.

/s/ Thomas Rawles Jones, Jr.

Honorable T. Rawles Jones, Jr.
United States Magistrate Judge

146